**BIENERT KATZMAN LITTRELL WILLIAMS LLP**
John Littrell (SBN 221601)
Michael R. Williams (SBN 192222)
360 E. 2nd Street, Suite 625
Los Angeles, CA 90012
Tel.: (949) 369-3700
Fax: (949) 369-3701
jlittrell@bklwlaw.com
mwilliams@bklwlaw.com

*Local Counsel for Plaintiff United Union of Roofers, Waterproofers & Allied Workers Local Union No. 8 WBPA Fund*

*[Additional Counsel listed on Signature Page]*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED UNION OF ROOFERS, WATERPROOFERS & ALLIED WORKERS LOCAL UNION NO. 8 WBPA FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>THE TRADE DESK, INC., JEFFREY TERRY GREEN, and LAURA SCHENKEIN,<br><br>Defendants. | Case No.:  2:25-cv-01396<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff United Union of Roofers, Waterproofers & Allied Workers Local Union No. 8 WBPA Fund ("Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of public filings made by The Trade Desk, Inc. ("Trade Desk" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, shareholder communications, conference calls, and postings on the Trade Desk website concerning the Company's public statements; and (d) review of other publicly available information concerning the Company and the Individual Defendants (defined below).

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all persons or entities that purchased Trade Desk Class A common stock between May 9, 2024 and February 12, 2025, inclusive (the "Class Period") against Trade Desk and certain of its officers (collectively "Defendants") seeking to pursue remedies under the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78a, 78j(b), and 78t(a) (the "Exchange Act").

2.     Trade Desk operates globally as a technology company, offering a self-service, cloud-based, ad-buying platform that allows marketers to plan, manage, optimize, and measure data-driven ad campaigns.

3.     Leading up to the Class Period, Trade Desk launched Kokai on June 6, 2023, a generative artificial intelligence ("AI") forecasting tool that enables users to more effectively deploy advertising spending. In a press release announcing the Kokai launch, Trade Desk described Kokai as a "co-pilot to the programmatic

1

marketer" that digests over 13 million advertising impressions every second, helping "advertisers buy the right ad impressions, at the right price, to reach the target audience at the best time."

4.      Immediately after the Kokai launch, Trade Desk began rolling out Kokai ("the Kokai Rollout") as the Company began transitioning its clients to Kokai from the Company's older ad-buying platform Solimar, among other things. Trade Desk touted the transition to investors as a seamless "switch over to the new" platform, and one "without the disruption that comes from yanking something out of the box and maybe having something totally hate it and just be angry." Trade Desk further claimed to expect "full adoption" of Kokai "over the course of 2024[.]"

5.      Despite the alleged simplicity of the Kokai Rollout, including with respect to transitioning clients, CEO Green repeatedly expressed the importance of Kokai to the Company's business, describing it as the "largest platform overhaul in our [C]ompany's history."

6.      Moreover, Kokai was held out to investors as an integral component of the Company's ability to gain share in "key growth markets[,]" including the connected TV ("CTV") market. Before the start of the Class Period, Defendants affirmed prior estimates that, from the June 2023 launch, Kokai "would take about a year to roll out in its entirety."

7.      Throughout the Class Period, Defendants repeatedly touted the value that the Kokai Rollout was providing to the Company's clients, as well as Kokai's positive impact on Trade Desk's revenue metrics. For example, after markets closed on May 8, 2024, during an earnings call in connection with Trade Desk announcing its financial results for the first quarter of 2024, CEO Green stated, "I believe our revenue growth acceleration in the first quarter speaks to the innovation and value that we are delivering to our clients with Kokai."

8.      Additionally, on August 8, 2024, during the earnings call discussing Trade Desk's financial results for the second quarter of 2024, CEO Green touted the progress of the Kokai Rollout, stating, "I've been incredibly encouraged by the early results from Kokai[,]" while highlighting that the "campaigns that have moved from Solimar to Kokai in aggregate, incremental reach is up more than 70%." That same day, CEO Green further stated, "I firmly believe that we have met the moment with Kokai."

