**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel.: (310) 819-3481

*Counsel for Lead Plaintiff Public Employees'*
*Retirement System of Mississippi,*
*and Lead Counsel for the Class*

**COHEN MILSTEIN SELLERS**
  **& TOLL PLLC**
Laura H. Posner (admitted *pro hac vice*)
(lposner@cohenmilstein.com)
88 Pine Street, 14th Floor
New York, NY 10005
Tel.: (212) 220-2925

*Counsel for Lead Plaintiff Arkansas Public*
*Employees' Retirement System, and Lead Counsel*
*for the Class*

[Additional counsel in signature block]

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re The Trade Desk, Inc. Securities Litigation* | Case No.: 2:25-cv-01396-CAS-DFM |
| | <u>CLASS ACTION</u> |
| | **FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| | **DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................1

II.   JURISDICTION AND VENUE...................................................................7

III.  THE PARTIES AND WITNESSES ...........................................................7

    A.    Plaintiffs .............................................................................................7

    B.    Defendants..........................................................................................8

IV.  SUBSTANTIVE ALLEGATIONS OF FRAUD ......................................10

    A.    The Trade Desk Business and Revenue Model .....................................10

    B.    The Critical Importance of Trade Desk's Transition to Kokai................11

    C.    Kokai Adoption Lagged and Failed to Drive Revenue Growth .............12

        (1)    Defendants' Representations Regarding Adoption Were False and Misleading ..........................................................15

            a)    TTD's Claimed Adoption Rates Were Inconsistent with Internal Numbers..............................................15

            b)    TTD Manipulated its Metrics to Support False Claims About Adoption...................................................16

            c)    Personnel Vacuum Contributed to Slow Adoption.............17

        (2)    Defendants Knew or Recklessly Disregarded the Truth About Lagging Adoption..................................................18

            a)    Tableau and Other Written Reports.....................................18

            b)    Internal Acknowledgment, Including by Defendant Green, at All-Hands Meetings of Kokai's slow adoption ...............................................................................20

    D.    Kokai Suffered from Serious Performance Issues and Product Defects................................................................................................21

        (1)    Key Kokai Features Were Defective and Undeveloped................24

        (2)    Kokai Could Not Integrate First-Party Data Necessary for Improved Ad Targeting in Certain Key Client Markets................28

        (3)    Kokai Failed Basic Tests of Platform Accuracy ..........................31

        (4)    Trade Desk Manipulated Kokai's Key Performance Metrics .......32

        (5)    Kokai Had Significant Pacing Problems .....................................32

(6)    Kokai's Unnavigable Interface Violated Basic User Interface and User Experience Principles ....................................33

E.    The Truth Emerges .........................................................................39

(1)    February 12, 2025: The Bottom Starts to Fall Out ........................40

(2)    March 11, 2025: Investors Learn About Certain of Kokai's Fundamental Defects ....................................................................42

(3)    August 7, 2025: Investors Learn the Full Extent of Kokai's Impediment to Revenue Growth ....................................................44

F.    While Investors Were Harmed, the Executive Defendants Enriched Themselves with Over $465 Million in Proceeds From Insider Sales ....................................................................................................45

(1)    The Executive Defendants Engaged in Massive Sales of Their Trade Desk Stock by Absolute Number, Proceeds, and Percentage of Shares Available to Sell ..........................................46

(2)    The Executive Defendants' Stock Sales Vastly Exceeded Their Control Period Sales ..........................................................46

(3)    The Timing of the Executive Defendants' Stock Sales Was Suspicious ....................................................................................47

(4)    The Executive Defendants' Stock Sales Allowed Them to Avoid Hundreds of Millions of Dollars in Losses ........................49

(5)    The Executive Defendants' 10b5-1 Trading Plans Do Not Immunize Them .........................................................................50

(6)    The Executive Defendants' Stock Sales Were Made Contemporaneous to Lead Plaintiff's Purchases ...........................51

V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ...............................................................................................52

A.    November 15, 2023—RBC Global TIMT Conference .........................53

B.    February 15, 2024—2023 Fourth Quarter Results ..............................54

C.    May 8, 2024—2024 First Quarter Results ...........................................56

D.    May 17, 2024—DMS by Luma Conference .........................................58

E.    June 3, 2024—Trade Desk Video .......................................................59

F.    June 25, 2024—Trade Desk Video .....................................................60

G.    June 28, 2024—Press Release ...........................................................61

H.    August 8, 2024—2024 Second Quarter Results ..................................62

I.     November 7, 2024—2024 Third Quarter Results & Analyst Call-Backs .................................................................................................... 64

J.     May 8, 2025—2025 First Quarter Results ................................... 68

VI.    LOSS CAUSATION ...................................................................... 70

A.    February 12, 2025: Defendants Disclose the Company's First-Ever Revenue Miss Due to Lagging Kokai Adoption ...................................... 70

B.    March 11, 2025: *AdWeek* Exposé Reveals Kokai Product Failures ........ 72

C.    August 7, 2025: Defendants Admit to the Extent of Kokai's Negative Impact ................................................................................... 73

VII.   ADDITIONAL SCIENTER ALLEGATIONS ...................................... 73

VIII.  APPLICABILITY OF PRESUMPTION OF RELIANCE ............................. 79

IX.    NO SAFE HARBOR ...................................................................... 80

X.    CLASS ACTION ALLEGATIONS ................................................... 81

COUNT I ......................................................................................... 83

VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5(B) PROMULGATED THEREUNDER (AGAINST ALL DEFENDANTS) ................................................................................... 83

COUNT II ........................................................................................ 84

FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE EXECUTIVE DEFENDANTS AS CONTROL PERSONS OF THE TRADE DESK ................................................................................... 84

COUNT III ....................................................................................... 85

FOR VIOLATION OF SECTION 20A OF THE EXCHANGE ACT AGAINST THE EXECUTIVE DEFENDANTS ................................................. 85

XI.    PRAYER FOR RELIEF .................................................................. 86

XII.   JURY DEMAND ........................................................................... 86

Court-appointed Lead Plaintiff Arkansas Public Employees Retirement System and Public Employees' Retirement System of Mississippi ("Lead Plaintiff") brings this action pursuant to Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (15 U.S.C. § 75a et seq., the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), on behalf of themselves and a class consisting of all persons and entities that purchased The Trade Desk, Inc. common stock ("TTD stock") from November 15, 2023, through August 8, 2025, inclusive (the "Class Period"). This Action is brought against Defendants The Trade Desk, Inc. ("Trade Desk," "TTD," or "the Company"), Trade Desk's Chief Executive Officer and Chairman Jeff Green, former Chief Financial Officer ("CFO") Laura Schenkein, and director and Chief Strategy Officer Samantha Jacobson (the "Executive Defendants" and, together with TTD, "Defendants").

Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts, upon information and belief as to all other matters, and upon the investigation of counsel, which included, among other things, review and analysis of: (i) TTD's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) public statements by TTD and its executives, including in press releases, on earnings or other analyst conference calls, in the news, on TTD's YouTube, LinkedIn and "X" channels, and on other social media sites; (iii) interviews of former employees and clients of TTD; (iv) securities analysts reports, news articles, and other publicly available sources; and (v) the whistleblower complaint filed by former TTD employee James Wagner on June 27, 2025. Lead Plaintiff believes that additional evidentiary support will arise for the allegations set forth herein after an opportunity for discovery.

## I.    **INTRODUCTION**

1.    This case arises from misstatements and omissions by Trade Desk and its senior officers regarding Trade Desk's critical new ad-buying platform called Kokai. Throughout the Class Period, Defendants touted, and analysts and the market believed, that Kokai—the Company's key product—had been quickly adopted by Trade Desk

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1

Case No. 2:25-cv-01396-CAS-DFM

customers and was driving revenue to the Company. As Defendants knew, but hid from investors, the reality was far different: adoption of Kokai was lagging and, as a result, it was not driving revenue; critical features of the platform simply did not work or had not yet even been developed; and Defendants were manipulating metrics to conceal Kokai's wide-ranging deficiencies. Defendants' knowledge of the true facts is clear—indeed, Defendant Green regularly spoke about Kokai's lagging adoption at internal, all-hands Company meetings, and Defendants were regularly apprised of client dissatisfaction and Kokai's deficiencies by the sales, marketing, and product teams and via metrics and client testimonials available on internal Tableau dashboards and reports.

2. Ultimately, the truth came out in three parts. First, on February 12, 2025, Defendants admitted that Kokai adoption was slower than expected due to the Company's execution missteps, resulting in Trade Desk's first-ever revenue miss. This news caused Trade Desk's stock price to plummet, dropping an extraordinary 30%—the biggest single-day market capitalization drop in Company history. Then, just a few weeks later, on March 11, 2025, an *AdWeek* exposé revealed for the first time that Kokai was suffering from fundamental deficiencies, causing serious client complaints and the lagging adoption rates, and resulting in a "reduc[tion in] the use and function of The Trade Desk's buying platform." Finally, due to Kokai's continued deficiencies and incomplete adoption, the Company disclosed on August 7, 2025, lower-than-expected revenue growth and the departure of its CFO, Defendant Schenkein, which caused Trade Desk's stock to plummet again by an additional 39%.

3. Trade Desk is a digital advertising purchasing platform. It promises to help clients efficiently purchase advertising space on websites, mobile devices, electronic billboards, and other digital spaces that are targeted to the key consumer demographics that advertisers want to reach. TTD earns revenue when clients spend money to buy ad space through its platform by charging for a percentage of the money spent buying ad space.

FIRST AMENDED CONSOLIDATED    2    Case No. 2:25-cv-01396-CAS-DFM
CLASS ACTION COMPLAINT

4.      Prior to the start of the Class Period, TTD's ad buying platform was called Solimar, which was launched in 2021.  Solimar was well-received and user-friendly and, due to its popularity with clients, TTD grew in revenue from $1.2 billion to $1.9 billion in just two years.

5.      But in June 2023, Defendant Green abruptly announced that TTD would be built around a new platform called Kokai, which would replace Solimar.

6.      Publicly, Defendants claimed that Kokai was a "major advance" in advertiser performance, representing a "completely new way to understand and score the relevance of every" ad placement that "pull[ed] together the best access of inventory across the open internet" and offering a "curated and simplified list of options" for users. They told investors that Kokai was quickly adopted by clients and driving revenue growth at the Company, first claiming that "50% of all TTD customers have now adopted Kokai" and it would be fully adopted by the end of 2024, and then later—when the end of 2024 had come and passed—that Kokai adoption was still swift and its performance was exceptional.  These claims mattered to the market: analysts believed, based on Defendants' assurances, that Kokai was a "key upside revenue driver" that drove "[c]onfidence in future growth" and made TTD "particularly attractive."

7.      The reality, of which Defendants were keenly aware, was far different. TTD clients had not adopted Kokai as represented and, as such, Kokai was not driving the promised revenue growth.  Further, Kokai did not provide the exceptional performance or features Defendants claimed it did; rather, Kokai suffered from a host of material deficiencies, including, among other things, that: clients could not execute "programmatic guarantee deals" with Kokai, a method of purchasing ad space at a high volume for a fixed price which TTD's clients highly preferred; Kokai could not accurately assess and measure "Relevance," which is a key metric to determine if ads are reaching appropriate audiences; and Kokai's full functionality was not usable for key Trade Desk client sectors like healthcare and politics, because it could not properly "seed" (*i.e.*, calibrate Kokai's algorithm based on external data) the platform to best

FIRST AMENDED CONSOLIDATED          3          Case No. 2:25-cv-01396-CAS-DFM
CLASS ACTION COMPLAINT

target audiences in those sectors. As a result, clients were rejecting Kokai, fleeing to competitors, and stagnating or even reducing their spending on the platform. Indeed, despite Defendants' claims, Kokai is still not fully adopted as of today, key features are still in the development phase, Trade Desk's growth has slowed considerably, and clients continue to flock to competitors.

8.   To conceal Kokai's lagging adoption rates, Defendants manipulated the numbers. Among other things, Defendants claimed that clients who merely had access to Kokai were not just converted, but "enthusiastically adopt[ing]" Kokai, even if they were not actually using the new platform. They touted meaningless performance metrics. And they selectively chose positive client stories to highlight to investors, while concealing the vast numbers of Trade Desk clients who reported dissatisfaction with Kokai and saw no improvement in ad campaigns as compared to Solimar.

9.   Defendants were well aware of Kokai's concealed failings. Throughout the Class Period, Defendants were laser-focused on and routinely advised of the lagging Kokai adoption rate and the fundamental deficiencies with the platform. Specifically, internal Tableau dashboards regularly viewed by the Executive Defendants gave them real-time reports regarding Kokai's sluggish adoption, transition and reversion rates, poor sales and product usage rates, and lack of feature-level engagement. The Executive Defendants also received weekly reports and other information on Kokai adoption and performance metrics, including the percentage of client business that had migrated from Solimar to Kokai, and participated in weekly all-hands meetings where these issues were regularly discussed. During these meetings and on Defendant Green's "world tour" of TTD clients in early 2024, the Executive Defendants also learned that Kokai's performance was significantly lacking, including that its "Relevance" metric, a key feature for clients to determine if their ads were reaching the correct target audience, was inconsistent and unreliable.

10.   The truth began to be revealed on February 12, 2025, when investors learned that Kokai was not the revenue driver that Defendants had claimed for the last

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                4                Case No. 2:25-cv-01396-CAS-DFM

fifteen months.  That day, TTD announced its earnings for the fourth quarter of 2024, missing revenue expectations for the first time in TTD's history.  Defendants conceded that the miss was not due to macro-economic factors or issues out of their control.  Rather, they explicitly admitted that the miss was "our fault," the Company took "full ownership of the shortfall," and "this miss was not due to a lack of opportunity or increased competition; it was on us."  Defendants revealed what they had known throughout the past fifteen months: TTD "stumbled" due to "execution missteps" and "Kokai rolled out slower than we anticipated."  Defendants also admitted that, because clients had not fully adopted Kokai, the Company was stuck "maintaining two systems, Solimar and Kokai [which] slows [TTD] down."  This news caused TTD's stock price to plummet *over 30%*, from $122.23 to $81.92, then *the largest single-day market capitalization drop in the Company's history*, causing *nearly $20 billion* in Company valuation to evaporate overnight.  As analysts at CSIMarket explained:

> The fervor surrounding Kokai was palpable, with The Trade Desk offering bold assertions about its capabilities. The firm had been vocal about what it termed the massive benefits the platform would offer, describing its initial performance as robust and suggesting that the best was yet to come. Statements such as we're already seeing results from Kokai performance today and we're just getting started helped cultivate a narrative of unstoppable growth and innovation within the company. *However, those statements now seem hollow following recent financial disclosures. The disjunction between the optimistic outlook previously presented and the revenue shortfall calls into question the accuracy of the information shared with investors and the public.*

11.     Then, an exposé in *AdWeek*, published aftermarket hours behind a paywall on March 11, 2025, revealed that TTD had *not* suffered from "small" execution errors (as Defendants claimed the month prior), but rather suffered admittedly self-imposed critical failures in attracting and retaining customers to Kokai, enticing them to increase their spend through the platform.  Over the next forty-eight hours, the *AdWeek* exposé became more widespread on social media, ultimately resulting in another significant stock price drop by market close March 13, 2025.  As analysts at Needham reported the same day:

> Th[is] is self-harm, pure and simple. Either Kokai is too hard to use, or too

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT        5        Case No. 2:25-cv-01396-CAS-DFM

expensive, or not good enough to shift away from Solimar. In any case, the blame here is squarely on TTD's poor execution during 2024.

Analysts at KeyBanc likewise reported on March 16 that "[s]tories of Kokai frustration persist," specifically citing the *AdWeek* report and noting "general frustration over Kokai's periodic table of ad buying."

12.     Finally, after the market closed on August 7, 2025, the Company admitted to slower-than-expected revenue growth. While the Company attempted to attribute the downturn to a multitude of reasons, analysts understood that the bearish results were, in large measure, due to the continued, slower-than-represented adoption of Kokai—including only an 8% increase measured in overall spend compared to the previous quarter's stated adoption. Upon this disclosure, TTD's stock again plummeted, this time by an additional 39%.

13.     As the truth was fully revealed, investors lost a staggering ***$42 billion in shareholder value*** from December 4, 2024, to August 8, 2025, alone.

14.     While investors were suffering these extreme losses, the Executive Defendants were profiting tremendously from insider sales of their shares at prices inflated by their misrepresentations. Over the course of the Class Period, ***Defendants sold more than $465 million*** of their stock, with Defendant Green selling over $443 million; Defendant Schenkein selling $18 million; and Defendant Jacobson selling an additional $7 million. These sales vastly exceeded their pre-Class Period sales and were suspiciously timed, with numerous sales made on the ***same day as*** or ***immediately following*** Defendants' false and misleading statements and omissions that artificially inflated TTD's stock price. Further, Defendant Green sold ***$48 million just one day*** before the February 12, 2025, disclosure of Kokai's slow adoption and the attendant revenue miss, which triggered the then-largest stock price drop in the Company's history.

15.     Lead Plaintiff now brings this case to remedy the harms Defendants have wrought.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT           6           Case No. 2:25-cv-01396-CAS-DFM

## II.    JURISDICTION AND VENUE

16.    The claims asserted herein arise under and pursuant to Sections 10(b), 20(a) and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

17.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

18.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).    Trade Desk is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

19.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    THE PARTIES AND WITNESSES

### A.    Plaintiffs

20.    Lead Plaintiff Arkansas Public Employees Retirement System ("APERS") is a multi-employer defined benefit retirement plan for the benefit of current and former public employees of the state of Arkansas.    APERS is responsible for the retirement income of employees of the state, including current and former employees of most state agencies, all counties, and hundreds of municipal entities and school districts.    APERS provides benefits to over 60,000 retirees, manages over $12 billion in assets for its beneficiaries, and is responsible for providing retirement benefits to more than 200,000 current public employees.    During the Class Period, Lead Plaintiff APERS purchased 228,475 shares of TTD common stock, and lost more than $12.608 million as a result of such purchases, as set forth in APERS's certification attached as Exhibit 1.

21.    Lead Plaintiff Public Employees' Retirement System of Mississippi

("MissPERS") is a pension fund established for the benefit of the current and retired public employees of the State of Mississippi.  MissPERS is responsible for the retirement income of employees of the state, including current and retired employees of the state's public-school districts, municipalities, counties, community colleges, state universities, libraries and water districts.  MissPERS provides benefits to over 75,000 retirees, manages over $33 billion in assets for its beneficiaries, and is responsible for providing retirement benefits to more than 250,000 current public employees.  During the Class Period, Lead Plaintiff MissPERS purchased 350,179 shares of TTD common stock, and lost more than $7.185 million as a result of such purchases, as set forth in MissPERS's certification attached as Exhibit 2.

