CAZ HASHEMI, State Bar No. 210239
chashemi@wsgr.com
BENJAMIN M. CROSSON, State Bar No. 247560
bcrosson@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300

JESSICA L. SNORGRASS, State Bar No. 259962
jsnorgrass@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1900 Avenue of the Stars, 28th Floor
Los Angeles, CA 90067
Telephone: (424) 446-6900

*Attorneys for Defendants*
*The Trade Desk, Inc., Jeffrey Terry Green,*
*Laura Schenkein and Samantha Jacobson*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| *In re The Trade Desk, Inc. Securities Litigation* | Case No.: 2:25-cv-01396-CAS-DFM<br><br><u>CLASS ACTION</u><br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Date: March 9, 2026<br>Time: 10:00 a.m.<br>Courtroom: 8D, 8th Floor<br>Before: Hon. Christina A. Snyder |

# TABLE OF CONTENTS


**Page**

I. INTRODUCTION ........ 1

II. STATEMENT OF FACTS ........ 2

A. The Trade Desk ........ 2

B. TTD's "Kokai" Platform ........ 3

C. Q4'24 Missed Revenue Guidance ........ 3

D. Q2'25 Financial Results and Ms. Schenkein's Transition ........ 4

E. Plaintiff's Allegations ........ 4

III. LEGAL STANDARD ........ 5

IV. THE FAC DOES NOT STATE A SECTION 10(B) CLAIM ........ 5

A. THE FAC DOES NOT PLEAD AN ACTIONABLE MATERIAL MISSTATEMENT OR OMISSION ........ 5

1. Many Challenged Statements Are Inactionable Puffery ........ 6

2. The Safe Harbor Protects Defendants' Forward-Looking Statements ........ 7

3. Plaintiff's Overarching Omissions Theory Does Not Adequately Plead Any False Or Misleading Statement ........ 8

a. Allegations Kokai Suffered From Severe Defects And Performance Issues Fail ........ 10

b. Allegations About Kokai Adoption Fail ........ 13

4. The Challenged Statements Are Not Adequately Alleged To Be False Or Misleading For Additional Reasons ........ 14

B. The FAC Does Not Plead A Strong Inference Of Scienter ........ 19

1. The Former Employees Do Not Support Scienter ........ 20

2. Individual Defendant Stock Sales Do Not Support Scienter ........ 25

3. The FAC's Remaining Scienter Allegations Fail ........ 27

4. The Competing Inferences Undermine Scienter ........ 28

C. The FAC Does Not Adequately Allege Loss Causation ........ 28

V. THE REMAINING CLAIMS FAIL ........ 30

VI. CONCLUSION ........ 31

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Applestein v. Medivation, Inc.*,
861 F. Supp. 2d 1030 (N.D. Cal. 2012), *aff'd*, 561 F. App'x 598 (9th Cir. 2014) ..... 26

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..... 11

*Brodsky v. Yahoo! Inc.*,
592 F. Supp. 2d. 1192 (N.D. Cal. 2008) ..... 7, 30

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ..... 2, 9, 12, 16

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ..... 15, 16, 18, 27, 30

*Curry v. Yelp Inc.*,
875 F.3d 1219 (9th Cir. 2017) ..... 29

*Dolly v. GitLab Inc.*,
2025 WL 2372965 (N.D. Cal. Aug. 14, 2025) ..... 14, 20

*In re AnaptysBio, Inc.*,
2021 WL 4267413 (S.D. Cal. Sept. 20, 2021) ..... 25

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) ..... 6

*In re Downey Sec. Litig.*,
2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ..... 21

*In re Herbalife, Ltd. Sec. Litig.*,
2015 WL 1245191 (C.D. Cal. Mar. 16, 2015) ..... 29

*In re Intrexon Corp. Sec. Litig.*,
2017 WL 732952 (N.D. Cal. Feb. 24, 2017) ..... 10, 17, 21

*In re Nimble Storage, Inc. Sec. Litig.*,
756 F. App'x 779 (9th Cir. 2019) .......... 6

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) .......... 27

*In re Rigel Pharm., Inc. Sec. Litig.*,
697 F.3d 869 (9th. Cir. 2012) .......... 18

*In re Siebel Sys., Inc. Sec. Litig.*,
2005 WL 3555718 (N.D. Cal. Dec. 28, 2005) .......... 18

*In re Silicon Graphics Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) .......... 21

*In re VeriFone Sec. Litig.*,
11 F.3d 865 (9th Cir. 1993) .......... 15

*Janus Capital Grp., Inc. v. First Deriv. Traders*,
564 U.S. 135 (2011) .......... 30

*Jaszczyszyn, v. SunPower Corp.*,
2024 WL 3463348 (N.D. Cal. Jul. 17, 2024) .......... 6, 8

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) .......... 8

*Kipling v. Flex*,
2020 WL 7261314 (N.D. Cal. Dec. 10, 2020), *aff'd sub nom. Nat'l Elevator Indus. Pension Fund v. Flex Ltd.*, 2021 WL 6101391 (9th Cir. Dec. 21, 2021) .......... 10

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) .......... 5, 28, 30

*Maine State Ret. System v. Countrywide Fin. Corp.*,
2011 WL 4389689 (C.D. Cal. May 5, 2011) .......... 28

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) .......... 8, 9

*McGovney v. Aerohive Networks, Inc.*,
2019 WL 8137143 (N.D. Cal. Aug. 7, 2019) .......... 11, 20, 21, 22

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) .......... 5, 21, 25, 26, 28, 29

*Ng v. Berkeley Lights, Inc.*,
2024 WL 695699 (N.D. Cal. Feb. 20, 2024) .......... 12, 30

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) .......... 2, 5, 17, 19, 20

*Oklahoma Firefighters Pension & Ret. Sys. v. Ixia*,
2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) .......... 25, 26

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) .......... 15, 16

*Park v. GoPro, Inc.*,
2019 WL 1231175 (N.D. Cal. Mar. 15, 2019) .......... 7, 20, 22, 23

*Patel v. Parnes*,
253 F.R.D. 531 (C.D. Cal. 2008) .......... 5, 30

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) .......... 7, 15

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) .......... 9, 13, 17, 19, 20, 25, 26, 27

**STATUTES**

15 U.S.C. § 78u-4(b) .......... 5, 19

15 U.S.C. § 78u-5 .......... 7

## I. INTRODUCTION

Plaintiff's First Amended Complaint ("FAC" or "¶") takes aim at advertising technology company The Trade Desk's ("TTD" or the "Company") new ad-buying platform called "Kokai" (updated from its prior platform "Solimar"). Initially launched in beta in June 2023, TTD publicly discussed expectations to transition clients from Solimar to Kokai over time, which during the class period was publicly expected to be by the end of 2025. After Kokai was launched, clients began adopting it and TTD periodically gave updates on the platform and adoption. Over the same period, TTD met its quarterly revenue guidance, as it had every quarter since going public in 2016. On February 12, 2025, however, despite solid growth, TTD announced that it slightly missed its Q4'24 revenue guidance due to "a series of small execution missteps." Its stock price declined 30% and this lawsuit followed.

Distilled to its core, the FAC consists of superficial, repetitive allegations that merely describe circumstances typical of a company's new technology product rollout and are hardly indicative of securities fraud. Although Kokai has been widely adopted and its rollout successful (*e.g.*, the FAC admits it is nearing full adoption), Plaintiff has devised a narrative of fraud in hindsight. As its theory goes, the individual defendants (TTD's CEO Jeff Green, former Chief Financial Officer Laura Schenkein and Chief Strategy Officer Samantha Jacobson (the "Individual Defendants" and, with TTD, "Defendants")) knew about severe Kokai "defects" and "performance issues" impeding adoption and revenue, but concealed them from—and lied about them to—investors, which caused TTD's stock price declines once "revealed."