9.      These statements, among others, were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects to make the statements made, in light of the circumstances under which they were made, not false and misleading. Specifically, Defendants failed to disclose that: (1) Trade Desk was experiencing significant, ongoing, self-inflicted execution challenges rolling out Kokai, including transitioning clients to Kokai from the Company's older platform Solimar; (2) such execution challenges meaningfully delayed the Kokai Rollout; (3) Trade Desk's inability to effectively execute the Kokai Rollout negatively impacted the Company's business and operations, particularly revenue growth; and (4) as a result of the above, Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

10.     The truth emerged after markets closed on February 12, 2025, when Trade Desk issued a press release announcing its financial results for the fourth quarter and full year of 2024. In the press release, Trade Desk reported fourth quarter revenue of $741 million—below the Company's previously issued guidance of $756 million and analysts' estimates of $759.8 million. Additionally, Trade Desk's revenue guidance of at least $575 million for the first quarter of 2025 missed analysts' estimates of $581.5 million.

11.    During the earnings call held that same day, CEO Green disclosed that Trade Desk has yet to reach full adoption of Kokai, as the Company is "maintaining 2 systems, Solimar and Kokai.  This slows us down."

12.    Later, on that same call, in response to a Cannonball Research analyst expressing concern regarding "issues with Kokai rollout pace," CEO Green simply stated, "you're right, that Kokai rolled out slower than we anticipated."  However, while addressing that same analyst question, CEO Green later explained that "in some cases, the slower Kokai rollout was deliberate."

13.    On this news, the price of Trade Desk Class A common stock dropped $40.31 per share, or more than 32%, from a closing price of $122.23 per share on February 12, 2025, to a closing price of $81.92 per share on February 13, 2025.

14.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in market value of the Company's Class A common stock when the truth was disclosed, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa).

17.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public,

and the omission of material information, occurred in substantial part in this Judicial District, as Trade Desk is headquartered in this Judicial District.

18.    In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## **PARTIES**

19.    Plaintiff United Union of Roofers, Waterproofers & Allied Workers Local Union No. 8 WBPA Fund is a public pension fund based in Long Island City, New York that provides retirement benefits for active and retired police officers and their beneficiaries.   The fund oversees assets under management in excess of $250 million on behalf of approximately 1,500 active and retired participants.   As set forth in the accompanying certification, incorporated by reference herein, Plaintiff purchased Trade Desk Class A common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

20.    Defendant Trade Desk is incorporated under the laws of Nevada, with its principal executive offices located in Ventura, California.  The Company's Class A common stock trades on the Nasdaq Global Select Market (the "Nasdaq") under the ticker symbol "TTD."

21.    Defendant Jeffrey Terry Green ("CEO Green") has served as the Company's Co-Founder, Chairman, President, and Chief Executive Officer ("CEO") at all relevant times.

22.    Defendant Laura Schenkein ("CFO Schenkein") served as the Company's Chief Financial Officer ("CFO") at all relevant times.

23.    Defendants CEO Green and CFO Schenkein (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and

authority to control the contents of the Company's reports to the SEC, shareholder letters, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

24. The Company and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

25. Trade Desk is a global technology company, offering a self-service, cloud-based, ad-buying platform that allows marketers to plan, manage, optimize, and measure data-driven ad campaigns.

26. On June 6, 2023, Trade Desk issued a press release announcing the launch of Kokai. Kokai is a generative AI forecasting tool that enables users to better predict the benefit of advertising spending. Specifically, Kokai's AI capabilities include predictive clearing, which enables traders to bid at the optimal level, scoring ad impressions based upon relevance to the advertiser, budget optimization, and key performance indicator ("KPI") scoring. In a press release announcing the Kokai launch, Trade Desk touted Kokai as a "co-pilot to the programmatic marketer" that digests over 13 million advertising impressions every

second, helping "advertisers buy the right ad impressions, at the right price, to reach the target audience at the best time."

27.    Thereafter, Trade Desk began the Kokai Rollout, which included transitioning its clients to Kokai from the Company's older ad-buying platform Solimar.  Trade Desk described the transition as one where clients can simply "switch over to the new" platform.  Moreover, the Company expected "full adoption" of Kokai "over the course of 2024[,]" "without the disruption that comes from yanking something out of the box and maybe having something totally hate it and just be angry."