**B.  Defendants**

22.  The Trade Desk is an advertising technology company incorporated in Nevada and headquartered in Ventura, California, that operates a digital platform that helps advertisers place ads, including on websites, podcasts, and streaming services. The Company was founded in 2009 and completed its initial public offering ("IPO") in September 2016.  Following its IPO, Trade Desk's common stock has traded on the NASDAQ under the ticker symbol "TTD."

23.  Defendant Jeff Terry Green co-founded TTD in 2009.  Since its founding, Green has been TTD's Co-Founder, Chief Executive Officer ("CEO") and Chairman. In his role as CEO, Green signed TTD's Forms 10-Q and 10-K and spoke publicly on behalf of the Company, including on its earnings calls, to analysts, on Trade Desk's social media platforms, and to the press.  During the Class Period, Green sold over 4 million shares of his TTD stock for proceeds exceeding $443 million.

24.  Defendant Laura Schenkein was announced as TTD's new Chief Financial Officer ("CFO") on May 10, 2023, and held that role from June of the same year until the Company's abrupt announcement on August 7 that she would be leaving the Company.  Prior to her role as CFO, Schenkein was TTD's director of Financial Planning & Analysis since 2014.  In her role as CFO, Schenkein signed TTD's Forms

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT          8          Case No. 2:25-cv-01396-CAS-DFM

10-Q and 10-K and spoke publicly on behalf of the Company, including on its earnings calls, to analysts, on Trade Desk's social media platforms, and to the press. During the Class Period, Schenkein sold 158,657 shares of her TTD stock for proceeds exceeding $18 million.

25. Defendant Samantha Jacobson has been TTD's Chief Strategy Officer and Executive Vice President since February 2022 and joined TTD's board in January 2024. In her roles, Jacobson signed TTD's Forms 10-K and spoke publicly on behalf of the Company, including at advertising technology conferences and on Trade Desk's social media platforms. During the Class Period, Defendant Jacobson sold 71,697 shares of her TTD stock for proceeds exceeding $7 million. Jacobson was specifically identified in a whistleblower complaint filed on June 27, 2025, in California Superior Court by James Wagner, TTD's Lead Principal Technical Account Manager from April 2022 to April 2025, in which Wagner alleges that he was fired for, among other things, raising and trying to discuss with his bosses that TTD was "misleading investors and making fraudulent statements and that it amounted to securities fraud." In that complaint, Wagner stated that it was Jacobson who wanted Wagner "out of the company" for raising concerns about the Company's misconduct.

26. Defendants Green, Schenkein, and Jacobson directly participated in the management of TTD's operations, had direct and supervisory involvement in TTD's day-to-day operations. They each had the ability to control and did control the Company's statements to investors, including in TTD's press releases and on its websites.[1] Defendants Green, Schenkein, and Jacobson were responsible for and involved in drafting, reviewing, approving, publishing, and making the Company's

---

[1] Certain false and misleading statements and omissions below were disseminated through TTD's website or social media pages. TTD's SEC filings repeatedly direct investors to these sources for further material information about the Company. *E.g.*, The Trade Desk, Inc., Proxy (Form DEF 14A) at 1, 15–17 (Apr. 12, 2023); The Trade Desk, Inc., Annual Report (Form 10-K) at 14, 85 (Feb. 15, 2024); The Trade Desk, Inc., Proxy (Form DEF 14A) at 1, 20–22 (Apr. 12, 2024); The Trade Desk, Inc., Annual Report (Form 10-K) at 14, 87 (Feb. 21, 2025).

public statements, including the false and misleading statements and omissions alleged herein.

## IV. SUBSTANTIVE ALLEGATIONS OF FRAUD

### A. The Trade Desk Business and Revenue Model

27. TTD was founded in 2009 by Defendant Green and Dave Pickles, the Chief Technology Officer at the time. It is an advertising technology company that purports to help advertisers optimize their advertising budgets across digital formats, including connected television ("CTV"),[2] webpages, social media, podcasts, mobile devices, computers, and streaming devices.

28. An advertiser's goal is to obtain the highest quality views (known as "impressions") by their target audience—*i.e.,* views that are most likely to result in a purchase, a subscription, or whatever action the advertiser wants the customer to take—at the lowest price possible.

29. TTD tracks and collects vast amounts of information about audiences and ad publishers. TTD claims to use proprietary technology and algorithms to analyze that data and then optimally bid on its clients' behalf to place ads in digital spaces (like banners on the top of a website or pop-ups on a mobile device) that will yield the highest quality ad impressions. This type of ad-buying is known as "programmatic advertising."

30. TTD does this through its platform, which is the tool by which advertisers design and execute their ad campaigns. The platform consists of (i) a "front end," the User Experience ("UX") or User Interface ("UI"), through which users interact with the platform; and (ii) a "back end," the under-the-hood engineering that matches a client's ads with available ad space based on underlying data and the client's chosen settings or parameters.

31. TTD's business is ad-buying. According to the Company, its revenue generation is completely dependent on clients not just signing up to use TTD's platform,

---

[2] Connected television refers to television that is connected to the internet, which allows the television to communicate with advertisers to place ads dynamically.

but actually finding it useful and spending money on it, instead of on competitor platforms. Specifically, TTD only generates revenue by charging its clients a platform fee based on a percentage of a client's total spend on advertising and from providing data and other value-added services and platform features to clients.[3] Accordingly, TTD's success rises and falls on the quality, adoption, and engagement with its platform.

## B.    The Critical Importance of Trade Desk's Transition to Kokai

32.    In 2021, TTD launched its latest ad-buying platform, Solimar. Solimar was well-received by TTD's clients because it offered a simple, streamlined user experience and interface. Solimar has a straightforward hierarchy of tasks and settings and allows clients to make bulk changes to campaigns directly in the UI. Multiple former employees—including FE2,[4] FE3,[5] FE4[6]—and TTD's clients[7] confirmed that

---

[3] As Former Employee ("FE") 1 explained, TTD only makes money when advertisers spend money buying ad space from publishers—i.e., winning at auction—through TTD's platform. FE1 was TTD's Senior Data Scientist from June 2019 to August 2024 in the Company's Colorado offices. FE1 was responsible for developing and testing the "relevance" and "quality" metrics for Kokai from January 2024 until mid-2024, to determine whether the infrastructure around the metrics worked properly.

[4] FE2 was TTD's General Manager of Client Services from 2023 to July 2024. FE2 was responsible for overseeing and assisting client use of Kokai and the transition from Solimar to Kokai.

[5] FE3 was a TTD Staff Business Analyst from July 2024 to January 2025. FE3 was responsible for providing data analysis support, overseeing Tableau reporting, and maintaining data pipeline integrity.

[6] FE4 was TTD's Vice President of Global Support & Ad Policy Operations from December 2019 to December 2024. FE4 oversaw TTD's Global Support team, including the team responsible for building custom audiences and managing data support, including for Kokai. That team acted as a support escalation layer, channeling bug reports and feature requests from clients to the product team. FE4 also established and managed TTD's Ad Policy Operations team, which was created in the aftermath of the 2020 U.S. elections, to address increasing needs related to political advertising compliance (i.e., filtering out content referencing firearms, violence, etc.). Upon joining TTD, FE4 initially reported to Sairaj Uddin, who was the Vice President of Technology Operations at TTD. Following co-founder Dave Pickles's exit from TTD in September 2023, Uddin took over product development responsibilities and was Senior Vice President of Technology, Global Services, Business Intelligence, Business Engineering, Project Management, and IT at TTD. Over the course of FE4's tenure at TTD, FE4's reporting line alternated between Uddin and Naseem Tuffaha, who was the Chief Growth Officer at TTD, both of whom reported directly to Defendant Green.

[7] As part of its investigation, Lead Plaintiff spoke with the director of a marketing

---

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT           11           Case No. 2:25-cv-01396-CAS-DFM

TTD's clients found Solimar useful, productive and easy to operate.

33.     Despite Solimar's adoption and success, on June 6, 2023, Defendant Green abruptly launched Kokai, a new iteration of TTD's platform, to replace Solimar.  During his remarks announcing Kokai, Defendant Green promised clients and investors that "nearly all" clients would see an upgrade by "the end of the summer."

34.     From that day forward, Defendants repeatedly told investors that TTD's switch from Solimar to Kokai was a two-fold, key driver of growth at TTD: first, existing TTD clients purportedly quickly transitioned from Solimar and adopted Kokai due to Kokai's new user interface and improved performance and, as a result, were increasing their spending on the platform; second, Kokai supposedly drew new clients to TTD, diverting spending from competitors to TTD and increasing the Company's market share.  For example, on May 8, 2024, Defendant Green stated on an earnings call that "our *revenue growth acceleration* in the first quarter speaks to the *innovation and value that we're delivering to our clients with Kokai*," and Defendant Schenkein said Kokai was "*help[ing] deliver another quarter of consistently strong growth and profitability to start 2024.*"

35.     Investors and financial analysts believed and embraced Defendants' claims that Kokai drove TTD's financial success.  For example, on September 18, 2024, analysts at Insider Monkey explained that Kokai's reported "early results have been encouraging" and that its supposed "[p]erformance metrics across the company have also improved . . . helping it unlock performance budgets for several years."

**C.     Kokai Adoption Lagged and Failed to Drive Revenue Growth**

36.     Throughout the Class Period, Defendants repeatedly told investors that its clients were rapidly adopting Kokai—the necessary predicate to TTD's revenue growth.

---

company who has served in this role since March 2023.  That director's company oversaw 50 clients that have accounts within Trade Desk.  The clients span all industries but are heavily concentrated in the healthcare industry.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT          12          Case No. 2:25-cv-01396-CAS-DFM

37. For example, on November 15, 2023, Defendant Schenkein spoke at the RBC Capital Markets Investor Conference, during which she assured investors that Kokai would "achieve *full* adoption" by the end of 2024. Similarly, on February 15, 2024, when TTD issued its fourth quarter 2023 results, Defendant Green claimed that Kokai was being "***enthusiastically adopted.***"

38. Analysts and the market took note of these positive representations regarding client adoption and spend, as well as their impact on TTD's revenue. On February 16, 2024, securities analysts at Davidson reported that "ramping customer adoption of the Kokai new UX/platform" contributed to TTD's "resilience"; and BMO Capital Markets reported that Kokai was the revenue driver that made TTD "particularly attractive." On February 22, 2024, Needham also described Kokai as a "key upside revenue driver[]" for TTD.[8]

39. While 2024 came and went without "full adoption," Defendants continued to tout Kokai's purportedly strong adoption rates. For example, on August 8, 2024, during TTD's second quarter 2024 earnings call, Defendant Green stated that he was "***incredibly encouraged by the early results from Kokai***," stating unequivocally that the Company had "***met the moment with Kokai***," which was "***firing on all cylinders . . . .***"

40. Securities analysts and the market embraced Defendants' positive representations regarding client adoption and spend. For example, on August 8, 2024, BTIG reported that TTD's stated adoption rates for Kokai left them "feeling better about the setup for Trade Desk into 2H24 and 2025," and Capital Market Labs similarly reported that "[c]onfidence in future growth is driven by . . . the major Kokai platform upgrade." The next day, a flurry of analyst reports echoed the same enthusiasm based on Defendants' assurances: Wedbush highlighted "rising adoption of Kokai, . . . [for which] early results have been overwhelmingly positive"; Morgan Stanley reported that

---

[8] This same language also appeared in reports issued by Needham on August 9, September 11, and October 1, 2024.

"[t]he higher ROAS [Returns on Ad Spend] that TTD is able to deliver with Kokai is substantial as advertisers aim to optimize ad spend and prove the efficacy of each marketing dollar and over time Kokai may help unlock performance budgets on TTD" and, "if these trends persist, it should help TTD continue to drive strong growth going forward . . . ."

41.     During analyst call backs in November 2024, Defendants again made multiple positive and specific representations regarding the state and pace of Kokai's adoption, with Defendants stating that nearly **50%** of clients had already adopted Kokai and that **100%** would adopt by the end of 2025; those representations were in turn reported to the market.  Specifically, Defendants stated the following:

- "~50% of all TTD customers have now adopted Kokai, which has driven a 30% uptick in data usage alongside a 25-30% downtick in CPC/CPA" (told to by Defendants and reported by BTIG on November 7, 2024);
- Kokai was "to be fully adopted by end of 2025 (currently nearing 50%)" (told to by Defendants and reported by Guggenheim on November 7, 2024);
- TTD "remain[ed] confident that [Kokai] will achieve a 100% roll-out for all advertisers by the end of 2025, while inching towards 50% adoption currently" (told to by Defendants and reported by Truist on November 7, 2024);
- "ad campaigns run on Kokai were at about 50% penetration of clients during 3Q24" (told to by Defendants and reported by Needham on November 8, 2024);
- "[c]lients continue to adopt Kokai, and the percentage of spend through Kokai is approaching 50% and is on pace to reach 90% by the end of next year" (told to by Defendants and reported by Wedbush on November 8, 2024); and
- "[TTD] Mgmt. remains confident that [Kokai] will achieve a 100% roll-out for all advertisers by the end of 2025 (that is, 100% of advertisers' spend via Kokai), while inching towards 50% adoption currently" (told to by Defendants and reported by Truist on November 20, 2024).

42.     Despite their drumbeat of positive statements about adoption, Defendants knew (but omitted) that Kokai adoption was significantly slower than represented and that large numbers of clients detested Kokai, rejecting it entirely or at least refusing to

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                14                Case No. 2:25-cv-01396-CAS-DFM

increase spend and, as a result, that Kokai was not driving revenue like Defendants claimed.

### (1) Defendants' Representations Regarding Adoption Were False and Misleading

#### a) TTD's Claimed Adoption Rates Were Inconsistent with Internal Numbers

43. First, TTD failed to even get close to achieving "full adoption" by the end of 2024, as Defendants had claimed would happen. Rather, as Defendants would later admit, by the end of 2024, at best, only 50% of their clients had adopted Kokai.

44. Second, TTD's representations regarding 100% adoption by the end of 2025 were, as FE5[9] put it, detached from reality. As of August 2024, when Defendant Green was telling investors that he was "***incredibly encouraged by the early results from Kokai***" and Kokai was "***firing on all cylinders***," only 5–10% of FE5's portfolio's clients had adopted Kokai—including only two of the Company's 10 most critical clients. Similarly, only approximately 18% of FE6's[10] client business had moved to Kokai as of that month. As discussed further below, these slow adoption rates were well known and internally discussed and reported on consistently throughout the Class Period.

45. The adoption of Kokai was so poor that Trade Desk specifically enlisted FE7, a Manager of Brand Strategy, in July 2024 to assess why Trade Desk clients and agencies were not adopting Kokai and what they did not like about Kokai.[11] FE7's research was supervised by FE7's boss, David Godycki, and was approved by and presented to Trade Desk's CMO Ian Colley on December 21, 2024. FE7 recounted that the research project began in July 2024, and the preparation work was finished in

---

[9] FE5 was a Senior Trading Specialist from late 2022 to mid-2024 in TTD's New York office. FE5 was responsible for supporting the accounts of major tech companies in their use of Solimar and Kokai.

[10] FE6 was a Senior Director of Client Services at TTD from November 2023 to August 2024. FE6 was responsible for TTD's relationship with a large holding company and engaged with all activities supporting that account.

[11] FE7 was a manager of brand strategy at TTD from December 2023 to June 2025.

---

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT       15       Case No. 2:25-cv-01396-CAS-DFM

September 2024. Consistent with the preparation work, in October 2024, FE7 interviewed 20 different Vice Presidents and Directors of both advertising agencies and TTD clients. As detailed in a final report presented internally at TTD, many of these clients reported that they were still using Solimar rather than Kokai. FE7 further confirmed that it was well known internally at Trade Desk that use of Kokai was always at or around only 60% at these agencies.

46. Indeed, even long after the Class Period, Kokai is *still* not fully adopted by all TTD clients or even fully developed. A July 1, 2025, report by *AInvest* confirmed that Trade Desk's statements regarding Kokai adoption were false. Specifically, it reported that one-third of TTD's clients had *still* not migrated to Kokai by July 1, 2025, "with many clinging to the legacy Solimar platform due to Kokai's steep learning curve."

47. Similarly, a July 24, 2025, *AdExchanger* report explained that Defendant Green's claims in February 2025—including that Kokai was being enthusiastically adopted, and the Company would deprecate Solimar by the end of 2025 because Kokai development and adoption were complete—were false. As detailed in its report, Kokai "*will require more time and it is unclear exactly how much*," and the "*[t]he previous plan to reach full Kokai adoption by the end of 2025 is in doubt . . . .*" Further, according to "a source close to The Trade Desk with direct knowledge, [TTD] currently has *no* concrete plans to deprecate Solimar *at all*" because "*some of Kokai's features are still being developed*," let alone fully adopted. Indeed, on August 7, 2025, Defendant Green admitted that *still* only three-quarters of client spend was through Kokai, and certain Kokai features were *still* in the beta phase and not even rolled out.

### b) TTD Manipulated its Metrics to Support False Claims About Adoption

48. In an effort to maintain the ruse of Kokai's quick adoption and immense popularity, Defendants manipulated how they were counting which clients had "adopted" Kokai. Specifically, Defendants counted clients who primarily were still

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT      16      Case No. 2:25-cv-01396-CAS-DFM

working through Solimar, as having adopted Kokai. For example, FE6 explained that, as long as a client's business was available on both platforms, TTD counted the customer as having migrated to Kokai. FE6 further explained that TTD personnel were encouraged by Trade Desk management to simply push certain line items over to Kokai from Solimar, so the client could access the same business on either platform, and then TTD would claim the account had been migrated to Kokai and been "adopted" by the client.

49.     Relatedly, to further boost adoption numbers, TTD forced clients onto Kokai, often over their express objections. For example, in the fourth quarter of 2024, as explained by a director of a marketing company for TTD clients, TTD forced certain client accounts to migrate from Solimar to Kokai, despite repeated protests from those clients about the new platform's poor performance. The director's clients began noticing these forced changes in December 2024. FE5 similarly recalled that TTD personnel were encouraged to send clients emails pushing them to adopt Kokai, even when they did not want to switch platforms.

**c)     Personnel Vacuum Contributed to Slow Adoption**

50.     Contributing to Kokai's slow adoption was the fact that TTD was suffering from a personnel vacuum during the exact period when such personnel were needed to drive adoption of Kokai.