Plaintiff's theory fails in all aspects. To start, many challenged statements are easily dismissed as inactionable puffery and forward-looking statements protected by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Further, Plaintiff offers no well-pled allegations that any statement was actually

false when made, and its reliance on an omnibus omission theory—seemingly targeted at every class period mention of "Kokai"—fails because it cannot explain how not disclosing Plaintiff's (non-existent) "fundamental defects" and other purported issues "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).[1]

Plaintiff also has not even come close to raising a strong inference of scienter, an "intent to deceive, manipulate, or defraud" (*Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020)), nor could it because none existed. Plaintiff relies almost entirely on statements by 12 former employees ("FEs"), but none claim to have personally interacted with any Individual Defendant nor (understandably) offer any probative insights into their state of mind. Indeed, their statements are inconsequential and not indicative of scienter, suggesting that Plaintiff has mistaken quantity for quality.

Finally, Plaintiff's theory of loss causation is foreclosed by Ninth Circuit law, which requires it plausibly allege a revelation of fraud—which it has not.

For these reasons and those below, the FAC should be dismissed.

## II. STATEMENT OF FACTS

### A. The Trade Desk

TTD is headquartered in Ventura, California and operates a digital platform helping advertisers place ads on websites, podcasts and streaming services. ¶22. TTD generates revenue by charging clients a platform fee based on a percentage of their total spend on advertising and from providing data and other value-added services and platform features. ¶31. TTD disclosed that, as of December 31, 2023, it had 3,115 full-time employees in 19 countries. Exhibit ("Ex.") 1 to the Declaration of Benjamin Crosson at 11.

[1] Unless otherwise noted, all emphases are added and all citations are omitted.

### B. TTD's "Kokai" Platform

On June 6, 2023, TTD announced the launch of its updated platform, Kokai, which among other things, would incorporate advances in artificial intelligence ("AI"). ¶¶33, 64. TTD explained it would continue to add Kokai features and capabilities and scale over time. *E.g.*, Ex. 2 at 8 (2/15/24 Q4'23 earnings call: "Kokai is now live, and ... will scale over the next year"). While Schenkein stated at the start of the class period on November 15, 2023 that the Company expected "full adoption" over the course of 2024, TTD thereafter repeatedly conveyed that it was pursuing full adoption by the end of 2025.[2]

### C. Q4'24 Missed Revenue Guidance

After several quarters of meeting its revenue guidance during the class period, on February 12, 2025, TTD announced its Q4'24 and FY24 results: FY24 revenue was $2.4 billion, a 26% increase year-over-year, and Q4'24 revenue was $741 million, a 22% year-over-year increase but $15 million lower than guidance. ¶10; Exs. 4-5. TTD's stock price declined over 30%. ¶130.

The Company explained on its Q4'24 earnings call that spend on its platform "exceeded $12 billion" during 2024, "the highest in our history." Ex. 6 at 3. However, Green acknowledged that TTD missed its revenue guidance, discussing that "we stumbled due to a series of small execution missteps[.]" *Id.* Green further described that "there were a series of decisions we could have made to enhance the short-term performance," but instead "[w]e consistently choose to focus on the long-term opportunity[.]" *Id.* at 4. Among other things, he noted that TTD executed its "largest reorganization in company history in December." *Id.*

In addition, Green noted that a majority of clients had moved to Kokai, and TTD expected to complete the transition during 2025. *Id.* at 4, 7. Green also discussed that Kokai "rolled out slower than we anticipated" but "much of that was

[2] Analysts recognized Kokai was "in open beta" and should "roll[] out to all customers in 2025." Ex. 3 at 1 (Truist 11/20/24, cited at ¶212(f)).

for good reason," including because TTD saw "moments and places to inject AI," a "long-term positive." *Id.* at 13-14; *id*. at 14 ("In other words, in some cases, the slower Kokai rollout was deliberate[.]").

**D. Q2'25 Financial Results and Ms. Schenkein's Transition**

Two quarters later, on August 7, 2025, TTD announced it met its Q2'25 revenue guidance (revenue grew 19% year-over-year) and gave Q3'25 revenue outlook of $717 million. Ex. 7; Ex. 8; ¶142. TTD also announced a new CFO and that Schenkein would remain with TTD as a senior advisor through the end of the year. Ex. 9. Green commented: "[h]aving worked closely with Laura for almost 12 years, I have nothing but admiration and respect for her many contributions to the company's success." *Id*. TTD's stock price declined approximately 40% on August 8, the last day of the class period (¶144), with analysts largely citing increasing competition and industry risks. *See* ¶240 (citing, *e.g.*, Exs. 10-12).

**E. Plaintiff's Allegations**

Plaintiff alleges securities fraud on behalf of a putative class of purchasers of TTD common stock from November 15, 2023 through August 8, 2025. FAC at p.1. According to Plaintiff, Defendants fraudulently concealed that "critical" features of Kokai "did not work" or had not been developed, adoption was "lagging" and Kokai was not "driving revenue." ¶1.

Plaintiff alleges the "truth" was revealed in three "corrective disclosures," when: (i) Defendants purportedly "admitted" on February 12, 2025 that Kokai adoption "was slower than expected due to the Company's execution missteps"; (ii) a March 11, 2025 *AdWeek* article purportedly "revealed for the first time" Kokai "fundamental deficiencies"; and (iii) based on TTD's August 7, 2025 financial results, the market purportedly had "concern" TTD's growth rate had slowed "as a result of poor Kokai adoption." ¶¶2, 226, 237-241.

## III. LEGAL STANDARD

To plead a Section 10(b) and Rule 10b-5 claim, a plaintiff must allege, *inter alia*, a material misrepresentation or omission, scienter and loss causation. *Endologix*, 962 F.3d at 413. The claims are subject to heightened pleading requirements under Rule 9(b) and the PSLRA's "formidable" pleading standards. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1054-55 (9th Cir. 2008). Plaintiffs must "specify" each allegedly misleading statement, the reasons why the statement is misleading and, if the allegation is made on information and belief, "state with particularity all facts on which that belief is formed." *Endologix*, 962 F.3d at 414 (quoting 15 U.S.C. § 78u-4(b)(1)). The complaint must also raise a "strong inference" of scienter (*id*.) and plausibly allege the "fraud was *revealed* to the market and *caused* the resulting losses." *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014).

## IV. THE FAC DOES NOT STATE A SECTION 10(B) CLAIM

### A. THE FAC DOES NOT PLEAD AN ACTIONABLE MATERIAL MISSTATEMENT OR OMISSION

As discussed below, many challenged statements are puffery and/or protected by the PSLRA safe harbor, and none are adequately alleged to be false or misleading. Further, Plaintiff ignores its PSLRA obligation to specify in detail *which allegations* it contends render actionable *which statements* and why, and fails to tie its allegations to specific dates and disclosures to compare against TTD's public "representations" at the time. This pleading tactic alone warrants dismissal. *Patel v. Parnes*, 253 F.R.D. 531, 551-54 & 553 n.197 (C.D. Cal. 2008) (dismissing 73-page securities complaint as "puzzle pleading" where it repeatedly recited "lumped together" falsity allegations after quoting public statements and "[did] not tie [the] reasons to particular statements"). Nonetheless, Defendants endeavor below to address Plaintiff's apparent contentions.

**1. Many Challenged Statements Are Inactionable Puffery**

"[V]ague statements of optimism" or "other feel good monikers" are not actionable because investors "know how to devalue the optimism of corporate executives." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). Here, Plaintiff challenges the following "optimistic, subjective assessment[s]" that are merely "puffing" and "hardly amount[] to a securities violation" (*id.*):

- **2/15/2024**: "[W]e've never launched a product with this much confidence …" and "is going to be enthusiastically adopted." ¶177.
- **5/8/2024**: ¶183(a) ("I believe our revenue growth acceleration … speaks to the innovation and value that we're delivering …"); ¶183(b) ("I've never been more optimistic about the future of the open Internet and our [ability to gain share]"); ¶184(b) ("[W]e are encouraged about the momentum of our business."); ¶185 ("[W]e are better positioned than ever to deliver premium value to advertisers …").
- **8/8/2024**: ¶202 (*e.g.*, sentence beginning with "[a]s Kokai ramps, we're intuitively surfacing value for advertisers …"; "we will continue to deliver exceptional value to advertisers"); ¶204 (*e.g.*, "incredibly encouraged by the early results from Kokai"; "met the moment with Kokai"; "firing on all cylinders").
- **11/7/2024**: ¶208 (statement beginning with "[w]e are similarly excited about"); ¶209(b) ("encouraging CMOs and CFOs to lean more and more on TTD"); ¶209(d) ("firing on all cylinders"); ¶210 ("best [product] that we've ever shipped").
- **2/12/2025:** "Kokai is more effective in almost every way." ¶217.
- **5/8/2025:** Q1 was "such a strong quarter for us." ¶221.