28.    CEO Green repeatedly expressed the importance of Kokai to the Company's business, describing it as the "largest platform overhaul in our [C]ompany's history."  CEO Green further highlighted Kokai as an integral component of the Company's ability to "continue to gain share, especially in key growth markets such as CTV" (*i.e.*, connected TV).  In the months leading up to the Class Period, Defendants affirmed prior estimates that, from the June 2023 launch, Kokai "would take about a year to roll out in its entirety."

**Defendants' Materially False and Misleading Statements<br>Issued During the Class Period**

29.    The Class Period begins on May 9, 2024.  After the markets closed the prior day on May 8, 2024, Trade Desk issued a press release announcing its financial results for the first quarter of 2024, ended March 31, 2024.  In the press release, Trade Desk reported first quarter revenue of $491 million, representing growth of 28% year-over-year.  Within the press release, CEO Green stated:

> With the continued strong growth of [connected TV], the growing ubiquity of UID2, new approaches to authentication, greater deployment of first-party data and retail data, and with significant AI advances in our Kokai platform, we are better positioned than ever to deliver

premium value to advertisers and continue to gain market share.

30.     During the corresponding earnings call held that same day, CEO Green touted the success of the Kokai Rollout, stating, "I believe our revenue growth acceleration in the first quarter speaks to the innovation and value that we are delivering to our clients with Kokai."  CEO Green further highlighted how Kokai will allow its users to capitalize on advertising opportunities beyond the technology conglomerates, such as Facebook, Instagram, and Google, *i.e.*, the "open Internet," stating:

> And the innovations in our Kokai platform will help our clients take advantage of this revaluation and fully leverage data-driven buying to fuel their own business growth. As a result, I've never been more optimistic about the future of the open Internet and our ability to gain more than our fair share of the nearly $1 trillion advertising [total addressable market].

31.     On the same call, CFO Schenkein reiterated the role of Kokai in propelling the Company's growth, stating, "All of our progress in areas such as CTV, Retail Media, Kokai and UID2 helped deliver another quarter of consistently strong growth and profitability to start 2024."

32.     On August 8, 2024, after the markets closed, Trade Desk issued a press release announcing its financial results for the second quarter of 2024, ended June 30, 2024, reporting second quarter revenue of $585 million and 26% revenue growth year-over-year.  In the press release, CEO Green emphasized that as Kokai continues to roll out, the Company is "intuitively surfacing value for advertisers, integrating data into every decision, advancing the full power of AI as a co-pilot, and enabling advertisers to maximize the potential of their first party data."

33.    During the corresponding earnings call held that same day, CEO Green touted Kokai's use case, stating:

> In order to help advertisers think about efficacy in new ways and to help them take advantage of the premium open Internet where consumers are most leaned in, after years of development, we launched our most ambitious platform to date, Kokai.  Kokai allows our clients to deploy data about their most loyal customers and then use that data as a seed to grow and harvest the next generation of loyal customers.

34.    During that same call, regarding the Kokai Rollout, CEO Green further proclaimed, "I've been incredibly encouraged by the early results from Kokai[,]" while highlighting that the "campaigns that have moved from Solimar to Kokai in aggregate, incremental reach is up more than 70%[,]" and "[c]ost per acquisition has improved by about 27% as data elements per impression have gone up by about 30%." CEO Green further explained that "performance metrics have improved by about 25%, helping to unlock performance budgets on our platform for years to come."

35.    Referencing his earlier remarks during the same call about "meeting with many [chief marketing officers]" ("CMOs") from global brands who are "putting a premium on the efficacy of marketing,"  CEO Green stated, "Given everything I said about what CMOs today are trying to accomplish and the pressures that they are under, I firmly believe that we have met the moment with Kokai."

36.    On November 7, 2024, after the markets closed, Trade Desk issued a press release announcing its financial results for the third quarter of 2024, ended September 30, 2024, reporting third quarter revenue of $628 million and providing fourth quarter revenue guidance of $756 million.  In the press release, CEO Green stated, "[T]he performance improvements that our clients are seeing with Kokai -

9

our largest platform upgrade to date - showcase the value of audience-driven, AI-enabled innovation."