51.     As FE1 explained, key User Experience personnel left shortly after the launch of Kokai. For example, Christine Jennings, the Vice President of Product Marketing, was terminated in September 2023—just weeks after the launch. FE8[12] explained that this left a vacuum in product marketing leadership during the exact period when such leadership was needed in order to drive adoption of Kokai. Indeed, after Jennings was terminated, there was no senior leader in product marketing for ***over a***

---

[12] FE8 was a senior marketing leader who reported directly to TTD's Chief Marketing Officer, Ian Colley, from prior to the start of the Class Period to 2025. FE8 spoke with Colley every week and participated in calls with Defendant Green occasionally; Colley himself reported directly to Defendant Green, and the two spoke regularly.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT          17          Case No. 2:25-cv-01396-CAS-DFM

*year*.  While FE8's boss, CMO Colley, nominally filled the role, Colley expressed to FE8 that he did not feel he had sufficient time for those duties.  FE7 added that half of the rollout of a program like Kokai is the marketing and how you communicate said rollout; accordingly, a lack of marketing personnel to communicate that rollout had obvious negative impacts on the rate and success of adoption.

### (2)    Defendants Knew or Recklessly Disregarded the Truth About Lagging Adoption

#### a)    Tableau and Other Written Reports

52.    Defendants knew the truth about Kokai's slower-than-represented adoption.  Indeed, multiple TTD former employees explained that the Executive Defendants received regular reports detailing in real-time Kokai's lagging adoption rates throughout the Class Period.

53.    For example, the Executive Defendants each had access to and regularly reviewed internal Tableau dashboards.  FE2 explained that the Tableau dashboards showed which specific clients had transitioned to Kokai and included statistics on how many clients had clicked a "revert to Solimar" button, which the Executive Defendants were monitoring carefully.  FE8, who helped develop the Marketing dashboards on Tableau,[13] explained that on Tableau there was an executive level dashboard that had key business metrics.  FE8 was told by Trade Desk's CMO Colley that there were also dashboards that tracked Kokai from various perspectives, including adoption metrics, client migration pacing, and feature-level engagement.  FE8 was also aware of these dashboards because he was asked by TTD's product marketing team if they could start pulling the Kokai (and other product-related) metrics into their own dashboards.  As FE9 explained, she personally observed individuals in client services writing and

---

[13] FE8 helped develop the Marketing dashboards on Tableau.  From that work, FE8 had a strong relationship with the BI team.

FIRST AMENDED CONSOLIDATED    18    Case No. 2:25-cv-01396-CAS-DFM
CLASS ACTION COMPLAINT

sending the emails to senior leadership, a level below Defendant Green. FE9 believes that Green also saw the information based on his involvement.[14]

54.     The Executive Defendants also received weekly spreadsheets that detailed Kokai's less-than-represented adoption.  FE6 explained that each senior director, including FE6, was responsible for completing a spreadsheet every week that included data pulled by customers, showing the percentage of their business that had migrated to Kokai, and a narrative section outlining what had gone well and what had not during the week.  FE6 explained that these weekly reporting spreadsheets were then provided to Defendant Green and other senior executives.

55.     FE2 described the same process, recounting how TTD personnel had to rationalize every week why certain clients had not moved over to Kokai from Solimar, which was regularly due to technical conflicts and data integration issues with Kokai (discussed further below).  FE2 stated that these client concerns were then reflected in aggregated reports that FE2 knew Defendant Green reviewed weekly, based on Defendant Green's discussion of them at the all-hands meetings (discussed further below) and the urgency with which he was pressing the Kokai adoption issue.  FE2 further stated that the Executive Defendants reviewed Tableau dashboards on Kokai's usage and adoption during the weekly all-hands meetings.

56.     FE3 also recounted how TTD leadership, including the Executive Defendants, made specific inquiries regarding Kokai adoption rates and performance, and that TTD's BI team, which FE3 was a part of, was under pressure to meet the volume and urgency of those inquiries.

57.     Additionally, as discussed above, Trade Desk's CMO, Colley, received a report in December 2024, detailing why Kokai's adoption was so slow.

---

[14] FE9 was Senior Director of Retail Data Partnerships at TTD from October 2021 to February 2025. In this role, FE9's main responsibilities were building and maintaining relationships with retailers, so they are able to monetize their data on TTD's platform.

FIRST AMENDED CONSOLIDATED               19          Case No. 2:25-cv-01396-CAS-DFM
CLASS ACTION COMPLAINT

**b)** **Internal Acknowledgment, Including by Defendant Green, at All-Hands Meetings of Kokai's slow adoption**

58.     Kokai's slow adoption by TTD clients was also regularly discussed within TTD.

59.     Multiple former employees confirmed that Kokai's lower-than-represented adoption rates were discussed in weekly all-hands meetings held throughout the Class Period, which were led by Defendant Green and attended by Defendants Schenkein and Jacobson:[15]

    a. FE3, who attended these meetings, confirmed that Defendant Green and others acknowledged the need to push adoption and shared actual adoption percentages during these meetings.

    b. FE10,[16] who also attended these meetings, likewise recalled Defendant Green saying during all-hands weekly meetings throughout 2023 that Kokai was behind schedule.

    c. FE8, who also attended these meetings, added that Kokai was a regular topic of discussion during these weekly all-hands meetings. FE8 confirmed that, from Kokai's launch through FE8's departure in 2025, Defendant Green and other company leaders spoke at these meetings about Kokai, including its adoption rates, the need to increase certain metrics with clients, and updates on when certain product features would be launched. FE8 explained that Defendant Green demonstrated deep knowledge of the actual status of Kokai and its adoption at these meetings, and clearly was familiar with detailed metrics on these topics.

    d. FE2, who also attended these meetings, noted that during the meetings, the Executive Defendants reviewed Tableau dashboards on Kokai's actual usage and adoption.

60.     In addition, FE8 had multiple conversations with leadership, including TTD's CMO Colley and various sales leaders and the BI team, in which they confirmed Kokai's lagging adoption and sales performance. Colley also informed FE8 that he and Defendant Green spoke regularly on the subject of Kokai adoption.

---

[15] FE4 confirmed that if they were available, Jacobson and Schenkein would join the weekly all-hands meetings. Jacobson regularly gave updates on data strategy, which included first-party data integration updates (discussed further below), at these meetings.

[16] FE10 was the Director of Advertising Policy at TTD from May 2021 to January 2024, and in that role, was responsible for making sure advertisers were not violating the law or TTD policies —in other words, keeping consumers and partners safe.

61.     Additionally, FE4 sat next to Uddin—the SVP of Technology after Dave Pickles's departure who reported directly to Defendant Green—who regularly told FE4 that Kokai's adoption was slower than the Company was publicly projecting.  FE4 confirmed that Uddin and Defendant Green had repeated conversations regarding the Kokai rollout and slow adoption.

**D.     Kokai Suffered from Serious Performance Issues and Product Defects**

62.     Throughout the Class Period, Defendants repeatedly claimed that Kokai was quickly adopted (and therefore driving revenue), largely because it offered a simple and effective interface with the features clients needed, streamlined first-party data integration, and other improvements over predecessor and competitor products.

63.     For example, during the scripted portion of Defendant Green's remarks on the February 15, 2024, earnings call, he highlighted Kokai's Relevance metric, stating that:

> *Kokai represents a completely new way to understand and score the relevance of every ad impression, across all channels. It allows advertisers to use an audience-first approach to their campaigns, targeting their audiences wherever they are on the open internet. Our AI optimizations, which are now distributed across the platform, help optimize every element of the ad purchase process.*

64.     Similarly, during TTD's first quarter 2024 earnings call on May 8, 2024, Defendant Green touted Kokai's suite of cutting-edge tools—including "*relevance scoring, forecasting, budget optimization, frequency management, or upgraded measurement*"—which were "*bringing the power of AI to a broader range of key decision points than ever . . . .*"

65.     Just a week later, on May 17, 2024, during a panel discussion at the DMS by Luma Conference, Defendant Jacobson also touted Kokai's feature called the "Sellers and Publishers 500 Plus," which purportedly identified the best publishers with whom to place ads, claiming that component was "*pulling together the best access of inventory across the open internet to make it easy for advertisers to buy in a brand-*

*suitable way that still transparently delivers performance.*"  Defendant Jacobson also touted Kokai's use of first-party data to drive more efficient ad-buying, stating "*[w]e . . . recognize the value of machine learning or AI which is why we've pulled in the opportunity for advertisers to bring incredible first-party data assets to bear.*"

66.     On August 8, 2024, during TTD's second quarter 2024 earnings call, Defendant Green again touted the purported performance improvements its clients purportedly enjoyed on Kokai, claiming that "incremental reach is up more than 70%," "[c]ost-per-acquisition has improved by about 27%."  He claimed that:

> [P]erformance metrics have improved by about 25% helping to unlock performance budgets on our platform for years to come. So our clients are getting *more precise, more cost efficient, and then they're able to reinvest for even more reach and drive a much better return* on ad spend.

Specifically, Defendant Green touted the supposed efficient data-seeding process on Kokai, stating: "Kokai allows our clients to deploy data about their most loyal customers, and then use that data as a seed to grow and harvest the next generation of loyal customers."

67.     Similarly, during the scripted portion of his remarks of the Company's November 7, 2024, earnings call, Defendant Green touted Kokai's innovations, which were supposedly "*helping advertisers identify and target new potential customers with much greater precision.*"  He further represented that, as a result of "[i]nnovations in Kokai," customers' "*[d]ata elements per impression continued to increase*," which was "significantly" improving performance.

68.     And, at the February 12, 2025, earnings call, Defendant Green again touted the supposedly uniformly positive feedback TTD was receiving from clients on Kokai, claiming that "[w]e are producing case study after case study as clients continue to lean into the features of our Kokai platform, *every one of them* showing the enhancements and effectiveness that goes up with the use of Kokai."

69.     Defendants' positive claims regarding Kokai's supposed performance and interface mattered to financial analysts and the market.  For example, on February 26,

2024, a *MarketBeat* article reported that Kokai was "enhanc[ing] programmatic advertising buying by providing an intuitive user experience . . . ." On May 29, 2024, *AdWeek* likewise reported on TTD's publication of the 100 top publishers featured on Kokai's Sellers and Publishers 500 Plus tool, quoting TTD's Vice President of Inventory Development Will Doherty as saying the 500 Plus list—which clients could now toggle "on" or "off" when using Kokai—was "where the best shows, content and journalism lives." Once again, on August 8, 2024, Piper Sandler highlighted the Company's representations that "[t]he Kokai roll-out appears to be driving real improvements for advertisers, with performance metrics improving by ~25% across the platform," and on August 9, 2024, Wedbush reported that "[f]or campaigns that have moved to Kokai, The Trade Desk has observed a 70% increase in incremental reach while cost-per-acquisition improved ~27%." And the next day, a flurry of analyst reports from Piper Sandler, Wedbush, and others, echoed the same enthusiasm about Kokai's purported performance.

70.     Likewise, on September 18, 2024, Insider Monkey reported, based on the Company's representations, that "[Kokai's] early results have been encouraging, with the campaigns holding an incremental reach of more than 70% after moving to Kokai" and "[p]erformance metrics across the company have also improved by 25%," which "translates to more cost-efficient and precise clients." Similarly, on December 23, 2024, a report by analysts at Zacks emphasized, based on Defendants' representations, that "TTD's Kokai solution is helping advertisers identify and target new potential customers with much greater precision."

71.     In reality, Defendants concealed from investors that Kokai had numerous and serious product defects that prevented clients from performing key functions and made Kokai worse than Solimar and competitor products, thereby impeding adoption and revenue growth.

FIRST AMENDED CONSOLIDATED              23        Case No. 2:25-cv-01396-CAS-DFM
CLASS ACTION COMPLAINT

**(1)   Key Kokai Features Were Defective and Undeveloped**

72.     TTD's stated value proposition was that its platform helps clients place ads efficiently—*i.e.*, it garners the most impressions with the highest quality audience at the lowest price.  The critical metrics by which this is assessed are referred to as "Key Performance Indicators" or "KPIs."  Given the importance of these metrics to clients, Defendants repeatedly touted the KPIs for Kokai—but the truth that Defendants concealed from investors and the public was that many of the KPIs were totally unreliable, not offered in Kokai, or still in development.

73.     *__"Relevance"__*: One of Kokai's purported key KPIs was "Relevance," which Defendant Green repeatedly touted during the Class Period.  Relevance is supposed to measure how similar the audiences an advertiser is reaching are to the audiences an advertiser intends to target.  For example, an advertising campaign for Depends diapers that reaches men ages 18 to 25 might include a high "reach" metric (the number of consumers who have seen an ad), but the relevance score should be abysmal, because young men are not the target audience for the product Depends is selling.

74.     In January and February 2024, FE1 was tasked with developing a metric on top of the Relevance data infrastructure to show clients in Kokai how relevant their reached audience was to a target audience.  To do this work, FE2 needed a population that was known to be highly relevant, and a population that was known to be highly irrelevant and needed to ensure that Kokai would correctly measure the former as having high Relevance and the latter as having low Relevance.  FE1 explained that a failure to pass this test would indicate that the Relevance metric was not performing reliably and consistently.

75.     To test the accuracy of Kokai's Relevance metric, FE1 proposed a model to capture how sensitive the Relevance infrastructure was, as it is not possible to create a meaningful metric on top of machine-learning or AI models like those used in Kokai if the underlying model's sensitivity is unknown.  FE1 understood no such model to test the sensitivity of the Relevance metric existed at TTD.  FE1's proposal was never

implemented and, prior to leaving in mid-2024, FE1 was not aware of *any* such sensitivity analysis for the Relevance metric—whether using his approach or a different approach to ask the same question. FE1 explained that without knowing how well calibrated the Relevance metric was, one could not say anything about how well Relevance performed.[17]

76. FE1 explained that two data science teams responsible for parts of Relevance were regularly arguing over whose proposed method was better and would eventually be utilized. There were regular arguments in meetings between the teams, which FE1 knew about from conversations he had with data scientists and product managers who were present during those meetings. (One such contentious meeting occurred in early-to-mid summer 2024 in Boulder, Colorado.) The attendees of the meetings that FE1 spoke to said that it was expressed in these meetings that ***the Relevance models did not work in a predictable and stable fashion in many scenarios in Kokai.*** These meeting started in May 2024 and were held throughout the summer of 2024. FE1 explained that the data science teams were taking the Relevance issues to the product teams, who informed Defendant Green of the instability problems. FE1 explained that, because the relevance score might not accurately reflect how relevant the reached audience was relative to the desired target audience, the reliability of targeting for advertisements could not be guaranteed.

77. ***Programmatic Guarantee Deals***: Worse yet, Kokai's interface did not support "programmatic guarantee" deals, which are a highly popular method of purchasing ad space for TTD clients. Such deals are highly popular because they permit clients to contract with a publisher to buy a certain volume of ad slots at a fixed price. Programmatic guarantee deals are especially attractive because they assure clients that their ads will be placed somewhere.

---

[17] FE3 confirmed that the engineering teams also frequently asked about the behavior and validity of the metrics that TTD was touting as part of Kokai's success.

78. FE1, FE5, and FE9 confirmed that Kokai did not support programmatic guarantee deals and, because of that, customers resisted transitioning to Kokai.

79. As one TTD client explained on July 25, 2024, TTD representatives were "pushing [Kokai] but we probably won't be looking to migrate our large evergreen campaigns until after the holidays," because of the lack of programmatic guarantee deal functionality. An *AdWeek* article dated March 11, 2025, entitled "Struggling Product Behind The Trade Desk's Revenue Woes Angers Buyers and Publishers," similarly explained, based on conversations with ad buyers, that one of the key problems with Kokai is that it "doesn't support programmatic guaranteed campaigns—where a publisher reserves ad inventory for an advertiser at a pre-negotiated price." As *AdWeek* explained, such deals "are a staple for agency buyers," and Kokai's inability to provide for "them is '*just insane*' . . . ." An *AdWeek* article dated August 11, 2025, entitled "Exclusive: Marketers Move Millions in Ad Spend from The Trade Desk to Amazon's Ad Platform" likewise explained that Kokai's inability to support programmatic guarantee deals was one of the chief reasons that Trade Desk lost business and revenue to its competitor, Amazon.

80. ***Sellers and Publishers 500 Plus***: Despite Defendants' representations, Kokai's "Sellers & Publishers 500 Plus list"—a list of trusted publishers that advertisers could purportedly connect with directly through a pipeline called OpenPath, and via other SSPs—did ***not*** actually function. Specifically, it did not identify the highest quality publishers with which to advertise. As one Kokai client reported, he had done "a bit of A/B testing," to quantify whether that feature offered any improved performance, and it did not "out perform[ the] open market." In other words, turning on the feature that TTD had developed and touted had ***no impact*** on clients' ad campaign performance.

*   *   *

81. The Executive Defendants had direct knowledge of Kokai's deficiencies. Not only was Defendant Green directly informed about the Relevance metric issues, but

through the Tableau dashboard, the Executive Defendants requested and had access to KPI data throughout the Class Period that showed these metrics did not work as represented. FE3 explained that from at least mid-2024 through early 2025, Defendants Green, Schenkein, and Jacobson had explicitly requested and received access to KPI changes over time through the Tableau dashboard.

82.     These poor KPI results were further confirmed through direct client feedback. For example, FE2 stated Defendant Green's representations about Kokai's performance was based on selectively chosen data. FE2 stated that senior Vice Presidents at TTD would relay requests from Defendant Green and other executives for FE2 and others to find client success stories—rather than representative reports about the range of client experiences—but, in the first half of 2024, client services ***couldn't find any***. FE6 confirmed that, during FE6's tenure at the outset of the Kokai rollout, there was no clear evidence of performance improvement over Solimar. And the director at a marketing company (*see supra* ¶ 49), who oversaw fifty clients' use of Kokai, recalled never seeing the function and management capabilities that TTD touted. As FE2 put it, Kokai failed to deliver on performance; it was quite painful when the platform underserved clients that had been pushed to adopt it, and this happened often.

83.     Because of Kokai's inability to improve performance, FE6 explained, Kokai was not a growth strategy—ever.

84.     A March 19, 2025, *Digiday* report[18] confirmed that Kokai's significant deficiencies resulted in the Company's inability to reel in clients away from competitors such as Mediaocean, noting that "[w]hile Kokai was designed to shift linear budgets into programmatic, agencies aren't eager to juggle another platform, especially when their core operations are so tightly woven into Mediaocean's systems." A March 24, 2025, article in *ADOTAT* similarly described Kokai as "the AI-fueled interface that was supposed to be TTD's shiny new Tesla but feels like someone sold you a DeLorean

_____

[18] Defendant Green personally endorsed *Digiday*'s reporting, linking to an article by *Digiday* on a June 9, 2025, LinkedIn post.

with a busted flux capacitor." That article, comparing Kokai to a "UX Escape Room," described Kokai as "like Ikea instructions in a different language."