Courts routinely hold such statements are inactionable puffery, and they should be dismissed here. *See, e.g.*, puffery: *In re Nimble Storage, Inc. Sec. Litig.*, 756 F. App'x 779, 780 (9th Cir. 2019) ("I think we are making really good progress" penetrating a market); *Cutera*, 610 F.3d at 1111 ("everything is clicking"); *Jaszczyszyn, v. SunPower Corp.*, 2024 WL 3463348, at *9 (N.D. Cal. Jul. 17, 2024) (company is "well positioned to drive growth and profitability in

2022 and beyond”); *Park v. GoPro, Inc.*, 2019 WL 1231175, at *9 (N.D. Cal. Mar. 15, 2019) (“strong,” “solid” sales); *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d. 1192, 1200 (N.D. Cal. 2008) (“on the technology front we hit the ball out of the park”).

### 2. The Safe Harbor Protects Defendants’ Forward-Looking Statements

The PSLRA “safe harbor” protects forward-looking statements if *either* (i) they are accompanied by meaningful cautionary language, *or* (ii) the plaintiff fails to show the statements were made with actual knowledge that they were false or misleading. *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1189-90 (9th Cir. 2021); 15 U.S.C. § 78u-5(c)(1).

***First,*** Plaintiff challenges statements about management’s expectations for the timing of Kokai adoption. ¶174 (11/15/23 conference: “we’ll expect that over the course of 2024, we get to full adoption”); ¶177 (2/15/24 earnings call: Kokai “is going to be enthusiastically adopted”); ¶215 (2/12/25 earnings call: “we’ll move 100% of our clients to Kokai this year”); and ¶220 (5/8/25 earnings call: “[w]e expect all clients to be using it by the end of year[.]”).

Statements of the “plans and objectives of management for future operations,” including relating to “products or services” like those above, are forward-looking under the safe harbor. 15 U.S.C. § 78u-5(i)(1)(B); *Wochos*, 985 F.3d at 1195 (“we are confident we can … achieve a run rate of 5,000 vehicles per week by the end of 2017” was forward-looking). Further, each earnings call above cautioned that it contained forward-looking statements. Ex. 2 at 2-3 (2/15/24: “the discussion and our responses in Q&A may contain forward-looking statements”); Exs. 6 & 13 at 2 (similar). And, TTD encouraged investors to refer to the risk factors in its press release and SEC filings (*id.*), which specifically warned of risks related to client adoption. Ex. 1 at 16 (discussing risks of updates to platform which could impact client adoption and revenue); Ex. 14 at 26-27 (same); Ex. 15 at 31 (same).

Thus, the earnings calls statements are protected under the first prong of the safe harbor. In addition, as discussed *infra*, Plaintiff's failure to plead a strong inference of scienter as to any statement—let alone *actual knowledge* of falsity (an even stricter standard than scienter)—means the earnings calls statements, as well as Schenkein's statement at the November 15, 2023 conference, are independently protected under the second prong of the safe harbor.

***Second***, Green's statement on the February 15, 2024 Q4'23 call that 2024 "stands to be a major year" for U.S. political spending (¶177), and his remaining challenged statements from the May 8, 2024 Q1'24 and November 7, 2024 Q3'24 earnings calls about expectations for potential future growth, are forward-looking.[3] TTD cautioned they contained forward-looking statements (Ex. 2 at 2-3; Ex. 13 at 2; Ex. 16 at 2-3) and encouraged investors to refer to risk factors (Ex. 2 at 3; Ex. 13 at 2; Ex. 16 at 3), which specifically warned of relevant risks. *E.g.*, Ex. 1 at 18, 23 (discussing risks related to political advertising); Ex. 15 at 31 (discussing risks of clients not continuing to use TTD's platform, and of revenue growth not continuing); Ex. 14 at 25-27 (discussing risks related to investment decisions and growth relative to market). Thus, the statements are protected under both safe harbor prongs.

### 3. Plaintiff's Overarching Omissions Theory Does Not Adequately Plead Any False Or Misleading Statement

Allegations of "fraud must be accompanied by 'the who, what, when, where, and how.'" *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). In addition, Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*,

[3] ¶183(b) (Kokai innovations "will help our clients take advantage of this revaluation …"; "never been more optimistic about the future ..."); ¶209(a) (initiatives "position us for durable growth …"). *See Jaszczyszyn*, 2024 WL 3463348, at *10 ("well positioned to drive growth and profitability in 2022 and beyond" was forward-looking).

563 U.S. 27, 44 (2011). A duty to disclose is instead triggered only if an omission would make other statements made misleading. *Id*. at 44-45. To be misleading, a statement must "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006. Materiality requires "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx*, 563 U.S. at 38.

Moreover, as the Ninth Circuit has explained, "[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." *Brody*, 280 F.3d at 1006. But to be actionable, an omission must be misleading, not just "incomplete." *Id*.

Rather than meeting the particularity requirements above, the FAC catalogues TTD's statements over a 21-month period and robotically repeats an omnibus omissions theory that once Defendants "chose to tout Kokai," they were obligated to disclose its "significant defects," "lagging" adoption and "inflated" adoption numbers (*e.g.*, ¶¶175, 178, 186, 188), which alone requires dismissal.

Further, Plaintiff's reliance on disparate, unnamed FEs fails. To be credited, confidential witnesses ("CWs") must "provide an adequate basis for determining that [they] have personal knowledge of the events they report," which requires examining "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged … the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). Importantly, the reports themselves must also indicate falsity of the challenged statements. *Id*. As shown below, none of Plaintiff's FEs meet these requirements. And, **not one** FE is from TTD's finance organization to support that Kokai was impeding TTD's financial outlook. *Id*. at 996 (employee "had no firsthand knowledge of the workings" of finance department).

**a. Allegations Kokai Suffered From Severe Defects And Performance Issues Fail**

None of the FAC's allegations of Kokai's "significant defects" and "serious performance issues" withstand scrutiny. *E.g.*, ¶¶62-120.

***"Relevance Score":*** The FAC alleges Green "touted" Kokai's "relevance score" (measuring how similar audiences reached are to those targeted). ¶¶73-76. To impugn this feature, the FAC relies solely on FE1 (a "Senior Data Scientist" in Colorado (¶31 n.3)), who opined that, prior to leaving TTD in "mid-2024," the score "might" not accurately reflect how relevant audiences were, so its reliability "could not be guaranteed." ¶76. But Plaintiff does not contend TTD made "guarantee[s]" about "relevance score." Moreover, FE1's opinion arises from purportedly hearing secondhand that issues were discussed at meetings FE1 did not attend. ¶75. Lacking, however, are indicia of reliability (*e.g.*, corroboration) and details, such as what exactly was discussed, whether the purported issues were widespread or significant or even impacting revenue. ¶76. *See, e.g.*, *Kipling v. Flex*, 2020 WL 7261314, at *10-11 (N.D. Cal. Dec. 10, 2020) (rejecting CW allegations based on "vague hearsay" of hearing of problems from colleagues), *aff'd sub nom. Nat'l Elevator Indus. Pension Fund v. Flex Ltd.*, 2021 WL 6101391 (9th Cir. Dec. 21, 2021); *In re Intrexon Corp. Sec. Litig.*, 2017 WL 732952, at *4 (N.D. Cal. Feb. 24, 2017) (vague CW statement that technology did not work as intended could not support plaintiff's claim that technology failed to function).[4]

***"Sellers & Publishers 500 Plus"*:** The FAC alleges Defendants "touted" a list that identified "trusted publishers" advertisers could connect with, despite that it "did not actually function." ¶80. No FE addresses this feature. Instead, the conclusory allegation rests entirely on an unnamed purported "client" who allegedly "had done 'a bit of A/B testing,' to quantify whether that feature offered

---

[4] FE1 offers no basis of knowledge for "A/A test" contentions, which are wholly vague and uncorroborated. ¶99.

any improved performance, and it did not 'out perform [the] open market.'" *Id*. This is hardly sufficient to contend that this feature was defective, let alone that Defendants should have said so whenever they mentioned Kokai.