37.    During the accompanying earnings call held that same day, CEO Green once again assured investors that "[w]e are already seeing the results of Kokai performance today, but we're just getting started."  CFO Schenkein further touted that "[k]ey investment initiatives, including performance advancements in our Kokai platform . . . are not only strengthening our foundation, but position us for durable growth in 2025 and beyond."

38.    During the question-and-answer portion of the call, a RBC Capital analyst asked:

> [W]hat type of work does it take to help CMOs and the users understand the metrics coming out of Kokai but also to kind of gain trust around them? I know that's been a challenge in some other walled garden platforms, so people trusting the attribution data.

39.    In response, CEO Green stated:

> I really appreciate the question because I think this is one of the more nuanced ways that we have just so much opportunity in front of us. . . .   But the state of measurement is that walled gardens have essentially been grading their own homework for many, many years.  And one of the things that they've done really well is convinced people to use their own metrics and kept things quite simple.  But at times, that's been really difficult for some of the biggest brands in the world because they'll be told by a walled garden, we help you sell 101 toothbrushes, when the company actually only sold 100 toothbrushes total. . . .

40.    The above statements set forth in ¶¶ 29-39 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects to make the statements made, in light of the

circumstances under which they were made, not false and misleading. Specifically, Defendants failed to disclose that: (1) Trade Desk was experiencing significant, ongoing, self-inflicted execution challenges rolling out Kokai, particularly in transitioning clients to Kokai from the Company's older platform Solimar; (2) such execution challenges meaningfully delayed the Kokai Rollout; (3) Trade Desk's inability to effectively execute the Kokai Rollout negatively impacted the Company's business and operations, including revenue growth, and (4) as a result of the above, Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### The Truth Emerges

41.     The truth regarding the Kokai Rollout execution challenges that Trade Desk had been facing emerged after markets closed on February 12, 2025. Specifically, Trade Desk issued a press release announcing its financial results for the fourth quarter and full year of 2024, ended December 31, 2024. In the press release, Trade Desk reported fourth quarter revenue of $741 million—below the Company's previously issued guidance of $756 million and analysts' estimates of $759.8 million. Additionally, Trade Desk provided revenue guidance of at least $575 million for the first quarter of 2025, missing analysts' estimates of $581.5 million.

42.     In the press release, CEO Green stated, "[W]e are disappointed that we fell short of our own expectation in the fourth quarter." Moreover, CEO Green explained that the Company "undertook a reorganization to accelerate opportunities across CTV, retail media, identity, supply chain optimization, and audio[,] while forging ahead with innovations like Kokai. . . ."

43.     During the corresponding earnings call held that same day, CEO Green disclosed that Trade Desk has yet to onboard all of its clients onto Kokai, stating,

"[W]e'll move 100% of our clients to Kokai this year. Now the majority already have. But today, we're maintaining 2 systems, Solimar and Kokai. This slows us down. Kokai is more effective in almost every way."

44.   During that same call, in response to a Cannonball Research analyst expressing concern regarding "issues with Kokai rollout pace," CEO Green plainly stated, "you're right, that Kokai rolled out slower than we anticipated." However, while addressing that same analyst question, CEO Green later explained that "in some cases, the slower Kokai rollout was deliberate."

45.   Analysts swiftly reacted to the disappointing pace of the Kokai Rollout. For example, in a report titled "Debacle Leads To Doghouse," Wedbush Securities analysts cut their price targets and reported:

> Management attributed the miss in 4Q to a series of several, small execution mistakes (including a delayed rollout of the company's Kokai platform) while 1Q guidance signals management has decided to more aggressively invest in strategic initiatives this year.

46.   Additionally, in a report titled "Too Many Turnovers, On To The Next," Cantor Fitzgerald analysts also cut their price targets and noted that "slower rollout of Kokai (missed 50% EOY adoption goal) also weighed on 4Q revs."