### (2)    Kokai Could Not Integrate First-Party Data Necessary for Improved Ad Targeting in Certain Key Client Markets

85.    Also unknown to investors, Kokai was unable to "seed" the platform because it could not effectively integrate first-party data for many industries.

86.    First-party data is data that a company collects on its customers through purchase, search or viewing history. It can include such things as demographic background, spending habits, and personal and political interests. If first-party data were effectively integrated into Kokai, advertisers would be able to use that rich data set to specify which types of customers the client would like to target in its ad campaign, using parameters like age, location, and spending habits. Then, Kokai could comb through that data to find patterns, which it could then use to find other customers in its vast databases that were likely to exhibit similar behavior—a process called "seeding." Through this process, clients could define the ideal audience for their ad campaigns and get their ads to the right audience. As FE11[19] explained, the ability to seed was the most important part of Kokai because it changes how effectively Kokai's algorithm functions.

87.    Defendants told investors during the Class Period that, with Kokai, clients could "seed" a target audience to make their ad campaigns more effective. For example, during their second quarter 2024 earnings call on August 8, 2024, Defendant Green touted that "Kokai allows our clients to deploy data about their most loyal customers and then use that data as a seed to grow and harvest the next generation of loyal customers."

---

[19] FE11 was a Lead Associate Trading Director at TTD from November 2024 to March 2025. FE11 was responsible for working on all of TTD's pharmaceutical accounts and portfolios, managing three traders.

88. But in reality, clients in key sectors were *unable* to integrate their data and, thus, utilize the seeding functionality.

89. FE6, FE11, and FE2, for example, confirmed that Kokai was unable to integrate the first-party data of healthcare sector companies into its platform.[20] Healthcare sector clients were among TTD's largest and most substantial client base. FE11 explained that pharmaceutical client data (like other data in the healthcare sector) is highly sensitive and has restrictions regarding the use of such data as seeds. Accordingly, as FE11 explained, throughout the entire Class Period, because TTD could not integrate such data onto its platform, TTD resorted to utilizing "dummy" (*i.e.*, fabricated) seeds to inform the Kokai algorithm for pharmaceutical sector clients.

90. FE6 and FE11 confirmed that this inability to integrate healthcare sector customer data into the platform impeded healthcare sector client spending on Kokai, since those clients were unable to leverage the full scope of seeding. For example, FE6 explained that potential partners in the healthcare sector, like Crossix, have certain key medical information, but that information was not integrated into the platform, and thus TTD's clients did not have access to their audiences. FE6 confirmed this deficiency persisted until FE6 left Trade Desk in August 2024, and FE11 confirmed that it persisted as late as March 2025, when FE11 left the Company.

91. TTD's inability to integrate healthcare sector clients into Kokai had a detrimental impact on TTD's revenue. As TTD touted in multiple investor presentations, including both the second and third quarters of 2023, healthcare-related advertisers were a top three spender in both 2022 and 2023 for the Company, making up 11–12% of spend for TTD in each year. Accordingly, a slow-down in adoption and spending in that sector had an outsized impact on the Company's overall bottom line.

92. Relatedly, as 2024 was an election year, investors believed that political spending was a boon to TTD—as Defendants Green and Schenkein told investors

[20] The healthcare sector made up approximately 20 to 30% of FE6's book of business.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

29

Case No. 2:25-cv-01396-CAS-DFM

multiple times throughout the Class Period.  For instance, on the Company's fourth quarter 2023 earnings call, Defendant Green stated that "2024 stands to be a major year for political spending here in the United States."

93.    But, untold to investors, Kokai's inability to seed data significantly impeded political advertising through TTD.  FE4 explained that political sector clients were unable to transition to Kokai due to a combination of technical and compliance issues and, as a result, were forced to remain on the legacy Solimar platform.  Thus, those clients continued to deal with the same shortcomings in political ad workflows that had existed—and about which they had complained—in the previous election cycle, despite Defendants' claims that Kokai was a next-generation solution.  From FE4's conversations with Client Services, these workflows were deeply frustrating in the 2020 and then again in the 2024 election cycles.

94.    In addition to being unable to integrate the first-party data to seed data from key industries—contrary to Defendants' claims of Kokai's "incredible" data integration—FE11 stated that as late as the end of 2024 Kokai's seed process was still so confusing to TTD clients that they did not even know how to use it.  FE5 explained that TTD was opaque and ambiguous about how seeding worked, which bred skepticism in potential clients.  FE5 added that clients were also reluctant because TTD sales personnel were also not fluent or confident in how seeding worked on the platform.

95.    An additional impediment regarding data integration was that clients did not want to pay for the data that *had* been integrated.  FE4 said clients often objected to TTD's promotion of proprietary data products like seeding—which TTD charged a fee for—because they carried additional, undisclosed costs.

96.    Kokai's ability to integrate first-party data to seed the platform was also significantly hampered by Trade Desk's failure to be transparent regarding Kokai's algorithm inputs.  Transparency, FE4 noted, was an issue that came up repeatedly with customers, as they were regularly surprised by hidden fees associated with recommended functionalities.  One Kokai client expressed a similar conclusion, stating

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                30                Case No. 2:25-cv-01396-CAS-DFM

on November 20, 2024, that TTD was "not particularly transparent" regarding how fees and features worked, and instead, as another client noted, "tack[ed] on" fees. Another Kokai client commented that same day that TTD's "whole model is excessive fees." According to FE7's research, among the things participants did not like about Kokai was the lack of transparency around platform fees.

97. This lack of transparency was further highlighted when, on March 28, 2025, the Trade Desk was sued by consumers for its improper use of UID2—the identification system TTD developed for tracking consumers—alleging significant privacy violations. As industry leaders and commentators have observed, TTD's approach to identifying consumers represented a new low for the ad tech industry: "From a purely technical standpoint, [UID2 is] a regression in privacy in that [it] allow[s] tracking of users who are presently protected against tracking."

98. FE2 confirmed that Defendant Green and other TTD executives were kept apprised of these data integration challenges through Tableau reporting and regular updates through the chain of command.

### (3) Kokai Failed Basic Tests of Platform Accuracy

99. Also unknown to investors, Kokai was unreliable and did not pass basic tests necessary to confirm it was working properly. FE1 explained that an A/A test creates two separate but identical environments in which the software—in this case, Kokai's bidding optimization—runs. If the optimization is stable, the two identical environments should produce identical bidding behavior and results; if they do not, it means the Kokai software is producing random, inexplicable results. FE1 explained that Kokai was often unable to pass a simple A/A test, and that the Executive Defendants knew that. In other words, because Kokai would produce two different bidding results under identical scenarios, the Kokai platform was producing *random, uncontrollable results*. That is, rather than spend advertisers' money in an optimized way, Kokai would instead make random decisions about how to bid for ad space.

FIRST AMENDED CONSOLIDATED          31          Case No. 2:25-cv-01396-CAS-DFM
CLASS ACTION COMPLAINT

**(4)    Trade Desk Manipulated Kokai's Key Performance Metrics**

100.    To conceal Kokai's fundamental product defects and falsely reassure investors, Defendants touted metrics that were manipulated or meaningless.

101.    One such metric was "incremental reach," which measured how many consumers an ad was reaching for the first time.  FE1 explained that Defendant Green's statement on August 8, 2024, that "incremental reach is up more than 70%" was misleading because, internally, incremental reach was always discussed and measured on a campaign-by-campaign basis.  Accordingly, Defendant Green had no accurate basis for touting Kokai's incremental reach in the aggregate—*i.e.*, over multiple campaigns—like Defendant Green purported to do during the second quarter 2024 earnings call, given the different combinations of settings and different levels of aggressive pricing.  FE1 explained that there are many settings that can affect incremental reach, and as such, Defendant Green was touting a meaningless and inaccurate metric by stating that incremental reach was "up more than 70%."

102.    Another of the manipulated metrics was "cost per acquisition."  FE5 explained that Defendant Green's statement on August 8, 2024 that Kokai's costs per acquisition KPI had "improved by about 27%" was misleading because Defendant Green was inaccurately attributing to Kokai a reduction in cost due to other things, like seasonality (*i.e.*, the time of year when the ad campaigns were being run), creatives (*i.e.*, the quality of the ads themselves), audience, or what the opposition trader did during an ad buy.  As FE5 explained, without a proper A/B test set up to determine what actually drove the reduction in cost, Defendant Green was just touting a number that was easily manipulated, rather than statistically rigorous, in order to persuade clients to adopt Kokai.

**(5)    Kokai Had Significant Pacing Problems**

103.    Also unknown to investors, Kokai suffered from significant problems with pacing, *i.e.*, how a client's money was spread out over a campaign's lifecycle.  Pacing is an important aspect of programmatic advertising—as indicated by TTD's own

FIRST AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT
                    32          Case No. 2:25-cv-01396-CAS-DFM

publication of an article titled "Improve pacing and Decision Power from the Programmatic Table"—but if Kokai's ability to efficiently spread ad spending over the course of a campaign (referred to as pacing) is broken, it can result in ad campaigns spending money too fast (*i.e.*, bidding too much for earlier ad slots, and thus paying more money for lower quality impressions) or too slowly (*i.e.*, not bidding enough, leaving advertiser money on the table and failing to get ads placed).

104.    FE1 confirmed that Defendant Green was in meetings with product managers where Kokai's pacing problems were discussed.  FE1 learned this from a product manager who he sat next to and was in the meetings wherein Defendant Green and the product managers talked about issues with Kokai causing the delays.  FE1 said that it was in the second quarter of 2024 when he was told by a colleague that Defendant Green was aware of Kokai's pacing issues, and that this was hampering Kokai adoption.

### (6)    Kokai's Unnavigable Interface Violated Basic User Interface and User Experience Principles

105.    In addition to the above-mentioned product defects, Kokai's interface was unnavigable and created significant inefficiencies for clients that deterred them from adopting and spending on the platform.  Kokai's interface—which, as reflected in the below image, was premised on chemistry's periodic table of elements—was concocted by Defendant Green in defiance of his marketing and product design personnel. Unsurprisingly, then, the interface was confusing, tremendously unpopular with TTD clients, and deterred (rather than facilitated) increased spending on Kokai.

106. FE1 confirmed that Defendant Green explained in a weekly all-hands meeting that his 14-year-old son had told him to base Kokai's design on the periodic table of elements, and that the UX & UI team was instructed to execute that vision. FE1 added that several people on the UX & UI team were irritated at this decision, and some quit as a result of it. UX & UI personnel expressed that they had told Defendant Green that basing a 21st century software interface on a hundred-year-old table based on atomic chemical properties violated basic user interface and user experience principles.

107. These were not simply aesthetic concerns; customers reported that they directly impeded functionality on Kokai. As was later publicly reported in an *Ad Tech Explained* article, Kokai's new interface significantly disrupted the regular workflow for ad traders, forcing TTD clients to use Solimar and slowing down the adoption of Kokai. Indeed, FE2 confirmed that, rather than being perceived as an upgrade over Solimar, Kokai's periodic table exacerbated the challenge of switching clients to Kokai: rather than simplifying the user experience with fewer clicks, basic user functions became more complex.

108. As early as Kokai's launch in June 2023, Defendants knew that its clients were dissatisfied with Kokai and that the interface deterred adoption. For example, the director, who worked since 2023 at a marketing company which oversees 50 clients

with TTD accounts, explained that the director's clients were given the option to adopt Kokai in June 2023—but abandoned it within two months because, as the director's company reported to TTD, Kokai's interface made no sense and caused significant problems for users, as it was illogical as to navigation and performing basic tasks.

109.    Indeed, the director of the marketing company was part of an independent focus group created by Trade Desk in March 2024 to obtain opinions on Kokai. This focus group was recorded, and the director provided verbal comments during the focus group about how the user interface and user experience made no sense, and the director's trouble navigating it. The director recalled that the director's marketing company "hated [Kokai] with a passion." The director confirmed that part of the problem with Kokai was that functions available in Solimar were not available in Kokai, and if they were, they were not designed and explained in a logical way that was easy to navigate and locate. As the director put it, a task that took 15 minutes in Solimar now took 45 minutes in Kokai, causing clients to lose a half hour of billable hours.

110.    A senior manager at Havas, a French advertising company, and two assistant directors at Spark (another advertising company) and Digitas (an ad agency)— with whom the director conversed in late 2024 and early 2025—also shared these grievances with Kokai. The representative from Havas said that the Kokai user interface and user experience made absolutely no sense and was crippling their manpower hours since it took two-to-three times as long to do simple tasks, which the Havas employee told TTD representatives.

111.    Similarly, according to FE4—TTD's Vice President of Global Support & Ad Policy Operations from December 2019 to December 2024—Defendant Green knew that Kokai lacked any discernible workflow. FE4 learned this from conversations with Uddin, the SVP of Technology, and from what Green said during internal meetings towards the end of 2023. FE4 explained that clients were presented with "programmatic table" tiles but had no clear direction on how to navigate or link actions together. FE4 recalled, as one example, that clients could not easily clone settings across multiple ad

campaigns without encountering numerous bugs. As another example, clients were unable to perform certain actions within the platform's front end, and FE4's team completed those tasks manually through support tickets.

112. FE2 similarly confirmed that, throughout FE2's tenure at TTD (2023 to mid-2024), clients suffered issues including incompatibility with third-party tools to fundamental bugs and missing features. And FE5 confirmed that Kokai's platform was buggy and unfinished up until the time FE5 left in August 2024, recalling the same cloning issue that FE4 raised. FE5's understanding is that even in December 2024, the bugs persisted. FE5 explained that these bugs discouraged clients from engaging with the platform throughout 2024.

113. Indeed, despite Defendants' claims that Kokai was an upgrade, Kokai actually *reduced* functionality from Solimar in certain key respects. As one Kokai user wrote in an internet post on June 13, 2024, "[b]asic functions are buried deeper in the UI [user interface] than ever before, some features of the last UI are missing entirely." Another Kokai client agreed on July 25, 2024, writing that Kokai was "[c]urrently not [useful]" because basic functionality like "Bulk cloning Campaigns / ad groups and changing budgets are not possible on kokai." Changes for the worse included limited column customization, which made it harder for clients to pull key reports and monitor metrics and the inability to bulk edit, as described by FE5 and FE4.

114. FE3 and FE6 also independently confirmed that Kokai introduced confusion for clients and, as a result, they were resistant to move to the new platform. As FE6 put it, rather than being *pulled* onto the platform through new features and an enticing interface, clients were being *pushed* onto the platform. FE3 said acclimating to the interface complexity was like trying to learn multiple languages at once.

115. As one client put it on June 13, 2024, clients had:

> [B]een handed a UI [user interface] without the most essential metrics necessary to managing campaigns . . . . Honestly, it's very concerning how out of touch this has become and seems to be driven by their controlling shareholder/founder. . . . [T]he fact this thing hit Beta without a clear way to build a new advertiser or build a new campaign on the front page . . . .

well I don't know how to explain that other than it being a clusterfuck project.

116. Defendants were well aware of these serious product defects throughout the Class Period. For example, Defendant Green made clear in a February 15, 2024, earnings call that he had just been on a "world tour" across four continents to talk to customers about Kokai because he was "concerned that the amount of change would make [clients] afraid of adopting something new simply because of how much it changed . . . ."

117. Moreover, multiple former TTD employees confirmed that Kokai's deficiencies and interface challenges were well-known and openly discussed at TTD, including with the Executive Defendants.

118. As discussed above, many of these deficiencies were discussed in Tableau reports and other communications to the Executive Directors, as well as in the weekly all-hands meetings.

119. Further, FE1 confirmed that TTD employees talked openly about the poor design of the Kokai interface, including data science and end-product employees. FE2 similarly confirmed that his team provided the Executive Defendants with qualitative descriptions of client experience with the user interface, which included detailed client accounts of frustrations with Kokai's interface through reports that went through TTD's senior client service Vice Presidents directly to the Executive Defendants and other TTD executives.

120. The Executive Defendants also knew about these deficiencies because, as FE8,[21] FE2,[22] and FE10 explained,[23] they monitored online discussion of Kokai, which included critiques of Kokai's interface and platform.

* * *

121. The fundamental defects in Kokai's platform were significant for the Company's revenue growth. Each month that went by where Kokai was not functional or where clients were struggling to or deterred from increasing their use of it, TTD left revenue on the table. In the meantime, clients shifted their advertising spending to TTD competitors. As TTD's own Chief Revenue Officer, Jed Dederick, stated under oath during Google's antitrust trial, TTD was constantly competing with other demand-side platforms ("DSPs") (*i.e.*, other companies that help advertisers buy ad space). When asked under oath at an unrelated trial whether any customers use TTD "as their only demand-side platform," Dederick replied:

> Typically, no. . . . typically, an advertiser who works with The Trade Desk will also work with those other demand-side platforms to have access to highly valuable inventory [not available on TTD], like YouTube [or Amazon].

122. And that is precisely what TTD's clients did. Former employees confirmed TTD clients were *not* adopting or growing their spend on Kokai and instead were buying ads elsewhere.

123. For example, FE8 understood from colleagues in Client Services and Trading that TTD clients, including some of TTD's larger clients, voiced concerns

---

[21] FE8 recalled that TTD had personnel in its Communications team whose job it was to monitor discussion of TTD and Kokai on social media—an effort referred to internally as "social listening." There was a social media team with 3–4 people, one of whom was responsible for "social listening," and they would report their findings up through Public Relations and Communications. FE8 knew these reports would then get sent to TTD CMO Colley, who spoke regularly with Defendant Green.

[22] FE2 stated that there was regular discussion at TTD regarding social media posts about the reaction to Kokai.

[23] FE10 recounted that Defendant Green would reference things he read on Blind, a workplace social media app featuring critiques of TTD, during all-hands meetings.

---

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT      38     Case No. 2:25-cv-01396-CAS-DFM

about Kokai.  For example, FE8 was told that one of the company's larger clients, a major multinational seller of consumer-packaged goods, was transitioned onto Kokai but had concerns including that Kokai was poorly designed, the results were not compelling, and they did not want to increase spend.