***"Programmatic Guaranteed" Deals:*** Based on FE1, FE5 (Senior Trading Specialist, ¶44 n.9) and FE9 (Senior Director of Retail Data Partnerships, ¶53 n.14), Plaintiff alleges Kokai did not support "programmatic guaranteed" deals, "a method of purchasing ad space at a high volume for a fixed price." ¶¶77-78. However, no FEs allege TTD made promises about programmatic guaranteed deals to the contrary, and in any event, an *AdWeek* article Plaintiff relies on (¶11) concedes programmatic guaranteed "accounts for only a small share of spend[.]" Ex. 17 at 4.

***"Major" Data Integration Issues:*** Plaintiff's claims of "major" data integration issues are in fact minimal and vague at best. *E.g.*, ¶¶88-93. According to the FAC, integrating client data allowed TTD to "seed" it to help clients define an ideal target audience. ¶86. Three FEs say healthcare sector clients could not integrate their data into Kokai for seeding; but FE2 offers no facts at all, FE11 admits healthcare client data "is highly sensitive" and has seeding "restrictions," and a different seeding method was used for those clients, and FE6 and FE11 do not explain or quantify how being "unable to leverage the full scope" of seeding "impeded spending." ¶¶89, 90. *Cf. McGovney v. Aerohive Networks, Inc.*, 2019 WL 8137143, at *14 (N.D. Cal. Aug. 7, 2019) (plaintiffs failed to allege statements were misleading where they did not "quantify" their allegations and "the severity of [the] problems"). Further, the FAC concedes these advertisers made up only 11-12% of spend in 2022 and 2023, and its allegation of a "detrimental impact on TTD's revenue" is merely conclusory and "not entitled to the assumption of truth" on a motion to dismiss. ¶91. *Ashcroft v. Iqbal*, 556 U.S. 662, 663-64 (2009).

Plaintiff's vague claims about political sector clients also fail. FE4 claims they could not transition to Kokai due to "technical and compliance issues," but

never says what those "issues" were or how they related to Kokai and appears to admit they continued to spend with TTD in 2024. ¶93. FE12 says "certain" unspecified political customers "split their budgets across multiple platforms," and others adopted additional platforms, though provides no examples or avers how this impacted TTD's broader outlook. ¶124. Plaintiff's citation to trial testimony where TTD said its clients "typically" work with other platforms "to have access to … ***inventory not available on TTD***" (*e.g.*, YouTube) (¶121) demonstrates why "splitting budgets" allegations are a non-starter. Indeed, 2024 was TTD's "most successful year ever for political ad spend." Ex. 6 at 10.

***User Interface:*** According to the FAC, Kokai's user interface was unpopular and deterred spending on Kokai. *E.g.*, ¶¶109, 111. But cherry-picking client complaints is no substitute for well-pled facts demonstrating how TTD's statements affirmatively gave a material misimpression of its state of affairs. *Brody*, 280 F.3d at 1006; *see, e.g.*, *Ng v. Berkeley Lights, Inc.*, 2024 WL 695699, at *8 (N.D. Cal. Feb. 20, 2024) (company "was not required to … recite the specifics of all customer complaints every time it described" its product). Nor is the marketing company director's claim that TTD "forced clients onto Kokai" informative; among other things, the director does not allege these clients stopped or even reduced their spend with TTD. ¶¶32 n.7, 49. The FAC's citation to internet commentary is equally uncompelling to meet the PSLRA and Rule 9(b)'s strict falsity standards (and concedes that what Plaintiff complains Defendants concealed, was *public*).[5]

***"Significant Pacing Problems":*** Plaintiff alleges "significant pacing problems" (*i.e.*, spread of money over campaigns) solely because FE1 purportedly learned from an unnamed product manager that "product managers talked about

[5] *E.g.* ¶115 (quoting Reddit user "JimmyTango," with another cautioning: "his entire online persona is dedicated to hating on TTD," so take it "with a grain of salt" (Ex. 18)).

issues with Kokai causing … delays." ¶¶103-104. But FE1 provides no specifics as to how this "hamper[ed]" Kokai adoption, which or how many customers it affected, how long any issue lasted or any other relevant particulars to warrant consideration of the uncorroborated hearsay. *Zucco*, 552 F.3d at 996 (CW report not reliable where it consisted of hearsay statements from anonymous personnel and lacked detail).

**b. Allegations About Kokai Adoption Fail**

Despite making the inflammatory claims that Kokai adoption was "significantly slower than represented" and "publicly reported adoption numbers were inflated" (*e.g.*, ¶¶42, 175), Plaintiff does not follow through with support.

The FAC appears to identify five timing-related statements during the class period: (i) Schenkein's forward-looking expectation in November 2023 of adoption by 2024 year-end (¶174); (ii) representations around November 7, 2024 that adoption was at about ***50%*** with a goal of ~90% by 2025 year-end (¶212); (iii) TTD's February 12, 2025 statement that the "***majority***" of clients had moved to Kokai (¶215); (iv) TTD's May 8, 2025 statement that "[a]round ***two-thirds"*** of clients were "using Kokai" and the "***bulk of the spend***" was through Kokai (¶220); and (v) TTD's August 7, 2025 statement that ***75% of client spend*** was through Kokai (¶47). But rather than pleading particularized facts that, for example, adoption was *not* 50% in November 2024 or a "majority" of clients were *not* on Kokai in February 2025, the FAC resorts to only generalized and conclusory assertions that adoption was "significantly slower" than reported, which is plainly insufficient.

Moreover, contrary to Plaintiff's suggestion that investors were misled as to the state of adoption beginning in November 2023, analyst reports cited by Plaintiff state—*nine months into* the 21-month class period—that Kokai was still "early" in its rollout and expectations for spend were focused on the second half of 2025. *See* ¶40 (citing Ex. 19 at 1, BTIG (8/9/24): "Kokai … expected to be used

by the vast majority of the customer/spend base ***by 2H25***"; Ex. 20 at 1, Wedbush (8/9/24): "***[s]ignificantly less than half of spend*** is flowing through Kokai today" and Kokai had not yet reached "general availability"; Ex. 21 at 1-2, Morgan Stanley (8/9/24): "early Kokai adopters saw performance gains"; "***Kokai is still early in its roll out***").

The FAC's claims of "manipulated" adoption numbers are equally baseless. FE6 asserts in uncorroborated and vague fashion that "management" encouraged "push[ing] certain line items over" to Kokai to claim the account had been "'adopted,'" but FE6 is silent as to when this purportedly occurred, who was involved, how FE6 knows this to be true or whether these counts were used for *public* reporting. ¶48. Likewise, personnel being "encouraged to send clients emails pushing" them to adopt Kokai is all-but-ordinary. ¶49; *cf. Dolly v. GitLab Inc.*, 2025 WL 2372965, at *11 n.6 (N.D. Cal. Aug. 14, 2025) (rejecting that company actions supported an inference of fraud "rather than an extension of the company's ordinary strategy for encouraging adoption of its products").

Finally, Plaintiff claims that TTD enlisted "Manager of Brand Strategy" FE7 to assess why clients were not adopting Kokai, who interviewed clients in October 2024 and alleges it was "well known" that their Kokai use was "at or around only 60%." ¶45. But this is *entirely consistent* with Plaintiff alleging TTD represented in November 2024 that adoption was around 50% (even *lower* than what FE7 reports). ¶41.[6]

### 4. The Challenged Statements Are Not Adequately Alleged To Be False Or Misleading For Additional Reasons

For the reasons above, Plaintiff's omnibus omission allegations fail to plead any false or misleading statement. Additional reasons warranting dismissal of the alleged misstatements follow below.