47.   Moreover, William Blair analysts published a report in response to the disclosure, homing in on the fact that "the company is maintaining two systems: Kokai and Solimar. While the majority of clients are already exclusively using Kokai, select clients are still utilizing Solimar but plan to shift by the end of 2025."

48.   On this news, the price of Trade Desk Class A common stock dropped $40.31 per share, or more than 32%, from a closing price of $122.23 per share on February 12, 2025, to a closing price of $81.92 per share on February 13, 2025.

**CLASS ACTION ALLEGATIONS**

49.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons and entities that purchased Trade Desk Class A common stock between May 9, 2024 and February 12, 2025, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

50.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Throughout the Class Period, the Class A common stock of Trade Desk actively traded on the Nasdaq (an open and efficient market) under the ticker symbol "TTD."  Millions of Trade Desk shares were traded publicly during the Class Period on the Nasdaq.  As of September 26, 2024, Trade Desk had more than 449 million shares of Class A common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Trade Desk or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

51.    Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

52.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests that conflict with those of the Class.

53.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b.    whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c.    whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, operations, and prospects of Trade Desk;

d.    whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Trade Desk;

e.    whether the market price of Trade Desk Class A common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.    the extent to which the members of the Class have sustained damages and the proper measure of damages.

54.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## <u>UNDISCLOSED ADVERSE INFORMATION</u>

55.    The market for Trade Desk Class A common stock was an open, well-developed, and efficient market at all relevant times.  As a result of the materially false and/or misleading statements and/or omissions particularized in this Complaint, the Company's Class A common stock traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased the Company's Class A common stock relying upon the integrity of the market price of the Company's Class A common stock and market information relating to Trade Desk and have been damaged thereby.

56.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of the Company's Class A common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about the Company's business, operations, and prospects as alleged herein.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, thus causing the Company's Class A common stock shares to be overvalued and artificially inflated or maintained at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class who purchased the Company's Class A common stock at artificially inflated prices and were harmed when the truth was revealed.

**SCIENTER ALLEGATIONS**

57.   As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

58.   As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Trade Desk, their control over, receipt, and/or modification of the Company's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Trade Desk, participated in the fraudulent scheme alleged herein.

**INAPPLICABILITY OF STATUTORY SAFE HARBOR**

59.   The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.   The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

60.   In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of

those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Trade Desk who knew that the statement was false when made.

## LOSS CAUSATION

61.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

62.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market.  This artificially inflated the prices of the Company's Class A common stock and operated as a fraud or deceit on the Class.  When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of the Company's stock fell precipitously, as the prior artificial inflation came out of the price.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

63.     The market for Trade Desk Class A common stock was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Trade Desk Class A common stock traded at artificially inflated and/or maintained prices during the Class Period.  Plaintiff and other members of the Class purchased the Company's Class A common stock relying upon the integrity of the market price of Trade Desk Class A common stock and market information relating to Trade Desk and have been damaged thereby.

64.    At all times relevant, the market for Trade Desk Class A common stock was an efficient market for the following reasons, among others:

a.    Trade Desk was listed and actively traded on Nasdaq, a highly efficient and automated market;

b.    As a regulated issuer, Trade Desk filed periodic public reports with the SEC and/or the Nasdaq;

c.    Trade Desk regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d.    Trade Desk was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

65.    As a result of the foregoing, the market for Trade Desk Class A common stock promptly digested current information regarding Trade Desk from all publicly available sources and reflected such information in the Company's stock price.  Under these circumstances, all purchasers of Trade Desk Class A common stock during the Class Period suffered similar injury through their purchase and/or acquisition of stock at artificially inflated prices, and a presumption of reliance applies.

66.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions.  Because this action involves

Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNTS AGAINST DEFENDANTS

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

67. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

68. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Trade Desk Class A common stock; and (iii) cause Plaintiff and other members of the Class to purchase Trade Desk Class A common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

69. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's Class A common stock in an effort to maintain artificially high market prices for Trade Desk Class A common stock in violation of Section 10(b)

of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

70. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's business, operations, and prospects, as specified herein. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the Company's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Trade Desk and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's Class A common stock during the Class Period.