124.    FE12[24] likewise stated that, as a result of frustrations with Kokai, certain TTD customers split their budgets across multiple platforms and adopted DSPs that better suited their needs, like StackAdapt and Basis, rather than using just TTD.

125.    FE1 also confirmed that he knew of TTD clients who were pulling their budgets off Kokai.

126.    An *AdWeek* article dated August 11, 2025, entitled "Exclusive: Marketers Move Millions in Ad Spend from The Trade Desk to Amazon's Ad Platform" further corroborated that advertisers were shifting millions of dollars in ad budgets from Trade Desk to Amazon, in part, due to TTD's deficient "user interface" and Amazon's "greater measurement visibility."  The *AdWeek* article highlighted the following material moves from Trade Desk to Amazon as a result of Kokai' deficiencies: (i) a global auto brand moved approximately $80 million in annual ad spend by the end of 2025 Q1;(ii) a global tech brand that redirected nearly $5 million of ad spend; (iii) 30% of an ad agency's clients who shifted the bulk of their CTV and display budgets, particularly around Thursday Night Football; (iv) 30% of an ad agency's clients shifted 100% of their total annual ad budgets between February and August 2025; and (v) 40 brands at Tinuiti who moved 12% of their budgets from DSPs like TTD; and (vi) 80% of PMG clients shifted tens of millions in CTV budgets away.

### E.    The Truth Emerges

127.    Beginning in early 2025, the truth emerged to investors: the product TTD had spent years touting as an effective and highly productive platform with a user-

---

[24] FE12 was a TTD Political Trading Specialist from July 2023 to February 2025. FE12's clients included political advertisers such as New Blue Interactive, NVAR, AL Media, and Tom Foster.

friendly interface that was quickly adopted by clients and driving revenue was not the marvel Defendants claimed.  In reality, existing clients were not adopting Kokai at the speed or rates Defendants claimed; those clients who had transitioned to Kokai were not increasing their advertising spend; and there were significant defects with Kokai that impeded its performance and effectiveness.  The result was catastrophic for TTD's bottom line and ultimately its investors.

### (1)  February 12, 2025: The Bottom Starts to Fall Out

128.  On February 12, 2025, after market close, TTD issued its fourth quarter 2024 results and—for the first time in the Company's history—TTD fell far short of its stated revenue expectations of $756 million, as well as analyst consensus expectations of $758 million.

129.  In an earnings call that same day, Defendant Green explained that Kokai execution errors and slow adoption was the cause of the revenue miss.  Defendants partially revealed what they had known throughout the past fifteen months: TTD "stumbled" due to "execution missteps."  Defendant Green was forced to admit that "Kokai rolled out slower than we anticipated" and that, because the Company had not yet reached full adoption of Kokai, "today we're maintaining two systems, Solimar and Kokai."  Defendant Green was further forced to add that "[s]ome clients are still transitioning from our previous platform" and that the revenue miss was *not* due to macro-economic factors or issues out of their control.  Rather, Defendants were required to admit that the miss was "*our fault*," with the Company forced to take "full ownership of the shortfall."  As Defendant Green acknowledged, "this miss was *not* due to a lack of opportunity or increased competition; it was on us."

130.  On this news, TTD's stock plummeted over 30%, from a high of $122.23 on February 12, 2025, to just $81.92 at close on February 13, 2025, the largest single day market cap drop in the Company's history.  Overnight, billions in market capitalization evaporated.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

40

Case No. 2:25-cv-01396-CAS-DFM

131. Notably, in contrast, TTD's competitor AppLovin saw a major stock surge on February 13, 2025, reflecting that TTD's clients were turning to competitors who could absorb spend clients were no longer willing to invest in TTD, as reported by an *Ad Tech Explained* article dated April 1, 2025.

132. Analysts were stunned and concerned about Kokai and its drag on the Company's revenue. RBC analysts underscored "a slower than expected deployment of Kokai, falling short of its expectations to reach 50% of its install base and impacting results." Cantor and Jefferies analysts agreed, highlighting on February 12, 2025, the direct relationship between Kokai and the revenue miss, with the former reporting "slower rollout of Kokai (missed 50% EOY adoption goal) also weighed on 4Q revs," and the latter noting that it was a "primary reason[] for the miss." Jefferies further reported that "the slowdown from the Q3 call in November to late December is certainly cause for concern." *AdExchanger* echoed on February 12, 2025, that investors were unwilling to take the earnings miss as merely a "one-off."

133. A February 18, 2025, *Marketing Dive* article concluded that the revenue miss was as an example of "where breathless hype has not always matched the reality of what is often a timely and resource-intensive implementation process for a technology that has a lot of kinks to iron out."

134. Faced with this backlash, and in an effort to assuage concerned investors, Defendant Green claimed—falsely—that Kokai's slow adoption was a deliberate, strategic decision the Company had purportedly chosen to embrace, rather than the result of significant issues with the product. Defendant Green claimed that "the slower Kokai rollout was deliberate" and "for good reason." Defendant Green further promised investors that most customers had "already" converted to Kokai and that TTD would "move 100% of our clients to Kokai this year." He further touted the interface and its superiority to prior products, claiming "***Kokai is more effective in almost every way.***" He further assured investors that "we are producing case study after case study as clients

continue to lean into the features of our Kokai platform, every one of them showing the enhancements and effectiveness that goes up with the use of Kokai."

135.    These representations reassured many analysts and investors.    For example, RBC reported that "Management attributed the softness to small execution missteps while seeing no change in the market opportunity or competitive environment." Analysts at Truist noted that TTD "is constantly iterating on Kokai given the level of sophistication the new platform brings, and as a result, decided to roll out Kokai slower than it anticipated in order to optimize performance for each client." Despite lowering their 2025 revenue expectations, Jefferies also reported that it remained long-term "fundamental fans" of TTD.  And Oppenheimer reported that

> [w]hile bulls will do some soul-searching, we think the story is intact . . . .
>
> We lower our target to $115 from $135, but maintain our Outperform rating.

### (2)    March 11, 2025: Investors Learn About Certain of Kokai's Fundamental Defects

136.    A month later, the truth about what Defendants had euphemistically deemed "execution missteps" was revealed for what it really was.  After markets closed on March 11, 2025, *AdWeek* published an exposé based on interviews of twelve industry insiders—including two ad publishers, a tech partner, and nine brand and agency ad buyers who used TTD as their primary DSP.  The exposé revealed that, contrary to Defendant Green's assurances, Kokai performance was not what Defendants claimed.

137.    The *AdWeek* article described how, rather than driving growth through its improved performance—as Defendants had touted during the Class Period—Kokai "greatly *reduced* the use and function of The Trade Desk's buying platform."  The report described how Kokai had been met with "widespread resistance among media buyers."  The report further detailed how the new interface was "not intuitive"; rather, it "force[d] media buyers to learn an entirely new workflow that feels disconnected from industry norms."  It further noted that:

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT            42            Case No. 2:25-cv-01396-CAS-DFM

> Just as The Trade Desk needs publishers to sign onto Kokai so it can have a lot of unique supply, it also needs advertisers as the demand source. But the ad buyers ADWEEK spoke to were reluctant to use it.

Notably, in connection with the article, and as further evidence that the Company was knowingly concealing the truth from the market, the Company refused to answer *AdWeek*'s basic question of how many clients had currently migrated to Kokai.

138.    While the *AdWeek* article sat behind a paywall, over the following two days, it began to cause a frenzy on social media.  At 2 PM on March 12, Karsten Weide, an ad tech expert with thousands of followers on X (formerly known as Twitter), tweeted out the article with the word, "***Ouch.***"  On March 13, NBC's VP of Programmatic Demand Trey Titone, who later called the *AdWeek* article "scandalous," tweeted a screengrab of the programmatic table of elements, sarcastically referring to it as "what peak UX design looks like."[25]  Also on March 13, Twitter account @101Programmatic—an account devoted to programmatic advertising—reacted to the *AdWeek* story and posted its own thread, titled "What's wrong with TTD Kokai?" and posted a series of critiques with Kokai's design.

139.    The *AdWeek* exposé revealed what many inside TTD had known for almost two years: Kokai was not a state-of-the-art, revolutionary ad selling technology, but instead a defective platform—built upon a wholly untested design with unstable performance indicators—which clients refused to voluntarily adopt.

140.     On this news, TTD's stock price cratered further, falling over 11%, from $60.63 on March 11, 2025, to $53.88 on March 13, 2025.

141.    But, again, Defendants made a series of false statements designed to calm investors.  For example, at TTD's first quarter earnings call of 2025, on May 8, Defendant Green claimed—falsely—that "***[t]he core of Kokai has been delivered, and adoption is now ahead of schedule.***"  Defendant Green further reassured investors by

---

[25] Tritone would later state that that tweet was one of the most viral he had ever published.

adding that "[a]round two-thirds of our clients are now using it and the bulk of the spend in *our platform is now running through Kokai.*"  Defendant Schenkein concurred, stating the Company's results were due to the "the strength to the uptake in Kokai adoption."  As a result, TTD's stock rebounded, jumping nearly 19% from market close on May 8 to market close on May 9.

### (3)    August 7, 2025: Investors Learn the Full Extent of Kokai's Impediment to Revenue Growth

142.    Finally, after market close on August 7, 2025, TTD released its second quarter 2025 earnings, revealing the full truth, including further delays in Kokai's adoption and an expected slow-down in revenue.  These revelations obliterated any notion that Defendant Green correctly described the challenges with Kokai in February 2025 as "small" execution missteps.  Specifically, Defendant Green was forced to admit that only three quarters of Trade Desk's client spend was on Kokai, and that key Kokai features were still *not* developed, including a feature intended to address the pacing issues described above, as well as performance.  Rather, client spend on Kokai as a percent of overall spend had increased only 8% as compared with TTD's previous earnings report.  Additionally, TTD announced that Defendant Schenkein was abruptly leaving the Company.  Defendant Schenkein, who was with Trade Desk for 12 years, is only in her early 40s and not near retirement age and had not indicated that she was leaving to take a position at another Company.  Atypical for a situation in which a CFO is leaving a Company voluntarily for a position at another Company, Defendant Schenkein is staying on at Trade Desk in a non-executive capacity for 4 months, and the CFO position is being transitioned in less than 2 weeks to a current Trade Desk board member with no experience serving as a CFO.

143.    Investors and the market were shocked by the slowdown in TTD's growth rate as a result of poor Kokai adoption.  Following the August 7 revelations, several analysts downgraded the stock; Bank of America downgraded TTD's stock from Buy to Underperform, citing slowed growth as a concern; Moffett Nathanson downgraded

TTD's stock from Sell to Hold; and Wedbush and Citi to Neutral from Outperform and Buy, respectively. Oppenheimer highlighted TTD's "slower pace of next-gen adtech adoption," and Jefferies emphasized that "the rollout of the company's new Kokai platform has been slower than expected."

144. TTD's stock continued to crumble upon this news, falling from $88.33 at 4 PM on August 7, 2025, to $54.23 at 4 PM on August 8—a nearly 40% drop in just 24 hours.

**F.      While Investors Were Harmed, the Executive Defendants Enriched Themselves with Over $465 Million in Proceeds From Insider Sales**

145. At the same time the Executive Defendants touted Kokai to investors, they unloaded over $465 million of their stock. These stock sales were highly unusual and suspicious, including (i) when measured by the total amount of shares sold; (ii) in contrast with their prior trading history; (iii) the timing of the sales relative to key false and misleading statements and omissions and corrective disclosures; and (iv) the avoidance of substantial losses.

146. As a result of these Class Period sales, the Executive Defendants profited from the artificial inflation in the price of Trade Desk's stock due to Defendants' false and misleading statements and omissions to investors throughout the Class Period. These sales occurred before the revelation of Kokai's lagging adoption and fundamental deficiencies and the attendant drag on TTD's revenue, and thus before Trade Desk's stock price substantially declined in response to those revelations.

147. Lead Plaintiff used publicly available trading data reported to the SEC on Form 4 to evaluate the Executive Defendants' trading activity during the Class Period, and during a period of equal length immediately prior to the Class Period of February 20, 2022, to November 14, 2024 (the "Control Period").

---

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                45        Case No. 2:25-cv-01396-CAS-DFM

**(1)   The Executive Defendants Engaged in Massive Sales of Their Trade Desk Stock by Absolute Number, Proceeds, and Percentage of Shares Available to Sell**

148.   Defendants sold a tremendous amount of TTD stock during the Class Period.  In particular, Defendant Green sold 4,081,128 shares of his TTD stock during the Class Period, for proceeds of more than *$443 million*.

149.   Defendant Schenkein sold 169,840 shares of TTD stock during the Class Period, for proceeds of more than *$18 million*.  In addition, during the Class Period, 34,162 shares of Defendant Schenkein's TTD stock, or just over $9 million, were withheld to pay for her personal taxes in connection with Company-issued stock.

150.   Finally, Defendant Jacobson sold 71,697 shares of TTD stock during the Class Period, for proceeds of more than *$7 million*.  In addition, during the Class Period, 17,284 shares of Defendant Jacobson's TTD stock, or just over $1.6 million, were withheld to pay for her personal taxes in connection with Company-issued stock.

**(2)   The Executive Defendants' Stock Sales Vastly Exceeded Their Control Period Sales**

151.   As the following charts depict, both Defendants Green and Schenkein sold remarkably more of their TTD stock during the Class Period than during the Control Period, in terms of both absolute numbers and proceeds.[26]  As reflected in the below chart, Defendant Green sold *over five-times* more shares during the Class Period than in the Control Period, and Defendant Schenkein sold *over fifty-times* more shares during the Class Period than in the Control Period.

---

[26] Defendant Jacobson did not file Form 4's during the Control Period and so no data is available to analyze her Control Period transactions.





**(3) The Timing of the Executive Defendants' Stock Sales Was Suspicious**

152. The Executive Defendants' outsized stock sales were also suspiciously timed. They each sold a vast number of shares at artificially inflated prices ***after*** they learned materially adverse information, but ***before*** that information was disclosed to the public. In fact, the Executive Defendants' stock sales were on the very ***same day*** as or

*immediately following* their false and misleading statements and omissions regarding Kokai that served to artificially inflate TTD's stock price.

153. For example, on November 15, 2023—just *two days* after Defendant Green amended his 10b5-1 plan—Defendants falsely and misleadingly assured investors that, "*we'll expect that over the course of 2024, we get to full adoption*" of Kokai. Then just two days later, Defendant Schenkein sold 2,613 of her shares for $173,712 in proceeds.

154. Similarly, on February 16, 2024, just *one day* after Defendants falsely and misleadingly told the market that they had never been more confident that Kokai was being "*enthusiastically adopted*," Defendant Schenkein sold 3,391 of her shares for proceeds of $303,596. A week later, between February 21 and 23, 2024, Defendant Green sold 225,000 of his shares for proceeds of $18.60 million.

155. Once again, on August 8, 2024, Defendants issued additional false and misleading statements, including that they were "*incredibly encouraged by the early results from Kokai*," stating unequivocally that the Company had "*met the moment with Kokai*" and Kokai was "*firing on all cylinders . . . .*" Just two trading days later, on August 12, 2024, Defendant Jacobson sold 21,162 of her shares for over $2 million in proceeds, on August 16, 2024, Defendant Schenkein sold 3,130 of her shares for $310,903 in proceeds; and between August 22–26, 2024, Defendant Green sold 419,351 of his shares for proceeds of over $43.5 million.

156. Then, on November 7, 2024, Defendants falsely and misleadingly told the market that "*[t]he adoption [of Kokai] has been phenomenal. The product is the best that we've ever shipped.*" That same day, Defendant Schenkein sold another 27,687 of her shares for over $3.5 million.

157. Further, the Executive Defendants also sold hundreds of thousands of their personal shares immediately preceding the truth about their fraud coming to light, which caused the Company's stock price to plummet. Most notably, Defendant Green sold 400,000 shares—for a total of *$48,271,897*—just *one day before* the February 12, 2025,

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT     48     Case No. 2:25-cv-01396-CAS-DFM

disclosure that Kokai's slow adoption caused TTD's first revenue miss ever, which caused the Company's stock price to fall from $122.23 to $81.92, or 33%—*then the largest single-day stock drop in the Company's history.*

158.    Notably, *all* of Defendants Green's sales during the Class Period occurred at prices higher than the stock would ever reach after the truth was revealed.



**(4)    The Executive Defendants' Stock Sales Allowed Them to Avoid Hundreds of Millions of Dollars in Losses**

159.    By selling unusually large amounts of stock before the corrective disclosures, Executive Defendants were able to avoid approximately *$320 million* in losses.

160.    As previously noted, following the February 12, 2025 corrective disclosure, Trade Desk's stock price dropped 33%, from $122.23 to $81.92, the largest one-day price drop, in the history of Trade Desk, on an absolute dollar basis.  By that time, Defendant Green had already sold 4,051,251 shares of stock, avoiding a loss of $163.30 million (4,051,251 x $40.31) on the February 12, 2024, corrective disclosure. Similarly, Defendants Schenkein and Jacobson had already sold 158,657 and 56,691

FIRST AMENDED CONSOLIDATED                    49          Case No. 2:25-cv-01396-CAS-DFM
CLASS ACTION COMPLAINT

shares respectively, avoiding losses of $6.40 million and $2.89 million, respectively at the time of the February 12, 2025, corrective disclosure.

161.    Similarly, on the August 7, 2025, corrective disclosure, Trade Desk's stock price dropped 39%, from $88.33 to $54.23—the largest one-day price drop in the history of Trade Desk, measured on a percentage basis.  By that time, Defendant Green had sold 4,081,128 shares of stock, avoiding an *additional* loss of $139.17 million (4,081,128 x $34.10) on the August 7, 2025, corrective disclosure.  Similarly, Defendants Schenkein and Jacobson had sold 169,840 and 56,691 shares respectively, avoiding *additional* losses of $5.79 million and $2.44 million respectively.

162.    In total, the suspicious timing of the stock sales enabled Defendant Green to avoid a $302.47 million decline in the value of his holdings, and Defendants Schenkein and Jacobson to avoid declines of $12.19 million and $5.33 million, respectively.

### (5)    The Executive Defendants' 10b5-1 Trading Plans Do Not Immunize Them

163.    A 10b5-1 plan is a defense to insider trading liability *only* if it is entered into by an insider "*[b]efore becoming aware*" of material non-public information and was established "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading.  *See* SEC Rule 10b5-1(c), 17 C.F.R. § 240.10b5-1 (2022).  Beyond violating SEC rules, courts treat adopting or modifying a plan while in possession of material non-public information as highly suspicious of fraud.