[6] Claims of a "personnel vacuum" (¶¶50-51) and costs of "undertaking ... two platforms" (*e.g.*, ¶200) are unpersuasive and non-specific.

***<u>11/15/2023: Conference</u>***

As to Schenkein's statement that "we'll expect that over the course of 2024, we get to full adoption" of Kokai, the FAC alleges no particularized facts that Defendants did *not* expect to get to "full adoption" of Kokai over a year later (¶¶174-175), and that a "prediction proves to be wrong in hindsight does not render the statement untrue when made." *In re VeriFone Sec. Litig.*, 11 F.3d 865, 871 (9th Cir. 1993).

***<u>2/15/2024: Q4'23 Results</u>***

Plaintiff challenges Green's statement that "Kokai represents a completely new way to understand and score the relevance of every ad impression[.]" ¶180. But even if FE6's uncorroborated, hearsay opinion were true that the reliability of the relevance "score" "could not be guaranteed" (¶¶76, 181), it is not inconsistent with Kokai representing a "completely new way" to "understand and score" relevance.

Plaintiff also challenges Green's opinion statement on the call regarding "enthusiastic[]" adoption. ¶¶177-178. As a matter of law, however, "a 'pure statement of opinion' is generally not actionable[.]" *Wochos*, 985 F.3d at 1196 (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 187 (2015)).

To plead the falsity of an opinion, Plaintiff must adequately allege (1) "the speaker did not hold the belief she professed," (2) "a statement of fact contained within" the opinion is untrue or (3) material omitted facts were known to the defendants that go to the basis for their opinions and rendered the statements "misleading to a reasonable person reading the statement fairly and in context," which is "no small task[.]" *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017). The third "omissions" prong requires Plaintiff allege "particular (and material) facts" going

to the basis for the opinion, including "about the inquiry the [speaker] did or did not conduct or the knowledge it did or did not have[.]" *Omnicare*, 575 U.S. at 194.

Here, the FAC does not plead facts that Green did not actually believe his opinion, nor challenges a supporting statement of fact. And because Plaintiff has not alleged any facts going to the inquiry or basis supporting his opinion, Plaintiff has not alleged falsity under the "omissions" prong. *Align*, 856 F.3d at 618.

***<u>5/8/2024: Q1'24 Results</u>***

Similarly, Green's opinion statement on TTD's Q1'24 earnings call about "revenue growth acceleration" (¶183(a)) and his optimism about the future (¶183(b)) are not actionable for the same failure to satisfy the thresholds for challenging opinions for the reasons above.

Similarly, Plaintiff does not plead any facts showing that "progress" in Kokai did *not* contribute to Q1'24 results. ¶184(a).

***<u>5/17/2024: Conference</u>***

The FAC claims that Jacobson's statement about the opportunity to bring "first-party data assets to bear" (¶191) should have disclosed that healthcare and politics clients were "unable to integrate their data to seed[.]" ¶¶192, 198. But read in context, Jacobson's response is far from categorical and does not promise that *all* first-party data that *every* client wanted to use had occurred. Nor has Plaintiff alleged sufficient details to show that not mentioning integration data for two, specialized and regulated client sectors (¶¶32 n.6, 89) presented a materially misleading state of affairs. *Brody*, 280 F.3d at 1006.[7]

***<u>6/28/2024: TTD Press Release</u>***

Plaintiff's challenge to TTD's June 28, 2024 press release discussing Kokai one year post-launch, including about its user interface, beta performance and

---

[7] Green's statements in TTD's June 25, 2024 video (¶¶196-198) are allegedly false, and fail, for the same reasons as Jacobson's statements in the May 17 conference.

"relevance" fails because Plaintiff makes no attempt to plead why these statements are false, nor how Plaintiff's perceived issues render them materially misleading. ¶¶199-200.

***<u>8/8/2024: Q2'24 Results</u>***

Plaintiff's suggestion that TTD's "positive representations" about Kokai "client adoption and spend" on its Q2'24 earnings call were misleading is belied by the same analyst reports it cites, which conveyed that Kokai was still early in its rollout. ¶¶201-206; *supra* at 13-14.

In addition, Plaintiff has not shown that Green did not "believe that we have met the moment with Kokai" or anything to otherwise adequately undermine the opinion statement. ¶¶204-205; Ex. 22 at 7.

Further, Plaintiff claims Defendants "touted metrics that were manipulated or meaningless" to conceal Kokai's "fundamental" defects, but Plaintiff's support is beyond feeble. ¶100; *Endologix*, 962 F.3d at 416-17 (rejecting CW allegations that were "high on alarming adjectives" but "short on the facts"). ***First***, Plaintiff claims Green's statement that on Kokai, "in aggregate," incremental reach (new consumers reached) was up more than 70% (¶203(b)) was false because, according to FE1, incremental reach "was always discussed and measured on a campaign-by-campaign basis." ¶¶101, 206. But FE1 offers no convincing explanation for why it cannot possibly be analyzed in the aggregate, nor claims insight into more senior level discussions or the basis for the statement to even pass *Zucco's* reliability test. 552 F.3d at 995.

***Second***, alleging that "cost per acquisition" was a manipulated metric fares no better. ¶¶102, 206. Remarkably, the sole basis for this is FE5's vague opinion that a "proper A/B test set up" was needed to make this assertion; yet FE5 does not explain why that is so, that any relevant testing was *not* done or that FE5 had any insight into TTD's basis for the statement. Nor does FE5 even claim involvement in data science at TTD. ¶102; *cf. Intrexon*, 2017 WL 732952, at *4-5 (rejecting

CW's opinion that device "did not work 'as it should'" based on CW's limited involvement overall and only *her* experience); *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th. Cir. 2012) ("disagreements over statistical methodology and study design are insufficient to allege a materially false statement").

***<u>11/7/2024: Q3'24 Results & Analyst Call-Backs</u>***

Plaintiff's allegation that Green's November 7, 2024 statements that Kokai adoption "has been phenomenal" and it was "the best [product] that we've ever shipped" fail because they are opinions and Plaintiff does not plead facts showing Green did not believe adoption was not "phenomenal" or Kokai was not the "best" product to date, nor how those beliefs could not possibly be so. *Align*, 856 F.3d at 615-16; ¶¶210-211.

Nor does Plaintiff allege specific facts as to how Kokai was not, for example, "helping advertisers" for the stated reasons. ¶209(c).

The FAC also refers to representations in analyst call-backs around November 7, 2024 that Kokai was "inching towards 50% adoption" and management had a goal to achieve "90%" adoption (or a "100% roll-out for all advertisers") by "the end of 2025," but Plaintiff offers no facts to indicate that adoption was *not* around 50% at the time. ¶212.

Finally, FE5 criticizes TTD's expectation for 100% adoption by the end of 2025 because as of August 2024, purportedly only 5-10% of FE5's clients had adopted Kokai. ¶44 (similar as to 18% of FE6's business). But FE5 (and FE6) do not explain how this fact rendered 2025 *end-of-year* adoption an impossibility. *See, e.g., In re Siebel Sys., Inc. Sec. Litig.*, 2005 WL 3555718, at *5 (N.D. Cal. Dec. 28, 2005) (stating expectation in February for 90% upgrade adoption by December not rendered misleading where adoption was only 20% in June; company could have expected most upgrades in "latter-half" of the year). And in any event, Plaintiff admits that as of August 2025, "three-quarters" of client spend came from Kokai, well on the way to achieving the full adoption goal. ¶47.

***2/12/2025: Q4'24 Results***

Plaintiff's challenge to Green's statement that TTD would move 100% of clients to Kokai in 2025, and "the majority already have" (¶¶215-216), fails as the FAC points to no facts to support that adoption was then *not* over half, and Plaintiff already conceded that about 50% adoption occurred months earlier. ¶212. In addition, Plaintiff's claims that Kokai "case studies" referenced on the call were false and misleading lack well-pled facts as to how or why. *E.g.*, ¶217. Finally, the FAC includes no support for its self-serving conclusion that Green "falsely" claimed that Kokai's rollout was influenced by "a deliberate, strategic decision" and "for good reason." ¶134. No FE asserts, and no well-pled fact supports, that this was not true. The allegations are mere *ipse dixit*.