71. Each of the Individual Defendants' primary liability and controlling-person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access

to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

72.   Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its Class A common stock.  As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

73.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Trade Desk Class A common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the shares and stock traded or trades, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class

purchased Trade Desk Class A common stock during the Class Period at artificially inflated prices and were damaged thereby.

74.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff, the other members of the Class, and the marketplace known of the truth regarding the problems that Trade Desk  was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased Trade Desk Class A common stock, or, if they had purchased such shares or stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

75.    By virtue of the foregoing, Trade Desk and the Individual Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

76.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's Class A common stock during the Class Period.

## COUNT II
### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

77.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

78.    The Individual Defendants acted as controlling persons of Trade Desk within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and

misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

79.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

80.    As set forth above, Trade Desk and the Individual Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's Class A common stock during the Class Period.

## PRAYER FOR RELIEF

81.    WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

a)    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)    Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

c)    Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)      Awarding such other relief as this Court deems appropriate.

## JURY DEMAND

82.    Plaintiff demands a trial by jury.

Dated: February 19, 2025

Respectfully submitted,

**BIENERT KATZMAN
LITTRELL WILLIAMS LLP**
*/s/ John Littrell*

John Littrell (SBN 221601)
Michael R. Williams (SBN 192222)
360 E. 2nd Street, Suite 625
Los Angeles, CA 90012
Tel.: (949) 369-3700
Fax: (949) 369-3701
jlittrell@bklwlaw.com
mwilliams@bklwlaw.com
*Local Counsel for Plaintiff United Union of
Roofers, Waterproofers & Allied Workers
Local Union No. 8 WBPA Fund*

**SAXENA WHITE P.A**
David R. Kaplan (SBN 230144)
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Fax: (858) 369-0096
dkaplan@saxenawhite.com

Marco A. Dueñas (*pro hac vice forthcoming*)
10 Bank Street, Suite 882
White Plains, New York 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
mduenas@saxenawhite.com
*Counsel for Plaintiff United Union of
Roofers, Waterproofers & Allied Workers
Local Union No. 8 WBPA Fund*

## **CERTIFICATION AND AUTHORIZATION**

I, Nick Siciliano, on behalf of United Union of Roofers, Waterproofers & Allied Workers Local Union No. 8 WBPA Fund ("Local 8"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I have reviewed a complaint prepared against The Trade Desk, Inc. ("Trade Desk") alleging violations of the federal securities laws and authorized its filing. I am authorized in my capacity as Business Manager of Local 8 to initiate litigation and to execute this Certification on behalf of Local 8.

2.  Local 8 did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.  Local 8 is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.  Local 8's transactions in Trade Desk common stock during the Class Period are set forth in the attached Schedule A.

5.  Local 8 has sought to serve and was appointed as lead plaintiff and/or representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

    *Peneycad v. RTX Corp.*, No. 3:23-cv-1035 (D. Conn.).

6.  Local 8 has sought to serve as a lead plaintiff or representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff appointment, was not appointed lead plaintiff, or the lead plaintiff decision is still pending: *None*.

7.  Local 8 will not accept any payment for serving as a representative party on behalf of the Class beyond Local 8's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this  19th  day of February, 2025.

*United Union of Roofers, Waterproofers &*
*Allied Workers Local Union No. 8 WBPA*
*Fund*

*Nick Siciliano*
Nick Siciliano (Feb 19, 2025 11:46 EST)

Nick Siciliano, Business Manager

2

**SCHEDULE A**
**United Union of Roofers, Waterproofers & Allied Workers Local Union No. 8 WBPA Fund**
**Transactions in The Trade Desk, Inc.**

| Common Stock Purchases | | |
|---|---|---|
| **Date** | **Shares** | **Price** |
| 11/08/24 | 659 | $125.5300 |
| 11/08/24 | 937 | $125.5300 |
| 12/16/24 | 631 | $132.0300 |
| 12/16/24 | 898 | $132.0300 |
| 12/27/24 | 42 | $120.9200 |
| 12/27/24 | 57 | $120.9200 |

| Common Stock Sales | | |
|---|---|---|
| **Date** | **Shares** | **Price** |
| | | |