164.    While certain of the Class Period sales by the Executive Defendants were made pursuant to 10b5-1 plans, the plans provide no safe harbor because those plans were adopted while in possession of material adverse information regarding Kokai and during the Class Period, and thus *after* Defendants began to fraudulently inflate the price of TTD stock.

165.    Specifically, Defendant Green amended a plan initially adopted on June 15, 2023, just after Kokai's launch, on November 13, 2023—just *two days* before

Defendants uttered their false and misleading statements at the RBC Global TIMT Investor Conference.  The other 10b5-1 plans adopted by Defendant Green were made on March 15, 2024, and September 12, 2024, both of which post-date the start of the Class Period and Defendants' misrepresentations to investors about Kokai.

166.    As to Defendant Schenkein, the 10b5-1 plan at issue was adopted on June 1, 2023, just days before Kokai's launch on June 6, 2023.  Adoption of her two other plans, on March 15, 2024, and December 13, 2024, respectively, both post-date the start of the Class Period and Defendants' misrepresentations to investors about Kokai.

167.    Finally, Defendant Jacobson's 10b5-1 plan at issue was adopted on August 22, 2024, nearly a year into the Class Period and, thus, Defendants' misrepresentations to investors.

### (6)    The Executive Defendants' Stock Sales Were Made Contemporaneous to Lead Plaintiff's Purchases

168.    The Executive Defendants' sales of TTD stock were made contemporaneously with Lead Plaintiff's purchases of TTD common stock during the Class Period—as set forth below and reflected in Lead Plaintiff's certifications at Exhibits 1 and 2.

169.    Defendant Green sold the following shares of TTD common stock for total proceeds in excess of $40 million, contemporaneously with Lead Plaintiff's purchases of the same:

| Date of Sale | Amount (Shares) | $ of Sale | Date of Lead Plaintiff Purchase[27] | Days After Insider Sale | Shares Purchased | $ of Purchase |
|---|---|---|---|---|---|---|
| 8/26/24 | 283,429 | $29.53 million | 8/29/24* | 3 | 2,109 | $0.22 million |
| 10/9/24 | 80,649 | $9.31 million | 10/11/24* | 2 | 7,582 | $0.89 million |

[27]Lead Plaintiff purchases in this Section of the Complaint identified with an asterisk refer to purchases by APERS; Lead Plaintiff purchases identified without an asterisk refers to purchases by MissPERS.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    51           Case No. 2:25-cv-01396-CAS-DFM

| Date of Sale | Amount (Shares) | $ of Sale | Date of Lead Plaintiff Purchase[27] | Days After Insider Sale | Shares Purchased | $ of Purchase |
|---|---|---|---|---|---|---|
| 1/7/25 | 17,207 | $2.28 million | 1/7/25 | 0 | 4,001 | $1.37 million |

170.   Defendant Schenkein sold the following shares of TTD common stock for total proceeds in excess of $9 million, contemporaneously with Lead Plaintiff's purchases of the same:

| Date of Sale | Amount (Shares) | $ of Sale | Date of Lead Plaintiff Purchase | Days After Insider Sale | Shares Purchased | $ of Purchase |
|---|---|---|---|---|---|---|
| 10/9/24 | 25,000 | $2.89 million | 10/11/24* | 2 | 7,582 | $0.89 million |
| 10/22/24 | 25,000 | $3.01 million | 10/25/24* | 3 | 29,839 | $3.56 million |
| 11/7/24 | 27,687 | $3.53 million | 11/11/24 | 4 | 96,070 | $12.37 million |

171.   Lastly, Defendant Jacobson sold the following shares of TTD common stock for total proceeds of approximately $3 million contemporaneously with Lead Plaintiff's purchases of the same:

| Date of Sale | Amount (Shares) | $ of Sale | Date of Lead Plaintiff Purchase | Days After Insider Sale | Shares Purchased | $ of Purchase |
|---|---|---|---|---|---|---|
| 11/29/24 | 22,062 | $2.83 million | 12/3/24 | 4 | 34,360 | $4.72 million |

## V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

172.   Throughout the Class Period, Defendants made a series of false and misleading statements and omissions.  Among other things, Defendants touted to investors that Kokai had supposedly been enthusiastically adopted by its client base and

was driving revenue for the Company by providing clients with improved performance and functionality, rich first-party data integration and seeding capabilities, and a simple, intuitive interface.  In truth, Defendants knew that TTD's clients were not adopting Kokai and that Kokai was not the much-touted revenue driver that Defendants claimed because it suffered from multiple fundamental defects.  Kokai's issues were so severe they led to the Company's first-ever revenue miss since going public.  Even today, TTD *still* cannot deprecate Solimar because Kokai's features are still being developed and the long-promised full adoption of Kokai has not occurred.

173.    Each statement in this Section by or attributed to Defendants Green, Schenkein, and Jacobson are also attributable to TTD because each such statement was made or performed by the relevant Executive Defendant in their capacity as a representative of TTD and because each such statement can be properly deemed a statement by TTD.

### A.    November 15, 2023—RBC Global TIMT Conference

174.    On November 15, 2023, Defendant Schenkein spoke at a RBC Capital Markets Conference, during which she stated that "*we'll expect that over the course of 2024, we get to full adoption*" of Kokai.

175.    The statement identified in paragraph ¶174 was false and misleading, and omitted material facts regarding Kokai's adoption by clients.  Once Defendants chose to tout Kokai's adoption, they were obligated (but failed) to disclose the adverse facts demonstrating that Kokai adoption was lagging and slower-than-expected, publicly reported adoption numbers were inflated, and there were significant defects with the platform—including that a number of Kokai's key performance metrics and features did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform were impossible to conduct and took longer to perform.  Kokai's serious defects deterred clients from adopting the platform, and caused clients (including major clients)

to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms.

### B. February 15, 2024—2023 Fourth Quarter Results

176.   On February 15, 2024, TTD filed a Form 10-K that included the Company's earnings results for the year ending December 31, 2023.  The same day, the Company held an earnings call with analysts to discuss its results, in which Defendants Green and Schenkein spoke.

177.   During the scripted portion of Defendant Green's remarks during the earnings call, he stated that "***We have never launched a product with this much change, and we've never launched a product with this much confidence that what we have represents a major advance in advertiser performance and that it is going to be enthusiastically adopted***." He further stated that "***2024 stands to be a major year for political spending here in the United States***."

178.   The statements identified in paragraph ¶177 were false and misleading, and omitted material facts. Once Defendants chose to tout Kokai's adoption and performance, they were obligated (but failed) to disclose the adverse facts demonstrating that Kokai adoption was lagging and slower-than-expected, publicly reported adoption numbers were inflated, and there were significant defects with the platform—including that a number of Kokai's key performance metrics and features did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform were difficult to conduct and took longer to perform.  Kokai's serious defects deterred clients from adopting the platform, and caused clients (including major clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    54         Case No. 2:25-cv-01396-CAS-DFM

revenue driver that Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms.

179. The statements identified in paragraph ¶177 were also false and misleading, and omitted material facts, because Kokai did not provide a "major advance in advertiser performance." Rather, Kokai suffered from significant deficiencies that detrimentally impacted advertiser performance, including that a number of Kokai's key performance metrics and features did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform were difficult to conduct and took longer to perform.

180. During the scripted portion of his remarks on the earnings call, Defendant Green further stated that

> ***Kokai represents a completely new way to understand and score the relevance of every ad impression, across all channels. It allows advertisers to use an audience-first approach to their campaigns, targeting their audiences wherever they are on the open Internet***.

181. The statements identified in paragraph ¶180 were false and misleading, and omitted material facts. Once Defendants chose to tout Kokai's performance and capabilities, they were obligated (but failed) to disclose that Kokai was suffering from significant deficiencies that detrimentally impacted advertiser performance, including that a number of Kokai's key performance metrics and features – including its Relevance metric – did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform were difficult to conduct and took longer to perform. These issues deterred clients from adopting the platform, and caused clients (including major clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that Defendants touted it to be.

**C.    May 8, 2024—2024 First Quarter Results**

182.    On May 8, 2024, TTD filed a Form 8-K that included the Company's earnings results for the quarter ending March 31, 2024.  The same day, the Company held an earnings call with analysts to discuss its results, in which Defendants Green and Schenkein spoke, and issued a press release which included a quote attributed to Defendant Green.

183.    During the scripted portion of Defendant Green's remarks during the earnings call, he stated:

    a.    "***I believe our revenue growth acceleration in the first quarter speaks to the innovation and value that we're delivering to our clients with Kokai.***"[28]

    b.    "[T]he open internet is getting replumbed and revalued, especially in contrast to the value offered by walled gardens. ***And the innovations in our Kokai platform will help our clients take advantage of this revaluation and fully leverage data-driven buying to fuel their own business growth. As a result, I've never been more optimistic about the future of the open Internet and our ability to gain more than our fair share of the nearly $1 trillion advertising TAM.***"

184.    During the scripted portion of Defendant Schenkein's remarks during the earnings call, she stated:

    a.    "***All of our progress in areas such as CTV, retail media, Kokai, and UID2 helped deliver another quarter of consistently strong growth and profitability to start 2024.***"

    b.    "In closing, ***we are encouraged about the momentum of our business. We're executing on large long-term growth drivers, including . . . Kokai . . . .***"

185.    TTD's press release accompanying the Company's Form 8-K also included a quote by Defendant Green, in which he stated that: ***"[W]ith significant AI advances in our Kokai platform, we are better positioned than ever to deliver premium value to advertisers and continue to gain market share.***"

186.    The statements identified in paragraphs ¶¶183-185 were false and misleading, and omitted material facts, because they conveyed that Kokai was driving

---

[28] Defendant Green began his scripted remarks by talking about Kokai.

and would continue to drive revenue growth for the Company. Once Defendants chose to speak about Kokai's ability to drive revenue for the Company and performance, they were obligated (but failed) to disclose the adverse facts demonstrating that Kokai adoption was lagging and slower-than-expected, and there were significant defects with the platform—including that a number of Kokai's key performance metrics and features did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform were difficult to conduct and took longer to perform. Kokai's serious defects deterred clients from adopting the platform, and caused clients (including major clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms.

187. On the earnings call, Defendant Green also touted that Kokai enjoyed a suite of cutting-edge tools—including "*relevant scoring, forecasting, budget optimization, frequency management, or upgraded measurement*"—which were "bringing the power of AI to a broader range of key decision points than ever . . . ."

188. The statement identified in paragraph ¶187 was false and misleading, and omitted material facts because it conveyed to investors that Kokai included critical and properly developed advertising tools, including "*relevant scoring, forecasting, budget optimization, frequency management, or upgraded measurement.*" Once Defendants chose to tout Kokai's capabilities and performance, they were obligated (but failed) to disclose the truth. In reality, there were significant defects with the platform—including that a number of Kokai's key performance metrics and features, including the Relevance metric, did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform

were difficult to conduct and took longer to perform.  These issues deterred clients from adopting the platform, and caused clients (including major TTD clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms.

### D.    May 17, 2024—DMS by Luma Conference

189.    On May 17, 2024, Defendant Jacobson appeared for a panel discussion on "Management" at the DMS by Luma Conference.  During that discussion, Defendant Jacobson touted Kokai's new "Sellers and Publishers 500+" list, a list which TTD claimed provided advertisers a list of the 500 best publishers with whom to place ads: "[W]e talked about Kokai, which is the upgrade of our platform and one of the components there is something we call the Sellers and Publishers 500+, and ***that's pulling together the best access of inventory across the open internet to make it easy for advertisers to buy in a brand-suitable way that still transparently delivers performance.***"

190.    The statement identified in paragraph ¶189 was false and misleading, and omitted material facts because it conveyed to investors that Kokai included critical and properly developed advertising tools, including a "Sellers and Publishers 500+" list which "pull[ed] together the best access of inventory across the open internet."  In reality, the Sellers and Publishers 500 feature did not improve performance, deterred clients from adopting the platform, and caused clients (including major TTD clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms.

191.     During the same appearance, Defendant Jacobson stated "***We . . . recognize the value of machine learning or AI, which is why we've pulled in the opportunity for advertisers to bring incredible first-party data assets to bear.***"

192.     The statement identified in paragraph ¶191 was false and misleading, and omitted material facts because it conveyed to investors that Kokai was able to integrate first-party data effectively. Once Defendants chose to tout Kokai's data integration capabilities, they were obligated (but failed) to disclose the adverse facts about first-party data integration, including that clients in key industries, including healthcare and politics, were unable to integrate their data to seed the platform, deterring clients from increasing their spending on the platform and preventing the platform from being the quickly adopted major revenue driver that Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms.

**E.     June 3, 2024—Trade Desk Video**

193.     On June 3, 2024, TTD published a video on its YouTube channel titled "Sellers and Publishers 500+."

194.     In the video, TTD stated:

> ***What if there was a solution that enables advertisers to maintain control over inventory quality while also reaching their desired audiences at scale? Well, there is. The Sellers and Publishers 500+. The Sellers and Publishers 500+ is an inventory buying option that is centered on transparency and decisioning. Comprised of high quality inventory from the top 500 plus inventory properties across the open internet. The Sellers and Publishers 500+ eliminates unnecessary complexity and fragmentation while enforcing the highest inventory standards it's never been easier to have . . . .*** A few attributes of the Sellers and Publishers 500+ list include: One, quality. Each seller and publisher is included on the list because it has a proven track record of quality inventory that delivers performance for advertisers. Quality is evaluated based on metrics such as viewability, supply paths and page level experiences which includes ad load and refresh rates. . . . ***The Sellers and Publishers 500 Plus is a transparent solution that helps advertisers focus on their audiences' ad experience and to confidently apply decisioning and optimization to their campaigns to reach their audience across the open internet.***

195.     The statements identified in paragraph ¶194 were false and misleading, and omitted material facts because they conveyed to investors that Kokai included

critical and properly developed advertising tools, including a "Sellers and Publishers 500+" list "*that helps advertisers focus on their audiences' ad experience and to confidently apply decisioning and optimization to their campaigns to reach their audience across the open internet.*"  In reality, the Sellers and Publishers 500 feature did not improve performance, deterred clients from adopting the platform, and caused clients (including major TTD clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that Defendants touted it to be.

### F. June 25, 2024—Trade Desk Video

196. On June 25, 2024, TTD published a video on its YouTube channel titled "Key Kokai Concepts – First-party data | From Trading Essentials: Kokai."

197. In the video, Defendant Green stated the following regarding first-party data integration on Kokai:

> One of the things that's important to talk about for just a minute is the importance and significance of first-party data. One of the things that we've maintained—this has actually been a belief of The Trade Desk since before we'd written a single line of code—was that an advertiser's first-party data is more valuable to them than anyone else's data. . . .

> One of the things that I'm most excited about in Kokai is that we fuse together a product we started shipping before Kokai, which is called Galileo. . . . Galileo is the way for you to onboard first-party data, and our goal was to make that as easy as possible. . . . *And throughout the platform you'll see relevance score, which is essentially saying let's take that seed or that first-party data that you've onboarded using Galileo, and let's compare that to the general audiences or the audiences that you're covering. So if a particular ad group has a relevant score of 25x, it means based on the source of truth, your seed, we think the people that you're targeting are roughly 25 times more likely to convert than the general population. That is only made possible by you leveraging your first-party data, so in order to get the best out of Kokai you have to be leveraging your first-party data on the platform.*

198. The statements highlighted in paragraph ¶197 were false and misleading, and omitted material facts.  Once Defendants chose to tout Kokai's performance and capabilities, including the ability to integrate first-party data, they were obligated (but

failed) to disclose the adverse facts about the platform. In reality, Kokai was suffering from significant deficiencies that detrimentally impacted advertiser performance, including that a number of Kokai's key performance metrics and features did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform were difficult to conduct and took longer to perform. These issues deterred clients from adopting the platform, and caused clients (including major clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms.

**G.    June 28, 2024—Press Release**

199.    On June 28, 2024, TTD issued a press release in which it stated:

a. "***Traders tout how Kokai is driving campaign success. . . . Already, Kokai—The Trade Desk's new UI [user interface]—has yielded notable campaign results, as told by the traders who have been using our new tools.***"

b. "***Overall, campaigns in Kokai Beta saw improved KPI performance, with notable optimizations across the board. This includes a 24% drop in cost per unique reach, 36% lower cost per click (CPC), and a 34% reduction in cost per action (CPA), on average. While it's clear our platform is driving results against a set of full-funnel KPIs, there are several key differentiators driving trader adoption, confidence, and success on the platform.***"

c. "There are various inputs that enable the platform AI to assess media impressions. ***One such input is relevance, a score that is derived from seed data — or data from your most ideal audience. Kokai can now use information about your ideal customer to assess every single impression, and then buy against those impressions based on value.*** Breeze is already seeing incredible results for the campaigns she manages."

d. "For media buyers, optionality is important, but too much decision-making in terms of campaign setup and delivery can be paralyzing. ***Decision overload is quelled by the platform, with AI serving as your co-pilot as you make selections. The new UI [user interface] offers a curated and simplified list of options, which means you can spend your time wisely, making smarter choices instead of being bogged down by endless decisions. Relevance is our secret to helping you simplify things enough to make those choices on***

*the platform.*"

200. The statements identified in paragraph ¶199 were false and misleading, and omitted material facts. Once Defendants chose to tout Kokai's performance and capabilities, they were obligated (but failed) to disclose the adverse facts about the platform, including that a number of Kokai's key performance metrics and features, including the Relevance metric, did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform were difficult to conduct and took longer to perform. These issues deterred clients from adopting the platform, and caused clients (including major TTD clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms.

**H.     August 8, 2024—2024 Second Quarter Results**

201. On August 8, 2024, TTD filed a Form 10-Q that included the Company's earnings results for the quarter ending June 30, 2024, and a Form 8-K therewith, containing a press release. The same day, the Company held an earnings call with analysts to discuss its results, in which Defendants Green and Schenkein spoke.