***5/8/2025: Q1'25 Results***

Plaintiff offers no facts to support its contention that statements on this earnings call were "false" because Kokai adoption, for example, was *not* "ahead of schedule" from the Company's perspective or that the bulk of spend was *not* "running through Kokai." ¶¶141, 219-223.

**B. The FAC Does Not Plead A Strong Inference Of Scienter**

Scienter requires pleading particularized facts showing an "intent to deceive, manipulate, or defraud." *Endologix*, 962 F.3d at 414; 15 U.S.C. § 78u–4(b)(2)(A). Plaintiff must show defendants' allegedly false or misleading statements were made "*intentionally* or with *deliberate recklessness*." *Zucco*, 552 F.3d at 991. Deliberate recklessness is "a form of intentional or knowing misconduct" requiring "a highly unreasonable omission … which presents a danger of misleading" investors that is either "*known to the defendant* or is so obvious that the actor *must have been aware of it*." *Id.*

The "'strong inference' requirement has teeth" and "'presents no small hurdle.'" *Endologix*, 962 F.3d at 414. In addition, courts must "compare the malicious and innocent inferences cognizable from the facts pled," and allow the

complaint to survive only "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw." *Id*. at 415, 419.

**1. The Former Employees Do Not Support Scienter**

As with falsity, Plaintiff must establish CWs' "reliability and personal knowledge" of what they report, and their statements must "themselves be indicative of scienter." *Zucco*, 552 F.3d at 995. Plaintiff's FEs again fail both tests: none offer any probative insights into any Individual Defendant's state of mind, and their mundane allegations do not suggest any intent to deceive.

Significantly, no FE reported to any Individual Defendant; indeed, the vast majority suggest they had *multiple* reporting lines between them and any Individual Defendant. Thus, they are not positioned to reliably speak to the Individual Defendants' knowledge or beliefs. Indeed, no FE even reports attending an individual meeting with an Individual Defendant or personally having a conversation with any of them, rendering their allegations all but moot. *See, e.g.*, *McGovney*, 2019 WL 8137143, at *19 (CWs did not support inference of scienter where they did not "even report[] to or ha[ve] direct personal contact with" the defendants). Further, the absence of any FEs from finance confirms none can show knowledge of concerning Kokai revenue issues. *See, e.g.*, *GoPro*, 2019 WL 1231175, at *18 (no scienter absent "specific factual allegations as to the [company's] finances and sales performance … at the time the statements were made" to support inference of defendants' knowledge that guidance was false or could not be met when issued).

As shown below, the FEs' allegations going to the Individual Defendants' knowledge are scant and largely consist of them receiving "Tableau" spreadsheets with metrics about Kokai, monitoring social media about Kokai and (Green and Jacobson) discussing Kokai during "all-hands meetings," none of which indicate scienter. *See, e.g.*, *GitLab*, 2025 WL 2372965, at *14 ("[e]ven assuming that the

[FEs] and [CWs] are reliable and have personal knowledge, their accounts do not indicate scienter"); *see also Intrexon*, 2017 WL 732952, at *6 (where fraud theory was based on alleged overhyping of company's deficient technologies, failure to adequately plead technologies were deficient foreclosed scienter).

***FE1:*** FE1's so-called "[r]elevance issues" (¶76) are not described with sufficient detail or corroboration to indicate their reliability or severity to support scienter. *Supra* at 10; *see In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999) (affirming dismissal; non-specific allegations invited court to "speculate" as to the "severity of the problems" to support officers knew their statements were false). And while FE1 may have believed "incremental reach" was always measured on a "campaign" basis (¶101), FE1 has not explained why it cannot be done differently nor claims to have discussed it with any Individual Defendant. *McGovney*, 2019 WL 8137143, at *20 (not crediting CW who did not claim any personal contact with defendant). That FE1 learned in Q2'24 that Green was "in meetings with product managers where Kokai's pacing problems were discussed" is likewise supremely vague and insufficient. *In re Downey Sec. Litig.*, 2009 WL 2767670, at *9 (C.D. Cal. Aug. 21, 2009) (CW statements disregarded if lacking specificity or based on hearsay, rumor or speculation).

***FE2:*** Seemingly based on "all-hands meetings," FE2 (a "General Manager of Client Services," ¶32 n.4) makes the bland assertion that the Individual Defendants "had access to and regularly reviewed internal Tableau dashboards" showing which clients had transitioned to Kokai. ¶53; *see also* ¶¶55, 59(d), 250-252, 255. *See Metzler*, 540 F.3d at 1069 (statements made at company-wide meeting unlikely indicative of fraud). But the FAC contains no facts showing any adoption rate was not accurately reported or that purported "severe" problems with Kokai would impact TTD's financial outlook. *See, e.g.*, *Silicon Graphics*, 183 F.3d at 985 (relying on receipt of reports to show statements rendered false and

misleading by business problems requires alleging their contents and specifics about, for example, "***negative financial projections***").

Further, FE2's report that client services could not find Kokai "success stories" in the "first half of 2024" in response to requests is contradicted by TTD discussing at least one high-profile one during that period. ¶¶82, 258; *see* Ex. 23 (Q1'24 earnings call) at 6 (discussing client Unilever increasing sales and targeting new customers more precisely in Kokai). That FE2's team provided reports of client "frustrations" with Kokai's user interface that purportedly made their way to the Individual Defendants, and that they "monitored online discussion of Kokai," are not revealing. ¶¶119, 120 n.22. TTD publicly discussed the amount of change Kokai brought clients (¶116) and online "critiques" are public.

***<u>FE3</u>:*** FE3 ("Staff Business Analyst," ¶32 n.5) reports the Individual Defendants inquired about Kokai adoption rates and performance (¶56), and "requested and received access to KPI changes" through the Tableau dashboard (¶81), but FE3 does not say what any information reflected. *See McGovney*, 2019 WL 8137143, at *20 (no scienter where allegations did not detail what was said, when and whether defendants saw it, nor alleged any information shown rendered statements false or misleading). That Green and others "acknowledged the need to push adoption" and shared adoption percentages at all-hands meetings is all-but-standard encouragement. ¶¶59(a), 247.

***<u>FE4</u>:*** According to FE4 ("Vice President of Global Support & Ad Policy Operations," ¶32 n.6), TTD's SVP of Technology said Kokai's adoption "was slower than [TTD] was publicly projecting." ¶61. But FE4 does not allege when this purportedly occurred, nor does it mean the projection was knowingly false when made, let alone would (or will) not be met. *Cf. GoPro*, 2019 WL 1231175 at *22 (CW allegations failed absent specific allegations about "the timing of what Defendants knew and when they knew it"). Moreover, FE4 does not say whether the SVP expressed this belief to Green or that Green concurred. ¶61.

FE4's remaining allegations are not additive or interesting (*e.g.*, hearsay allegations Green "knew" Kokai "lacked any discernible workflow" (¶111)). *Cf. GoPro*, 2019 WL 1231175, at *18 (no scienter where "at most," CWs showed "employees were underwhelmed by [company's] new product offerings").

***FE5:*** Like other FEs, FE5 (who "support[ed]" "major tech companies" (¶44 n.9)) is not alleged to have had any interaction with any Individual Defendant. While FE5 criticizes Green's "cost per acquisition" statements during TTD's August 8, 2024 earnings call (*supra* at 17-18 (¶102)), FE5's opinion is uncorroborated, unreliable and not probative of Green's state of mind.