202. The press release accompanying the Form 8-K included quotes from Defendant Green, which stated:

> *As Kokai ramps, we're intuitively surfacing value for advertisers, integrating data into every decision, advancing the full power of AI as a co-pilot, and enabling advertisers to maximize the potential of their first party data. With ongoing innovations in Kokai, the widespread adoption of UID2, and the expanding use of retail data, we will continue to deliver exceptional value to advertisers and grow our leadership in key high growth markets such as CTV.*

203. During the scripted portion of Defendant Green's remarks during the earnings call, he stated:

    a. ***Kokai allows our clients to deploy data about their most loyal customers, and then use that data as a seed to grow and harvest the next generation of loyal customers. Kokai helps them target those new audiences across the many thousands of destinations that comprise the best of the open Internet . . . .***

    b. ***For those campaigns that have moved from Solimar to Kokai in aggregate, incremental reach is up more than 70%. Cost-per-acquisition has improved by about 27% as data elements per impression have gone up by about 30%. In addition, performance metrics have improved by about 25% helping to unlock performance budgets on our platform for years to come. So our clients are getting more precise, more cost efficient, and then they're able to reinvest for even more reach and drive a much better return on ad spend.***

204. Defendant Green further stated that he was "***incredibly encouraged by the early results from Kokai***," stating unequivocally that the Company had "***met the moment with Kokai***" and Kokai was "***firing on all cylinders . . . .***"

205. The statements identified in paragraphs ¶¶202-204 were false and misleading, and omitted material facts because they conveyed to investors that Kokai clients were: (1) able to "deploy" their data and "seed" the platform in order to grow customers and produce better performing ad campaigns; and (2) experiencing significant performance improvements including in the areas of "incremental reach," "cost-per-acquisition," and "data elements per impressions" when, in reality, many Kokai clients—including TTD's largest and most lucrative clients—were unable to integrate their data to seed the platform and Kokai was not improving client performance. Once Defendants chose to tout Kokai's capabilities and performance metrics, they were obligated (but failed) to disclose the adverse facts about the platform, including that a number of Kokai's key performance metrics and features did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform were difficult to conduct and took longer to perform. These issues deterred clients from adopting the platform, and caused clients (including major clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing

the platform from being the quickly adopted major revenue driver that Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms.

206. The statement in subparagraph 203(b) is false for two additional reasons. First, internally, incremental reach was always discussed and measured on a campaign-by-campaign basis. Accordingly, Defendant Green had no accurate basis for touting Kokai's incremental reach in the aggregate—*i.e.*, over multiple campaigns, like Defendant Green purported to do during the second quarter 2024 earnings call—given the different combinations of settings and different levels of aggressive pricing. Second, Defendant Green was inaccurately attributing to Kokai a reduction in cost that are due to other things, like seasonality (*i.e.*, the time of year when the ad campaigns were being run), creatives (*i.e.*, the quality of the ads themselves), audience, or what the opposition trader did during an ad buy.

**I.     November 7, 2024—2024 Third Quarter Results & Analyst Call-Backs**

207. On November 7, 2024, TTD filed a Form 10-Q that included the Company's earnings results for the quarter ending September 30, 2024. The same day, the Company held an earnings call with analysts to discuss its results, in which Defendants Green and Schenkein spoke, and TTD filed a Form 8-K containing a press release which included a quote attributed to Defendant Green.

208. TTD's press release accompanying its Form 8-K included quotes attributed to Defendant Green stating that:

> *We are similarly excited about the momentum in retail media and the pace of adoption by advertisers who are taking advantage of our retail data marketplace. And the performance improvements that our clients are seeing with Kokai — our largest platform upgrade to date — showcase the value of audience-driven, AI-enabled innovation.*

209. During the scripted portion of his remarks on the earnings call, Defendant Green stated:

FIRST AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT
64
Case No. 2:25-cv-01396-CAS-DFM

a. "*Key investment initiatives, including performance advancements in our Kokai platform . . . are not only strengthening our foundation, but position us for durable growth in 2025 and beyond.*"

b. Kokai was "*encouraging CMOs and CFOs to lean more and more on TTD to deliver real, measured growth*," and the Company was "*already seeing the results of Kokai performance today . . . .*"

c. Kokai's innovations were "*helping advertisers identify and target new potential customers with much greater precision*" and "*[d]ata elements per impression continue to increase*," which was "*significantly*" improving performance.

d. TTD was "*currently firing on all cylinders*" with respect to Kokai, calling the efforts with respect to the new platform "*amazing.*"

210. In response to analyst questions, Defendant Green stated that "*[t]he adoption [of Kokai] has been phenomenal. The product is the best that we've ever shipped.*"?

211. The statements identified in paragraphs ¶¶208-210 were false and misleading, and omitted material facts, because they conveyed that clients were quickly and enthusiastically adopting Kokai and that Kokai clients were experiencing significant performance improvements. Once Defendants chose to speak about adoption of Kokai and its performance, they were obligated (but failed) to disclose that Kokai adoption was lagging and lesser-than-represented, publicly reported adoption numbers were inflated, and there were significant deficiencies with Kokai's performance—including that a number of Kokai's key performance metrics and features did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform were difficult to conduct and took longer to perform. This caused clients (including major TTD clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms.

212.     As publicly reported in several analyst reports, Defendant Green and TTD made additional representations on or around November 7, 2024, as part of "analyst call backs," regarding both current and anticipated Kokai adoption numbers, including:

   a. "*ad campaigns run on Kokai were at about 50% penetration of clients during 3Q24*" (told to by Defendants and reported by Needham on November 8, 2024);

   b. "*~50% of all TTD customers have now adopted Kokai, which has driven a 30% uptick in data usage alongside a 25-30% downtick in CPC/CPA*" (told to by Defendants and reported by BTIG on November 7, 2024);

   c. "*Kokai to be fully adopted by end of 2025 (currently nearing 50%)*" (told to by Defendants and reported by Guggenheim on November 7, 2024);

   d. Management "*remain[ed] confident that [Kokai] will achieve a 100% roll-out for all advertisers by the end of 2025, while inching towards 50% adoption currently*" (told to by Defendants and reported by Truist on November 7, 2024);

   e. "*Clients continue to adopt Kokai, and the percentage of spend through Kokai is approaching 50% and is on pace to reach 90% by the end of next year. . . . We expect the transition will attract incremental spending over time as Kokai adoption trends towards management's goal of 90% by the end of 2025*" (told to by Defendants and reported by Wedbush reported on November 8, 2024); and

   f. "*Mgmt. remains confident that it [Kokai] will achieve a 100% roll-out for all advertisers by the end of 2025 (that is, 100% of advertisers' spend via Kokai), while inching towards 50% adoption currently*" (told to by Defendants and reported by Truist on November 20, 2024).

213.     The statements identified in paragraph ¶212 were false and misleading, and omitted material facts.  Once Defendants chose to tout the purported client adoption of Kokai, they were obligated (but failed) to disclose that Kokai adoption was lagging and lesser-than-represented, publicly reported adoption numbers were inflated, and there were significant deficiencies with Kokai's performance—including that a number of Kokai's key performance metrics and features did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform were difficult to conduct and took longer to perform.  This caused clients (including major TTD clients) to reduce their

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT          66          Case No. 2:25-cv-01396-CAS-DFM

spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms.  February 12, 2025—2024 Fourth Quarter Results

214.    On February 12, 2025, TTD filed a Form 8-K that included the Company's earnings results for the quarter ending December 31, 2024.  The same day, the Company held an earnings call with analysts to discuss its results, in which Defendants Green and Schenkein spoke.

215.    In the scripted portion of his remarks on the earnings call, Defendant Green stated that TTD would: **"[M]ove 100% of our clients to Kokai this year. Now the majority already have."**

216.    The statement identified in paragraph ¶215 was false and misleading, and omitted material facts.  Once Defendants chose to tout adoption of Kokai, they were obligated (but failed) to disclose that Kokai adoption was lagging and lesser-than-represented, publicly reported adoption numbers were inflated, and there were significant deficiencies with Kokai's performance—including that a number of Kokai's key performance metrics and features did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform were difficult to conduct and took longer to perform.  This caused clients (including major TTD clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms.  Indeed, even today Kokai has not been fully adopted.

217.    During the earnings call, Defendant Green further stated that:

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT          67          Case No. 2:25-cv-01396-CAS-DFM

***Kokai is more effective in almost every way.*** We are producing ***case study after case study*** as clients continue to lean into the features of our Kokai platform, ***every one of them showing the enhancements and effectiveness that goes up with the use of Kokai.***

218. The statements identified in paragraph ¶217 were false and misleading, and omitted material facts. Once Defendants chose to tout Kokai's client experience, they were obligated (but failed) to disclose that clients routinely reported that Kokai did not perform well and was unable to provide critical services, including that a number of Kokai's key performance metrics and features did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform were difficult to conduct and took longer to perform. These issues deterred clients from adopting the platform, and caused clients (including major TTD clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms.

**J.    May 8, 2025—2025 First Quarter Results**

219. On May 8, 2025, TTD filed a Form 10-K that included the Company's earnings results for the quarter ending March 31, 2025. The same day, the Company held an earnings call with analysts to discuss its results, in which Defendants Green and Schenkein spoke.

220. In the scripted portion of his remarks on the earnings call, Defendant Green stated:

> ***The core of Kokai has been delivered, and adoption is now ahead of schedule. Around two-thirds of our clients are now using it and the bulk of the spend in our platform is now running through Kokai. We expect all clients to be using it by the end of year. . . .***
>
> ***We are also working with clients beyond typical brand and reach metrics. Kokai is delivering on lower funnel KPIs, including 24% lower cost per conversion and 20% lower cost per acquisition. These improvements are helping unlock performance budgets from new and existing clients. And***

*thanks to the work we've done in our data marketplace to increase the discoverability of third-party data, campaigns on Kokai use roughly 30% more data elements per impression. All of these efficiencies mean more dollars can be reinvested and put to work.*

221.    In the scripted portion of her response, Defendant Schenkein added that "*[i]t was such a strong quarter for us. And I would attribute the strength to the uptake in Kokai adoption . . . .*"

222.    In response to an analyst question, Defendant Green further represented that:

*As a result of these investments in AI and upgrading our platform altogether in Kokai, campaign performance on Kokai continues to be exceptional. Kokai is delivering on lower funnel KPIs, including 24% lower cost per conversion and 20% lower cost per acquisition, and these improvements are helping unlock performance and performance budgets from existing clients, but also from new clients that are a bit more focused on the performance side of things.*

223.    The statements in paragraphs ¶¶220-222 were false and misleading, and omitted material facts.  Once Defendants chose to tout adoption of Kokai, they were obligated (but failed) to disclose that Kokai adoption was lagging and lesser-than-represented, publicly reported adoption numbers were inflated, and there were significant deficiencies with Kokai's performance—including that that a number of Kokai's key performance metrics and features did not work, had not been fully developed or had not even been tested, there were major data integration issues causing the platform to be unworkable for key client sectors, clients could not make programmatic deals, and simple tasks on the platform were difficult to conduct and took longer to perform.  This caused clients (including major TTD clients) to reduce their spend on TTD, not increase their spend, or split their budget between TTD and competitors, thus preventing the platform from being the quickly adopted major revenue driver that Defendants touted it to be and forcing TTD to continue the costly undertaking of operating two platforms.

## VI.   LOSS CAUSATION

224.   The misrepresentations alleged herein were the proximate cause of the economic loss suffered by Lead Plaintiff and the Class.  There was a causal connection between the alleged misrepresentations and omissions and the losses (i.e., stock price declines) described herein.

225.   During the Class Period, Lead Plaintiffs and Class members purchased or otherwise acquired TTD common stock at artificially inflated prices, and were damaged thereby when the price of TTD common stock declined in response to the below disclosures.  Throughout the Class Period, the price of TTD's common stock was artificially inflated and/or maintained as a result of Defendants' materially false and misleading statements and omissions.  The price of TTD's common stock significantly declined, causing investors to suffer losses, in response to the disclosures concerning or connected to the facts misrepresented or concealed by Defendants, which are described more fully above in Section V.

### A.   February 12, 2025: Defendants Disclose the Company's First-Ever Revenue Miss Due to Lagging Kokai Adoption

226.   Investors began to learn the truth about Kokai on February 12, 2025, when TTD announced its financial results for the fourth quarter of 2024 and held an earnings call after market close.  That day, TTD announced for the first time in its history that it had fallen short of revenue expectations.  Defendant Green expressly attributed the shortcoming to the rollout of Kokai, which had progressed slower than represented.  *See supra* ¶¶ 128-35.

227.   Defendants Green and Schenkein were forced to admit during the earnings call that day that the slow adoption of Kokai had been caused by TTD failures.  As Defendant Green stated, "***I just want to be super clear, we missed because we had a series of small execution missteps.***"  Defendant Green spent time that day speaking to investors about "***what [TTD] got wrong.***"  As part of that discussion, Defendant Green

further was forced to admit that TTD's failure was not attributable to the macro-environment, forces in the advertising sector, or growing competition:

> [L]et me explain it as I see it: what falling short of our own expectations does not represent. This didn't happen because the opportunity isn't as big as we thought. In this case, it isn't because of competition either. *For Q4, the reality is that we stumbled* due to a series of small execution missteps while simultaneously preparing for the future. *If this were a sporting event . . . we turned over the ball too many times.*

228. Defendant Green expressly contrasted this result with previous headwinds the Company had faced during the COVID-19 pandemic, noting that "for the first time in 8 years we missed the expectations we set, and *it was our fault.*"

229. Defendant Schenkein was also forced to admit the same, noting that the Company took "*full ownership of the shortfall.*" Defendant Schenkein also was required to acknowledge that "this miss was not due to a lack of opportunity or increased competition; *it was on us.*"

230. That the fault lay with TTD itself and not with any macroeconomic factors was further underscored by the fact that 2024 was an election year—and, accordingly, should have been a boon to an advertising company like TTD, as Defendant Green himself repeatedly stated. For instance, in his 2023 third quarter prepared remarks, Defendant Green touted that TTD had been a "vital platform for leading political advertisers," and that "[i]n 2024, . . . we believe that spend will increase . . . ." And, in Defendant Green's 2023 fourth quarter prepared remarks, he made the same point, observing that "2024 stands to be a major year for political spending here in the United States."

231. Analysts and the financial press were stunned by Defendants' revelations. A report that day from Kantor emphasized the "slower rollout of Kokai (missed 50% EOY adoption goal) . . . weighed on 4Q revs," and another from Jeffries identified Kokai issues as the "primary reason[] for the miss."

232. Indeed, analysts at CSI Market specifically questioned TTD's "bold assertions" about Kokai's capabilities and the "massive benefits" the platform provided:

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT     71     Case No. 2:25-cv-01396-CAS-DFM

*[T]hose statements now seem hollow following recent financial disclosures. The disjunction between the optimistic outlook previously presented and the revenue shortfall calls into question the accuracy of the information shared with investors and the public. . . .* The Kokai platform was initially positioned to elevate The Trade Desk's capabilities, promising to enhance targeting, streamline ad buying, and ultimately drive more effective ad campaigns. *Yet, the disappointing revenue figures suggest that either the rollout is not functioning as intended or that market conditions have evolved*, leaving the company with its ambitions unfulfilled.

233. Other analysts agreed. For example, industry analysts at PPC Land described the revenue miss as having "exposed deeper strategic challenges . . . ."

234. As a result of the disclosure, TTD's stock price dropped over 30%, from $122.23 to $81.92, the largest single-day drop in the Company's history.

235. But reassurances by Defendants prevented the stock price from dropping further. Indeed, at the same time that Defendants made their admissions, they tried to downplay their significance. For instance, in his response to an analyst question on February 12, Defendant Green told investors that the Company had only suffered from "small mistakes" and, in fact, had elected for "trade-ups that [merely] compounded."

**B. March 11, 2025: *AdWeek* Exposé Reveals Kokai Product Failures**

236. After hours on March 11, 2025, *AdWeek* published an exposé chronicling advertisers' frustration with Kokai. That article brought to light that TTD had not suffered from small execution errors, nor had it traded off short-term gains for long-term success with the Kokai rollout. Rather, Kokai was exhibiting critical failures in attracting and retaining customers to the new platform. *See supra* ¶¶ 136-141.

237. While the article was published after market close on March 11, it sat behind a paywall and gained traction on social media over the next forty-eight hours.

238. As a result of the disclosure, TTD's stock price dropped an additional 11.09% on March 13, 2025, and 8.4% from its close on March 11.

**C.    August 7, 2025: Defendants Admit to the Extent of Kokai's Negative Impact**

239.    After hours on August 7, 2025, TTD announced its financial results for the second quarter of 2025 and held an earnings call, also after market close.  That day, TTD announced a faster-than-expected downturn in revenue growth. *See supra* ¶¶ 142-144.

240.    Analysts and the market yet again raised concern that TTD's growth rate had slowed as a result of poor Kokai adoption.  Several analysts downgraded the stock—Bank of America downgraded it from Buy to Underperform, citing slowed growth as a concern; Moffett Nathanson, Wedbush, and Citi downgraded to Hold. Oppenheimer noted "slower pace of next-gen adtech adoption" as an issue, and Jefferies reported that "the rollout of the company's new Kokai platform has been slower than expected."

241.    TTD's stock continued to crumble upon this news, falling from $88.33 at 4 PM on August 7, 2025, to $54.23 at 4 PM on August 8, a nearly 40% drop in twenty-four hours.

**VII.    ADDITIONAL SCIENTER ALLEGATIONS**

242.    A host of additional facts, in addition to those discussed above, support a strong inference that Defendants knew, or at minimum were severely reckless in not knowing, the true facts about Kokai.

243.    ***Defendants' $465 Million of Insider Stock Sales***: As set forth above in Section IV.F, the Executive Defendants capitalized on their materially false and misleading statements and omissions that inflated the price of TTD stock by disposing of personally held shares at artificially inflated prices.

244.    During the Class Period, the Executive Defendants reaped hundreds of millions of dollars from stock sales while in possession of material, non-public information: namely, that Kokai adoption was slow, and a number of Kokai's features were defective or undeveloped; Kokai could not integrate first-party data of key client

sectors; Kokai failed basic tests of platform accuracy; TTD was manipulating key performance metrics; Kokai suffered from pacing problems; and Kokai's interface was unnavigable and unintuitive.

245. As negative facts about Kokai accumulated, the Executive Defendants sold over ***$465 million*** in their stock. Specifically, Defendant Green sold 4 million shares of his TTD stock for $443 million, Defendant Schenkein sold 158,657 shares of her TTD stock for $18 million, and Defendant Jacobson sold approximately 71,697 shares of her TTD stock for $7 million. By contrast, in the Control Period, Defendant Green sold just $50 million worth of stock and Defendant Schenkein sold just $256,200 worth of stock.[29] Additionally, the timing of Executive Defendants' sales was highly suspicious: multiple sales occurred on or shortly after the issuance of false or misleading statements, and Defendant Green disposed of over $48 million in stock just ***one day*** before the February 12, 2025, disclosure that crashed the price of TTD common stock.