***FE6:*** FE6 (a "Senior Director of Client Services," ¶44 n.10) asserts that a weekly narrative and spreadsheet showing the percentage of senior directors' business that had migrated to Kokai were provided to Green and other senior executives, but the FAC does not explain how a spreadsheet showing that "only about 18%" of FE6's business had moved to Kokai by August 2024 would impart knowledge of a false statement. ¶¶44, 54, 253. In any event, Kokai was "early" in its rollout as of August 2024 (*e.g.*, Exs. 19-21 (analysts reporting same (cited at ¶40)), and Plaintiff admits that a few months later adoption was about 50% and was 75% of client spend by August 2025. ¶¶212, 267.[8]

***FE7:*** As previously discussed, FE7 "interviewed" certain clients and alleges it was well-known that certain agencies' adoption was "only 60%," which aligns with TTD's alleged external statements at the time and undermines scienter. ¶¶45, 212, 254.

***FE8:*** FE8 (a "senior marketing leader") "occasionally" participated in calls with Green, but only describes all-hands meetings. ¶¶51 n.12, 59(c). FE8 also offers rote allegations about Tableau spreadsheets (*e.g.*, they contained "key business metrics") and, according to FE8's boss (TTD's CMO), other dashboards

---

[8] FE6 does not allege any Individual Defendant was involved in purported improper adoption "counting." ¶256.

"tracked Kokai from various perspectives." ¶53. That TTD's CMO and Green "spoke regularly" about Kokai adoption (¶60), and that someone in communications "monitor[ed] discussion of TTD and Kokai on social media" and reported their findings to the CMO do not indicate scienter. ¶¶120 n.21; 257. Finally, FE8's claim that Kokai's "lagging adoption and sales performance" was confirmed in conversations with "leadership, including TTD's CMO" and others is missing dates, specifics of what was discussed, how that rendered projections or other statements false when made and all other key details needed to assess what the Individual Defendants purportedly knew and when vis-à-vis their public statements. ¶60.

***<u>FE9</u>:*** FE9's statements are highly unremarkable, claiming to have observed client services send Tableau dashboards to "senior leadership, a level below Defendant Green." ¶53. FE9 cites no support for the purported "belie[f]" that Green saw the information "based on his involvement," or why it would matter or render any statement knowingly false. *Id*.

***<u>FE10</u>:*** Equally unavailing, FE10 ("Director of Advertising Policy") merely reports attending weekly all-hands meetings in which Green referenced "things he read on Blind" ("a workplace social media app featuring critiques of TTD") and said throughout "2023" that Kokai was "behind schedule." ¶¶59(b) & n.16, 120 n.23. Plaintiff does not allege how this contradicts any contemporaneous public statement, particularly where the FAC admits Green spoke publicly in TTD's then-upcoming February 15, 2024 earnings call about "'the amount of change'" with Kokai and Plaintiff admits Kokai was well adopted. ¶¶47, 116, 267.

***<u>FE11 and FE12</u>*:** A "Lead Associate Trading Director" and "Political Trading Specialist" do not even mention the Individual Defendants, which if anything, again undermines scienter.[9]

---

[9] The same applies to the marketing company director. ¶259.

**2. Individual Defendant Stock Sales Do Not Support Scienter**

To evaluate Plaintiff's allegations that the Individual Defendants' class period stock sales give rise to a strong inference of scienter, the Court must consider: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with insiders' prior trading history." *Zucco*, 552 F.3d at 1005.

Plaintiff alleges Green and Schenkein's sales are suspicious because their class period sales exceed the number of shares sold during a prior "control period." ¶¶148-149. This argument ignores that the sales amount to a small percentage of their common stock holdings during the class period: only roughly 8.6% of Green's, and 17.9% of Schenkein's holdings.[10] The Ninth Circuit "typically require[s] larger sales amounts" than 37% to support scienter. *Metzler*, 540 F.3d at 1067; *see also In re AnaptysBio, Inc.*, 2021 WL 4267413, at *9 (S.D. Cal. Sept. 20, 2021) (sale of a "mere 20 percent" of defendant's holdings not suspicious); *Oklahoma Firefighters Pension & Ret. Sys. v. Ixia*, 2015 WL 1775221, at *36 (C.D. Cal. Apr. 14, 2015) (sale of 22.5% of defendant's shares not suspicious). Green and Schenkein's sales fall well below the threshold.[11]

Because Plaintiff has not pled any information as to Jacobson's pre-class period trading history (¶151 n.26), it cannot establish that her class period trades were suspicious. As the Ninth Circuit makes clear, "[e]ven if the defendant's trading history is simply not available, for reasons beyond a plaintiff's control, the

---

[10] At the beginning of the class period, Green (including through trusts and foundations) owned a total of 45,195,391 shares (Ex. 24 (11/17/23 & 12/18/23 Forms 4)) and Schenkein owned 666,949 shares. Ex. 25 (11/17/23 Form 4). During the class period, Green acquired 2,168,074 shares (Ex. 24 (11/17/23, 8/30/24, 9/24/24, 9/27/24, 10/2/24, 12/20/24 and 4/17/25 Forms 4), and Schenkein acquired 282,279 shares. Ex. 25 (4/25/24, 6/18/24, 7/11/24, 10/11/24, 10/24/24, 11/12/24 and 4/17/25 Forms 4).

[11] Schenkein's sales cannot be compared to Plaintiff's "control period" because she only became subject to Form 4 reporting requirements in June 2023. Ex. 26.

plaintiff is not excused from pleading the relevant history." *Zucco*, 552 F.3d at 1005-06.[12]

Moreover, scienter is undermined because both Schenkein and Jacobson "held ***more*** stock … at the end of the class period than ... at the beginning[.]" *Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1042 (N.D. Cal. 2012), *aff'd*, 561 F. App'x 598 (9th Cir. 2014); *see also Ixia*, 2015 WL 1775221, at *36 (defendant holding onto more shares than sold "strongly rebut[ted]" scienter).[13]

Plaintiff also ignores that class period sales were made pursuant to 10b5-1 plans (¶164), which weighs against scienter. *Metzler*, 540 F.3d at 1067 ("Sales according to pre-determined plans may 'rebut [ ] an inference of scienter.'"). While Plaintiff seeks to draw a negative inference from sales in close proximity to certain disclosures (¶¶153-157), the plans underlying those sales were implemented five or more months prior. For example, Plaintiff's heaviest emphasis is on Green's February 11, 2025 sales being "just one day before" TTD's 33% stock price decline (¶157), but it ignores that those sales were pursuant to a 10b5-1 plan adopted on "September 12, 2024." Ex. 24 (2/13/25 Form 4), *i.e.*, the plan was entered following TTD's statements that led analysts to report in August 2024, for example, that "[s]ignificantly less than half of spend is flowing through Kokai" and it had not yet reached "general availability," which is hardly suspicious. *See also, e.g.*, Ex. 25 (Schenkein 11/17/23 Form 4 reflecting sale pursuant to plan adopted June 1, 2023).

Finally, Plaintiff alleges the timing of implementing 10b5-1 plans was suspicious. ¶¶165-167. But the purported material non-public information

---

[12] In any event, Jacobson's sales amount to only approximately 28% of her class period common stock holdings; she owned 60,050 shares at its beginning (Ex. 27 (1/26/24 Form 3)) and acquired 195,240 shares during it. *Id.* (2/20/24, 4/25/24, 8/14/24, 12/03/24, 01/2/25, 1/30/25 and 4/17/25 Forms 4).

[13] At the end of the class period, Schenkein and Jacobson held 745,902 (Ex. 25 (5/16/25 Form 4)) and 167,189 shares (Ex. 27 (5/19/25 Form 4)), respectively.

("MNPI") Defendants had is merely Plaintiff's generalized allegations about purported Kokai issues and adoption, which fail as discussed herein. ¶¶164, 244.

**3. The FAC's Remaining Scienter Allegations Fail**

***Purported "Admission":*** Plaintiff claims Green's "admissions" on TTD's February 12, 2025 earnings call "make clear that he was well-aware" that Kokai's adoption was "slower than publicly stated." ¶246. But as discussed *supra* at 3-4, 13, 19, Green made *no* such "admission" in that call, or ever, that Kokai adoption was ever not as publicly reported. Indeed, Green *confirmed* TTD's prior expectation on the call that it would move all clients to Kokai by the end of 2025.