246. ***Defendants' Admissions***: Defendant Green's admissions make clear that he was well-aware of Kokai's slow adoption rates. As previously discussed (*see* Section VI.A), Defendant Green was forced to admit during the company's February 12, 2025, earnings call that Kokai's rollout was slower than represented—and Defendants were to blame. In making this admission, Defendant Green claimed the lagging adoption was "deliberate" and "for good reason." While Defendant Green's *post-hoc* justification was false, it is a concession that Defendant Green knew throughout the Class Period that Kokai adoption was slower than publicly stated.

247. ***Internal Discussion and All-Hands Meetings***: Multiple former employees, including FE3, FE10, FE8, and FE2, have confirmed that Executive Defendants and their colleagues discussed and acknowledged Kokai's less-than-represented adoption and usage rates and significant execution problems in regular

---

[29] Defendant Jacobson did not report her stock sales on Form 4 until February 15, 2024, well after the start of the Class Period.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT | 74 | Case No. 2:25-cv-01396-CAS-DFM

weekly meetings led by Defendant Green (and sometimes Jacobson), and attended by all of the Executive Defendants. *See supra* ¶¶58-61.

248.    As set forth above in paragraphs ¶¶59-60, FE4, FE10, FE8, FE2, and FE3 all confirmed that, during these meetings, Defendant Green discussed slow Kokai adoption rates.

249.    The Executive Defendants also knew through the weekly meetings that, contrary to their public statements touting Kokai's interface, design, efficacy, performance, and features, that TTD's clients were regularly reporting that they thought that Kokai's interface and design was hugely problematic and difficult to use, that its efficacy and performance were poor and that many of its features were not even developed, and as a result its clients were not going to adopt Kokai. *Id.*

250.    ***Reports of Lagging Adoption and Product Defects***: Former employees consistently reported that the Executive Defendants were well aware of Kokai's adoption issues, product defects, and failure to drive revenue through multiple reports throughout the Class Period.  These former employees reported that the Executive Defendants received, reviewed, monitored, and had access to contemporaneous Tableau and other reports, data, and information that contradicted their statements to investors and the public regarding Kokai adoption and performance.

251.    As FE8, FE2, and FE3 confirmed, throughout the Class Period, each of the Executive Defendants regularly utilized and had access to a Tableau-based executive dashboard which provided Kokai's real-time adoption, transition and reversion rates, sales and product usage rates, and feature-level engagement.  *See supra* ¶¶53-56.

252.    FE6, FE2, FE3, and FE8 also confirmed that, throughout the Class Period, reports and other information from Tableau regarding Kokai adoption and performance metrics—which included the percentage of client business which had migrated from Solimar to Kokai—were also circulated to each of the Executive Defendants weekly through emails.  *Id.*

253. Tableau and the emailed spreadsheets reports made clear that TTD was not obtaining "phenomenal" adoption rates, and that many key clients had not adopted Kokai. For example, at the time of FE6's departure in August 2024, only about 18% of FE6's client business had moved to Kokai. FE5 stated that TTD's goals of 90% adoption by June 2024 were detached from reality; as of August 2024, only 5–10% of FE5 portfolio's clients had adopted Kokai—including only two of their roughly 10 large clients that were very important to the Company.

254. Additionally, as FE7 stated, CMO Ian Colley—who met regularly with Defendant Green—had commissioned and received the results of a study that showed why clients did not like Kokai.

255. The Executive Defendants also learned through regular reports via Tableau that, contrary to their public statements touting Kokai's interface, design, efficacy and features, that TTD's clients were regularly reporting that they thought that Kokai's interface and design was hugely problematic and difficult to use. They received additional reporting that Kokai's efficacy was poor and that many of its features were not even developed, and as a result they were either not going to transition to Kokai or not use Kokai's revenue increasing features. *Id*.

256. ***Deliberate Steps to Inflate the Number of Clients Who Had "Adopted" Kokai***: Defendants took deliberate steps to inflate the number of clients it considered "adopted." As discussed above, TTD misleadingly included in its adoption rates clients who, rather than using Kokai, used Solimar for the ***majority of the time***. As FE6 explained, so long as clients had *access* to both version of the platform, they were considered "adopted." *See supra* ¶¶48-49.

257. ***Monitoring of Kokai Defects on Social Media***: The Executive Defendants also knew about Kokai's failures because, as FE8, FE2, and FE10 explained, they actively monitored social media platforms where Kokai was discussed by clients and were apprised of concerning coverage. As discussed above, those platforms regularly included biting critiques of Kokai's shortcomings. *See supra* ¶120.

258.     ***False Performance Metrics***: Defendants knowingly presented selectively chosen and baked performance improvement metrics to investors, sharing only "success stories," despite knowing that the typical client experience was far grimmer and the performance metrics were meaningless.

259.     ***Client Feedback***: The Executive Defendants also knew about Kokai's failures because they paid close attention to client feedback.  For example, the director above was a part of a focus group wherein TTD was expressly told, in March 2024, that the new interface was confusing and impeded client engagement with the platform.

260.     Indeed, Defendant Green publicly admitted that he personally was closely following customer reaction to and adoption of Kokai.  On the Company's February 15, 2024, earnings call, Defendant Green explained that he had just been on a "world tour" across four continents to talk to customers about Kokai.  In describing the trip, Defendant Green acknowledged he had taken it specifically "out of concern in the sense that I know we are giving them more change than ever [with Kokai.]"  Defendant Green expressed that he had been "concerned that the amount of change would make them afraid of adopting something new simply because of how much it changed . . . ."

261.     ***Frequent Statements on the Topics***: As described above, the Executive Defendants regularly spoke to investors and securities analysts regarding Kokai, claiming comprehensive personal knowledge of this topic. The fact that the Executive Defendants held themselves out to investors and analysts as knowledgeable about Kokai and the transition from Solimar to Kokai supports a strong inference they knew—or were severely reckless in not knowing—the true facts about Kokai.

262.     ***Critical Importance of Kokai to TTD***: TTD's sole business is ad-buying and Kokai was their primary new product.  From even before the initial Kokai launch, Defendants Green, Schenkein, and Jacobson made clear that Kokai was of monumental importance to the Company.

263.     For example, in his first quarter 2023 prepared remarks to investors on May 10, 2023, Defendant Green stated that the Kokai launch event "***will be the largest***

*platform launch* in our history. . . . I even hesitate to call it an upgrade because it is so much more than that."

264. Additionally, on November 9, 2023, on the third quarter 2023 earnings call, Defendant Schenkein echoed that Kokai was TTD's "*biggest product release ever*" and one of the Company's "*large growth drivers.*" Defendant Green agreed, stating in response to an analyst question that Kokai was among the primary reasons TTD would "outpace the industry and gain share." On February 15, 2024, Defendant Schenkein reiterated that Kokai was the Company's "*biggest product release ever.*" Finally, on February 12, 2025, on the fourth quarter 2024, Defendant Green stated that Kokai represented the Company's "*largest and most important platform overhaul ever.*" Indeed, as *AInvest* reported on July 1, 2025, The Trade Desk had "*staked its future*" on Kokai.

265. That the Executive Defendants and investors saw Kokai as determinative of TTD's success bolsters an inference that they paid close attention to its design, development, adoption, and reception.

266. ***Defendant Jacobson's Role***: Defendant Jacobson is TTD's Chief Strategy Officer and a member of the Board of Directors. That role, which includes overseeing product strategy such as Kokai, further supports an inference of scienter. She is deeply enmeshed in product development; indeed, her role is described as "manag[ing] strategic investments and cross-functional initiatives to reinforce TTD's position as an industry leader." At a fireside chat at DMS by LUMA 2024, where she spoke on behalf of Trade Desk, Defendant Jacobson displayed a deep understanding of what Trade Desk offers to its clients through Kokai, including not just specific attributes of the platform, but how they provide value to advertisers. She also displayed a keen understanding on how advertisers interact with Kokai and what advertisers need to be effective with consumers, including the importance of relevance metrics, integration of first party data.

267. ***Defendant Schenkein's Suspiciously Timed Departure***: On August 7, 2025, Trade Desk announced second quarter 2025 earnings, including a disappointing

third quarter outlook and the news that Kokai was still not fully adopted—only 75% of clients were on the platform.

268. That same day, Defendants also announced that Defendant Schenkein would be leaving her role as CFO in just two weeks. The departure was sudden and suspiciously timed—immediately after the Company's August 7, 2025, revelations that caused its stock price to decline by nearly 40%.

*       *       *

269. The foregoing facts, particularly when considered collectively (as they must be), support a strong inference of the Defendants' scienter.

## VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE

270. Plaintiffs are entitled to a presumption of reliance on the Exchange Act Defendants' material representations and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. the Company's securities traded in an efficient market;

d. the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the TTD stock;

e. Lead Plaintiff and other members of the Class purchased TTD common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

f. TTD stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

g. as a regulated issuer, TTD filed periodic public reports with the SEC and NASDAQ;

h. TTD regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

i. TTD was followed by numerous securities analysts employed by major brokerage firms, all of which wrote reports that were distributed to the sales force and certain customers of their

respective brokerage firm(s) and that were publicly available and entered the public marketplace.

271.    As a result of the foregoing, the market for TTD stock promptly digested current information regarding TTD from publicly available sources and reflected such information in the price of TTD stock.  Under these circumstances, all persons and entities who or which purchased or otherwise acquired TTD stock during the Class Period suffered similar injuries through their purchase of TTD stock at artificially inflated prices and thus, the presumption of reliance applies.

272.    The material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of TTD stock.

273.    Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased shares of TTD stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were fully disclosed.

274.    To the extent that Defendants concealed or improperly failed to disclose material facts with respect to TTD's business, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## IX.    <u>NO SAFE HARBOR</u>

275.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false and misleading statements alleged in this amended complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

276.    In addition, to the extent certain of the statements alleged to be false and misleading may be characterized by Defendants as forward-looking, those statements were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in any purportedly forward-looking statements.

277. Further, to the extent certain of the statements alleged to be false and misleading may be characterized by Defendants as forward-looking, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer who knew that the statement was false when made.

## X.   CLASS ACTION ALLEGATIONS

278. Lead Plaintiff brings this federal securities class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all persons and entities that purchased or otherwise acquired publicly traded TTD Common Stock (NASDAQ: "TTD") during the period from November 15, 2023, through August 8, 2025, inclusive, (the "Class Period"), and were damaged thereby, except as excluded below (the "Class").

279. Excluded from the Class are: (a) Defendants; (b) members of the immediate families of any Individual Defendant; (c) the subsidiaries and affiliates of TTD; (d) any person who was an officer, director or controlling person of TTD during the Class Period; (e) any entity in which any Defendant has a controlling interest or beneficial interest; and (f) the legal representatives, heirs, successors or assigns of any such excluded person or entity, in their capacities as such.

280. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class. Indeed, as of January 31, 2025, TTD had 452 million outstanding shares of TTD Stock.

281. Members of the Class may be identified from records maintained by TTD or its transfer agent and may be notified of the pendency of this Action by mail, using a form of notice customarily used in securities class actions.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    81          Case No. 2:25-cv-01396-CAS-DFM

282. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including:

a. whether the federal securities laws were violated by Defendants' respective acts as alleged herein;

b. whether the statements made by Defendants were materially false or misleading, or omitted material facts;

c. whether Defendants acted knowingly or with deliberate recklessness in making false or misleading statements, omitting material facts, or engaging in deceptive conduct;

d. whether the prices of TTD Stock during the Class Period were artificially inflated and/or artificially maintained because of Defendants' conduct complained of herein;

e. whether the Individual Defendants were controlling persons of TTD;

f. whether Defendants Green, Schenkein, and/or Jacobson sold TTD common stock while in possession of material, non-public information; and

g. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

283. Lead Plaintiff's claims are typical of the claims of other members of the Class and sustained damages arising out of Defendants' wrongful conduct in violation of the Exchange Act as alleged in this amended complaint.

284. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation. Lead Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

285. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impractical for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action.

286. Lead Plaintiff will rely, at least in part, on the presumption of reliance established by the fraud on the market doctrine. All purchasers of TTD Stock during

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

82

Case No. 2:25-cv-01396-CAS-DFM

the Class Period suffered similar injuries, including injury through their purchase of TTD Stock at artificially inflated prices and/or artificially maintained prices. A presumption of reliance therefore applies.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) Promulgated Thereunder (Against All Defendants)

287. Lead Plaintiff realleges, incorporates, and repeats each allegation above as if fully set forth herein.

288. This Count is brought under § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5(b) promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5(b), against Defendants TTD, Green, Schenkein, and Jacobson.

289. Defendants made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading in violation of § 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

290. Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of or attributable to TTD were materially false and misleading and were issued or disseminated to the investing public.

291. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for TTD Stock, Lead Plaintiff and other members of the Class purchased TTD Stock at artificially inflated prices during the Class Period. But for Defendants' fraud, Lead Plaintiff and members of the Class would not have purchased TTD Stock at such artificially inflated prices.

292. As set forth herein, when adverse, previously undisclosed facts concerning the Defendants were disclosed and/or when previously concealed risks materialized, the price of TTD Stock declined precipitously, and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchase of shares

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

83

Case No. 2:25-cv-01396-CAS-DFM

of TTD Stock at artificially inflated prices and the subsequent decline in the price of TTD Stock.

293. By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against the Executive Defendants as Control Persons of The Trade Desk

294. Lead Plaintiff realleges, incorporates, and repeats each allegation above as if fully set forth herein.

295. This Count is brought under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against Defendants Green, Schenkein, and Jacobson.

296. Defendants Green, Schenkein, and Jacobson, by reason of their status as senior executive officers and/or directors of TTD, directly, or indirectly controlled the conduct of TTD's business and its representations to the public, within the meaning of § 20(a) of the Exchange Act.

297. Defendants Green, Schenkein, and Jacobson knew or recklessly disregarded the fact that TTD's representations were materially false and misleading and/or omitted material facts when made. In doing so, Defendants Green, Schenkein, and Jacobson did not act in good faith.

298. By virtue of their high-level positions and their participation in and awareness of TTD's operations and public statements, Defendants Green, Schenkein, and Jacobson were able to and did influence and control TTD's decision-making, including controlling the content and dissemination of the misrepresentations and other deceptive conduct, that Lead Plaintiff and the Class contend artificially inflated and/or artificially maintained the price of TTD Stock.

299. Defendants Green, Schenkein, and Jacobson had the power to control or influence the statements made and conduct engaged in, giving rise to the securities violations alleged herein, as set forth more fully above.

300. By virtue of their positions as controlling persons of TTD, Defendants Green, Schenkein, and Jacobson are also liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of Defendants Green, Schenkein, and Jacobson's wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their purchase of TTD Stock during the Class Period.

## COUNT III

### For Violation of Section 20A of the Exchange Act
### Against the Executive Defendants

301. Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein. Count III is brought pursuant to § 20A of the Exchange Act against the Executive Defendants on behalf of Lead Plaintiff and members of the Class who were damaged by the Executive Defendants' insider trading.

302. As detailed herein, the Executive Defendants were in possession of material non-public information concerning TTD and took advantage of their possession of material non-public information regarding TTD to obtain millions of dollars in insider trading profits during the Class Period.

303. The Executive Defendants' sales of TTD common stock were made contemporaneously with Lead Plaintiff's purchases of TTD common stock (set forth below and in Lead Plaintiff's certifications in Exhibits 1 and 2, filed herewith) during the Class Period.

304. Defendants Green, Schenkein, and Jacobson sold shares of TTD common stock for total proceeds in excess of $40 million, $9 million, and $3 million contemporaneously with Lead Plaintiff's purchases of the same. *See supra* ¶¶ 168-71.

305. Lead Plaintiff and members of the Class who purchased shares of TTD common stock contemporaneously with sales by the Executive Defendants suffered

damages because (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§ 10(b) and 20(a) of the Exchange Act as alleged herein; and (2) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and omissions alleged herein.

306. Lead Plaintiff and members of the Class who purchased shares of TTD common stock contemporaneously with sales by the Executive Defendants suffered damages because (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§ 10(b) and 20(a) of the Exchange Act as alleged herein; and (2) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and omissions alleged herein.

## XI. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff, and on behalf of the other members of the Class, demands judgment against Defendants as follows:

A. Determining the instant Action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as Class Representative and Lead Counsel as Class Counsel;

B. Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts alleged herein;

C. Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, experts' fees, and other costs and disbursements; and

D. Awarding such other and further relief as this Court may deem just and proper.

## XII. JURY DEMAND

Lead Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: August 15, 2025

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

By: */s/ Jonathan D. Uslaner*
Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel.: (310) 819-3481

-and-

Hannah Ross (*pro hac vice* pending)
(Hannah@blbglaw.com)
John Rizio-Hamilton (admitted *pro hac vice*)
(johnr@blbglaw.com)
Prachi Patel (admitted *pro hac vice*)
(Prachi.patel@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel.: (212) 554-1400

*Counsel for Lead Plaintiff*
*Public Employees' Retirement System of Mississippi, and Lead Counsel for the Class*

**COHEN MILSTEIN SELLERS & TOLL PLLC**

*/s/ Laura H. Posner*
Laura H. Posner
(lposner@cohenmilstein.com)
Brendan R. Schneiderman
(bschneiderman@cohenmilstein.com)
88 Pine St., 14th Floor
New York, NY 10005
Tel.: (212) 838-7797

-and-

Steven J. Toll
(stoll@cohenmilstein.com)
Molly J. Bowen
(mbowen@cohenmilstein.com)
1100 New York Avenue, N.W., Suite 800
Washington, D.C. 20005
Tel.: (202) 408-4600

*Counsel for Lead Plaintiff Arkansas Public Employees' Retirement System, and Lead Counsel for the Class*

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

87

Case No. 2:25-cv-01396-CAS-DFM

John L. Davidson (*pro hac vice* forthcoming)
(jdavidson@dbslawfirm.net)
DAVIDSON, PLLC
1062 Highland Colony Parkway
200 Concourse, Suite 275
Ridgeland, Mississippi 39157
Tel.: (601) 932-0028

*Additional Counsel for Lead Plaintiff Public Employees' Retirement System of Mississippi*

**CERTIFICATE PURSUANT TO CENTRAL DISTRICT OF CALIFORNIA LOCAL RULE 5-4.3.4(A)(2)(I)**

I, Jonathan D. Uslaner, am the ECF User whose ID and password are being used to file the foregoing document.  In compliance with Local Rule 5-4.3.4(a)(2)(i), I hereby attest that Laura H. Posner concurs in this filing's content and has authorized the filing.

Dated: August 15, 2025

_/s/ Jonathan D. Uslaner_____
Jonathan D. Uslaner (Bar No. 256898)