***Kokai's "Importance":*** Kokai's "importance" and speaking publicly about Kokai does not speak to knowledge of "defects" or adoption impossibilities sufficient to render any statements knowingly false or misleading. ¶¶261-266. Further, any attempt by Plaintiff to rely on the core operations doctrine will fail as Plaintiff has not alleged this is the type of "unusual circumstance[]" where it could apply. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014).

***Schenkein's Departure:*** It is well-settled that plaintiffs must allege "sufficient information to differentiate between a suspicious change in personnel and a benign one" to support scienter. *Zucco*, 552 F.3d at 1002. Here, Plaintiff points to no facts in characterizing Schenkein's departure announced on August 7, 2025 as "sudden." ¶¶267-268. Nor does Plaintiff explain how the timing was "suspicious" merely because it was announced on the same day TTD allegedly provided a "disappointing [Q3'25] outlook" and update that "75%" of client spend was through Kokai. *Id.*; *e.g.*, *Align*, 865 at 622 (even CFO's departure coinciding with impairment charge not suspicious). That Schenkein would remain as a senior advisor through the end of the year further negates scienter. *Id.*; Ex. 9.[14]

---

[14] Plaintiff's passing reference to an unrelated employment lawsuit does not support any Individual Defendant's scienter (or falsity) (¶25), nor does Plaintiff

**4. The Competing Inferences Undermine Scienter**

Contrary to Plaintiff's rhetoric, there was never any "admission" of "severe" defects in Kokai that rendered statements contemporaneously knowingly false or misleading, nor does Plaintiff even attempt to contradict the accuracy of TTD's updates about Kokai adoption. Despite citing 12 FEs, none make the type of alarming allegations suggesting malicious intent common to securities fraud allegations, and they instead often support the *accuracy* of TTD's statements. Plaintiff's reliance on innocuous Tableau reports, all-hands meetings and public critiques of Kokai underscore Plaintiff has nothing truly indicative of scienter. With that backdrop, the *far* more compelling inference is that TTD accurately conveyed its goals for Kokai and gave accurate updates.

**C. The FAC Does Not Adequately Allege Loss Causation**

Plaintiff fails to plausibly allege it suffered a loss proximately caused by "revelation of fraudulent activity." *Loos*, 762 F.3d at 887.

***<u>February 12, 2025</u>:*** Plaintiff alleges investors "began to learn the truth about Kokai" when TTD announced it missed its Q4'24 revenue guidance. ¶¶226-235. But loss causation requires more than an earnings miss. *Metzler*, 540 F.3d at 1064-65. While Plaintiff alleges Green "expressly attributed the shortcoming to the rollout of Kokai," which "had progressed slower than represented" (¶226), that is not so. Plaintiff concedes that Green explained TTD missed its guidance "because we had a series of small execution missteps." ¶227. While Green mentioned Kokai "rolled out slower than we anticipated," he explained "much of that was for good reason," including "to inject AI," a "long-term positive." Ex. 6 at 13-14. And Green *reiterated* TTD's 2025 full adoption expectation. *Id*. at 7. In addition, the FAC cites certain analysts following the call, but none mention any wrongdoing. ¶¶135, 231. The lack of a revelation of fraud forecloses loss causation based on the

---

allege it investigated those allegations. *See Maine State Ret. System v. Countrywide Fin. Corp.*, 2011 WL 4389689, at *20-21 (C.D. Cal. May 5, 2011).

February 12 disclosure. *E.g.*, *Metzler*, 540 F.3d at 1063-65 (affirming dismissal where disclosure did not reveal fraud and earnings miss was "far more plausible" cause for stock decline).[15]

***<u>March 11, 2025</u>:*** Plaintiff alleges a purported *AdWeek* "exposé" "revealed for the first time" that Kokai was suffering from "critical failures." ¶¶2, 236-241. Given its reliance on "anonymous 'industry insiders,'" however, the article should be read with skepticism. Moreover, the article merely mentions that Kokai does not support "contract groups" (not suggested to be a "defect" or "failure") or "programmatic guaranteed" (which "accounts for only a small share of spend") and that certain interviewees did not like the user interface (though three planned to "stick with" TTD, including for its "'superior integration features and the controls'"). Ex. 17 at 3-5. Most significantly, the article does not *reveal* or even suggest fraud. *See Curry v. Yelp Inc.*, 875 F.3d 1219, 1225 (9th Cir. 2017) ("loss causation cannot be adequately made out merely by resting on a number of [publicly disclosed] customer complaints and asserting that where there is smoke, there must be fire").[16]

***<u>August 7, 2025</u>:*** Plaintiff claims the market had "concern that TTD's growth rate had slowed as a result of poor Kokai adoption" following TTD's August 8, 2025 financial results. ¶¶239-240. Setting aside that "concern" does not suffice for loss causation, Plaintiff's cited analysts did not attribute a downturn to

---

[15] Undated speculation by "analysts" at "CSIMarket," an obscure website purportedly out of Rogoznica, Croatia and Jacksonville, Florida, is no substitute for revelation of fraud. ¶¶10, 232; Ex. 28.

[16] Plaintiff inaccurately suggests Needham issued a report in response to the *AdWeek* article; rather, Needham's March 13 comments (¶11) were originally published days ***before*** the article. Ex. 29 at 5 (3/7/25 report). As to KeyBanc (¶11), it merely noted that "[s]tories of Kokai frustration ***persist***[.]" Ex. 30 at 2. *See In re Herbalife, Ltd. Sec. Litig.*, 2015 WL 1245191, at *4 n.7, 5-8 (C.D. Cal. Mar. 16, 2015) ("mere repackaging of already-public information" is insufficient for loss causation).

Kokai, but rather to increasing competition and industry risks. ¶240 (citing, *e.g.*, Ex. 11 at 1-4 (MoffettNathanson: attributing downgrade to "growing competition [*e.g.*, Amazon] and a slower-growing pie" in light of industry and channel risks); Ex. 12 at 1 (Wedbush: downgrading due to "Competitive Pressures Emerging," including Amazon)). Because "changing market conditions, changing investor expectations, or other unrelated factors" are insufficient for loss causation (*Loos*, 762 F.3d at 887), the disclosure does not suffice. *E.g.*, *Brodsky*, 592 F. Supp. 2d. at 1206-07 (no loss causation; announcement that earnings showed a deceleration in growth did not reveal fraud).[17]

## V. THE REMAINING CLAIMS FAIL

A defendant can only be liable under Section 10(b) if they "make" a challenged statement, *i.e.*, they have "ultimate authority" over it, including the content and whether and how to communicate it. *Janus Capital Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 141-44 (2011). Thus, no Individual Defendant can be liable for statements they are not alleged to have made.[18]

The Section 20(a) and 20A claims should be dismissed for lack of an adequately pled Section 10(b) claim. The 20(a) claim also fails for not pleading the Individual Defendants exercised the requisite control over anyone else (¶¶296-300), and the 20A claim also fails for not adequately alleging the Individual Defendants had MNPI at the times of their trades and/or 10b5-1 plan adoptions applicable to those trades. *Align*, 856 F.3d at 623; *Parnes*, 253 F.R.D. at 561-62.

---

[17] Plaintiff's cited *AdWeek* article confirms that TTD's ***"technology is effective***" and Amazon was increasing its competition. ¶126; Ex. 31 at 1. Further, any attempt to use Schenkein's departure for loss causation would fail. ¶2; *Berkeley Lights*, 2024 WL 695699, at *17-18.

[18] Likewise, the only participant in TTD's June 3, 2024 video was its "VP Inventory Development" (¶¶193-195; Ex. 32) and no Individual Defendant is alleged to have ultimate authority over it.

## VI. CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court dismiss the FAC.

Dated: October 14, 2025

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: /s/ *Caz Hashemi*
Caz Hashemi

*Attorneys for Defendants The Trade Desk, Inc., Jeffrey Terry Green, Laura Schenkein and Samantha Jacobson*

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendants The Trade Desk, Inc., Jeffrey Terry Green, Laura Schenkein and Samantha Jacobson, certifies that this brief contains 9,471 words, which complies with the word limit set by Court order dated October 9, 2025 (ECF No. 79).

/s/ *Caz Hashemi*
Caz Hashemi