**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:      (310) 819-3481

*Counsel for Lead Plaintiff Public Employees' Retirement System of Mississippi, and Lead Counsel for the Class*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Laura H. Posner (admitted *pro hac vice*)
lposner@cohenmilstein.com
88 Pine Street, 14th Floor
New York, NY 10005
Tel.:      (212) 220-2925

*Counsel for Lead Plaintiff Arkansas Public Employees' Retirement System, and Lead Counsel for the Class*

[Additional counsel in signature block]

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re The Trade Desk, Inc. Securities Litigation* | Case No. 2:25-cv-01396-CAS-DFM <br><br> <u>CLASS ACTION</u> <br><br> **LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** <br><br> Judge: Christina A. Snyder <br> Date: March 9, 2026 <br> Time: 10:00 a.m. <br> Courtroom: 8D |

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alghazwi v. Beauty Health Co.*,
2025 WL 2751076 (C.D. Cal. Sept. 23, 2025) .............................................*passim*

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021).............................................................6

*In re AnaptysBio, Inc.*,
2021 WL 4267413 (S.D. Cal. Sept. 20, 2021)..............................................27

*Atlas v. Accredited Home Lenders Holding Co.*,
556 F. Supp. 2d 1142 (S.D. Cal. 2008)...................................................16, 17

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ...........................................................2, 25, 28

*In re BioMarin Pharm. Inc. Sec. Litig.*,
2022 WL 164299 (N.D. Cal. Jan. 6, 2022)...................................................22

*Brodsky v. Yahoo! Inc.*,
592 F. Supp. 2d 1192 (N.D. Cal. 2008)..................................................17, 29

*Brown v. China Integrated Energy, Inc.*,
875 F. Supp. 2d 1096 (C.D. Cal. 2012) .......................................................23

*In re Celera Corp. Sec. Litig.*,
2013 WL 4726097 (N.D. Cal. Sept. 3, 2013)................................................13

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
2022 WL 4491093 (S.D. Cal. Sept. 27, 2022)..............................................27

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) .................................................................23, 30

*In re Countrywide Fin. Corp. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) .......................................................27

*Cullen v. Ryvyl Inc.*,
2024 WL 4536471 (S.D. Cal. Oct. 21, 2024)...............................................12

*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010) ..................................................................18

*Cutler v. Kirchner*,
   696 F. App'x 809 (9th Cir. 2017) ............................................................21

*In re Daou Sys. Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ..................................................................31

*Dolly v. GitLab Inc.*,
   2025 WL 2372965 (N.D. Cal. Aug. 14, 2025) ........................................25

*In re Downey Sec. Litig.*,
   2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ........................................25

*In re Doximity, Inc. Sec. Litig.*,
   2025 WL 1449598 (N.D. Cal. May 13, 2025) ..........................................28

*Evanston Police Pension Fund v. McKesson Corp.*,
   411 F. Supp. 3d 580 (N.D. Cal. 2019)................................................22, 30

*In re Extreme Networks, Inc. Sec. Litig.*,
   2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) ...................................24, 25

*In re Facebook, Inc. Sec. Litig.*,
   87 F.4th 934 (9th Cir. 2023) ....................................................................14

*Feyko v. Yuhe Int'l., Inc.*,
   2013 WL 816409 (C.D. Cal. Mar. 5, 2013)................................................2

*In re Fibrogen, Inc.*,
   2022 WL 2793032 (N.D. Cal. July 15, 2022) ..........................................23

*In re Finisar Corp. Sec. Litig.*,
   2017 WL 1549485 (N.D. Cal. May 1, 2017)............................................22

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ..................................................................28

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
   63 F.4th 747 (9th Cir. 2023)....................................................4, 5, 14, 16

*In re Honest Co. Sec. Litig.*,
   615 F. Supp. 3d 1149 (C.D. Cal. 2022) ....................................................15

*In re See Beyond Techs. Corp. Sec. Litig.*,
  266 F. Supp. 2d 1150 (C.D. Cal. 2003) ................................................................ 11

*In re Intuitive Surgical Sec. Litig.*,
  2017 WL 4355072 (N.D. Cal. Sept. 29, 2017) .................................................... 19

*Jaszczyszyn v. SunPower Corp.*,
  2024 WL 3463348 (N.D. Cal. July 17, 2024) ............................................... 14, 18

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ............................................................................. 2

*Kuhn v. Three Bell Cap.*,
  698 F. Supp. 3d 1119 (N.D. Cal. 2023) ............................................................. 5

*Loc. 272 Labor Mgmt. Pension Fund v. Walt Disney*,
  2025 WL 2428897 (C.D. Cal. Aug. 21, 2025) ................................................... 11

*McGovney v. Aerohive Networks, Inc.*,
  2019 WL 8137143 (N.D. Cal. Aug. 7, 2019) ............................................... 24, 25

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ......................................................................... 30

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018) ........................................................................... 28

*Nathanson v. Polycom, Inc.*,
  87 F. Supp. 3d 966 (N.D. Cal. 2015) ............................................................... 29

*In re New Century*,
  588 F. Supp. 2d 1206 (C.D. Cal. 2008) ........................................................... 16

*Ng v. Berkeley Lights, Inc.*,
  2024 WL 695699 (N.D. Cal. Feb. 20, 2024) .................................................... 30

*In re Nimble Storage, Inc. Sec. Litig.*,
  756 F. App'x 779, 780 (9th Cir. 2019) ............................................................. 18

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ............................................................................. 16

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) ............................................................... 20, 21, 27

*Okla. Firefighters Pension & Ret. Sys. v. Ixia*,
   2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) ....................................................27

*Okla. Firefighters Pension and Ret. Sys. v. Snap Inc.*,
   2024 WL 5182634 (9th Cir. Dec. 20, 2024)............................................22, 27

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
   780 F. App'x 480 (9th Cir. 2019) ................................................3, 25, 26

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015).....................................................................................18

*Park v. GoPro, Inc.*,
   2019 WL 1231175 (N.D. Cal. Mar. 15, 2019) .......................................18

*In re Plantronics, Inc. Sec. Litig.*,
   2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ......................................17

*In re Qualcomm Inc. Sec. Litig.*,
   2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) ......................................21

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ............................................*passim*

*In re Questcor Sec. Litig.*,
   2013 WL 5486762 (C.D. Cal. Oct. 1, 2013)..........................................27

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
   302 F. Supp. 3d 1028 (N.D. Cal. 2018).......................................28, 29

*Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*,
   790 F. Supp. 3d 763 (N.D. Cal. 2025)..........................................*passim*

*Robb v. Fitbit Inc.*,
   2017 WL 219673 (N.D. Cal. Jan. 19, 2017).............................................28

*Roberts v. Zuora, Inc.*,
   2020 WL 2042244 (N.D. Cal. Apr. 28, 2020).................................16, 25

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) .............................................................24

*Schenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 115 (N.D. Cal. 2017)................................................................22

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016) .........................................................2, 3, 19

*In re Siebel Sys., Inc. Sec. LItig.*,
    2005 WL 3555718 (N.D. Cal. Dec. 28, 2005).......................................4

*In re Silicon Graphics Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ........................................................24

*Smith v. Berryhill*,
    742 F. App'x 253 (9th Cir. 2018) ..................................................7

*In re Splunk Inc. Sec. Litig.*,
    592 F. Supp. 3d 919 (N.D. Cal. 2022).......................................28, 29

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)....................................................................20, 22

*In re Tesla, Inc. Sec. Litig.*,
    477 F. Supp. 3d 903 (N.D. Cal. 2020) ...........................................29

*Turocy v. El Pollo Loco Holdings, Inc.*,
    2017 WL 3328543 (C.D. Cal. Aug. 4, 2017) ...................................2

*United Ass'n Nat'l Pension Fund v. Carvana Co.*,
    759 F. Supp. 3d 926 (D. Ariz. 2024) .......................................12, 15

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
    2017 WL 66281 (N.D. Cal. Jan. 4, 2017)........................................17

*In re WageWorks, Inc., Sec. Litig.*,
    2020 WL 2896547 (N.D. Cal. June 1, 2020)....................................23

*Weston v. DocuSign*,
    669 F. Supp. 3d 849 (N.D. Cal. 2023)........................................20, 28

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ......................................................14

*Zaghian v. Farrell*,
    675 F. App'x 718 (9th Cir. 2017) ....................................................14, 15

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...............................................10, 12, 23

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 2

I.   The Complaint Adequately Alleges False or Misleading Statements ............. 2

    A.   Defendants' False or Misleading Statements Regarding Customer Adoption ........................................................................ 2

    B.   Defendants' False or Misleading Statements Concealing Kokai's Defects ................................................................................ 7

    C.   The PSLRA's Safe Harbor Does Not Protect Defendants' Misstatements ................................................................................ 13

    D.   Defendants' Statements Are Not Immaterial Puffery ....................... 15

    E.   Defendants' Statements Are Not Inactionable Opinions .................. 18

II.  The Complaint Raises a Strong Inference of Scienter ................................. 19

    A.   Defendants' Scienter Arguments Fail ............................................. 24

III. The Complaint Adequately Alleges Loss Causation ................................... 28

IV.  The Complaint Adequately States Claims Under Sections 20(a) and 20(A) ............................................................................................... 30

CONCLUSION ................................................................................................... 31

# INTRODUCTION

This case concerns Defendants' misstatements to investors about the Trade Desk's ("TTD" or "the Company") flagship product, an ad-buying platform called Kokai. Throughout the Class Period, Defendants touted Kokai's capabilities, telling investors that Kokai was being rapidly adopted by customers and driving revenue. In truth, Kokai suffered systemic defects, hampering adoption and TTD customer spending. Kokai's core "Relevance" feature did not work; Kokai lacked basic, programmatic guarantee deal functionality; Kokai was unusable for key client sectors because its "seeding" function was inoperable; and customers detested Kokai's interface. Defendants hid all this, manipulated Kokai's adoption figures, and profited handsomely by selling $465 million of their personal TTD stock.[1]

The truth emerged in three disclosures in 2025. On February 12, Defendants admitted to slower-than-expected Kokai adoption due to "execution missteps," leading to TTD's first-ever revenue miss and a 30% single-day stock price decline—the then-largest market-cap drop in TTD's history. Next, on March 11, an *AdWeek* exposé revealed Kokai's slow adoption was not just the result of "execution missteps," but also fundamental defects significantly "reduc[ing] the use and function of the Trade Desk's buying platform" for customers. That news caused an additional 11% stock price decline. Finally, on August 7, TTD again reported lower-than-expected revenue growth and the sudden departure of its CFO, Defendant Schenkein, prompting an additional 39% stock price decline—TTD's largest-ever daily stock price decline.

Facing these allegations, Defendants assert the Complaint is somehow not detailed enough and their statements to investors were immaterial optimism. But the Complaint—backed by accounts from twelve well-placed former TTD employees

---

[1] Emphases are added and internal citations and quotations are omitted unless noted. Cites to "¶" refers to paragraphs in the Consolidated Class Action Complaint (ECF No. 74).

("FEs"), investigative journalism including data and statements from current and former TTD customers, reports by securities analysts, and Defendants' own admissions—makes plain that Defendants' statements were false and misleading, and that Defendants knew as much. Defendants' self-serving narrative in their Motion (ECF No. 80-1 ("Mot.")), at most, raises factual disputes that cannot be accepted at the pleading stage.

## ARGUMENT

## I.  THE COMPLAINT ADEQUATELY ALLEGES FALSE OR MISLEADING STATEMENTS

A statement is false or misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). "Even if a statement is not false, it may be misleading if it omits material information." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir. 2018). Companies that "tout positive information to the market [must] do so in a manner that wouldn't mislead investors, including by disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016).

"[A]t the motion to dismiss stage the Court draws a reasonable inference that [p]laintiffs' interpretation of [a statement] is correct." *Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *14 n.2 (C.D. Cal. Aug. 4, 2017). Plaintiffs "can survive a motion to dismiss by alleging a single material misrepresentation." *Feyko v. Yuhe Int'l., Inc.*, 2013 WL 816409, at *4 n.2 (C.D. Cal. Mar. 5, 2013).

### A.  Defendants' False or Misleading Statements Regarding Customer Adoption

Throughout the Class Period, Defendants made multiple false and misleading statements and omissions regarding the state and pace of Kokai's adoption. *See* ¶¶172-223. Among other things, Defendants assured investors: (i) on November 15,

2023, that Kokai would **"get to full adoption" before** 2025; (ii) on February 15, 2024, that Kokai was being **"enthusiastically adopted"**; (iii) on August 8, 2024, that Kokai was **"firing on all cylinders"**; and (iv) in early November 2024, that **"adoption [of Kokai] has been phenomenal"** and **"~50% of all TTD customers have now adopted Kokai."** *E.g.*, ¶¶174, 177, 204, 210, 212(b).

These statements were false or, at a minimum, misleading because, having chosen to tout Kokai's adoption, Defendants were obligated—but failed—to disclose the "adverse information that cuts against the positive information." *Schueneman*, 840 F.3d at 706; *see also Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*, 790 F. Supp. 3d 763, 776 (N.D. Cal. 2025) ("Once defendants chose to extol [their new product], and to proclaim that their data showed [its] success…, they were bound to disclose the multiple negative internal test results that strongly contradicted such laudatory conclusions."); *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 483 (9th Cir. 2019) (sustaining statements touting product that omitted a "significant flaw").

In particular, in touting Kokai's adoption, Defendants were required to disclose that adoption lagged and was slower than publicly represented (¶¶54-55); customers were reducing spending and switching to competitors due to material defects with Kokai (¶¶79, 84, 123-26, 131, 133); and TTD's publicly reported adoption metrics were manipulated and inflated (¶¶48-49). *See Stitch Fix*, 790 F. Supp. 3d 763 (statements assuring future success of new customer platform but omitting problems with it were misleading); *Alghazwi v. Beauty Health Co.*, 2025 WL 2751076 (C.D. Cal. Sept. 23, 2025) (statements touting product but failing to disclose design flaws were misleading).

Contrary to Defendants' assertions (Mot. 13-14), the Complaint's detailed allegations amply satisfy the pleading requirements.

**First**, Defendants received weekly reports showing that TTD customers were **not** adopting Kokai. *See, e.g.*, ¶¶54-55. In August 2024, while Green represented

that Kokai was "firing on all cylinders," clients were well below 20% usage. *See* ¶253 (in August 2024, only 18% of FE6's clients and 5-10% of FE5's portfolio had adopted Kokai—including just 20% of key customers).[2] In November 2024, while Green told investors he was "excited" about Kokai adoption, truthfully, TTD had enlisted FE7 to figure out why TTD customers "were ***not*** adopting Kokai." ¶45. And, a March 2025 *AdWeek* exposé corroborated that customers were not adopting Kokai due to "widespread resistance among media buyers." ¶137.

**Second**, due to Kokai's defects (discussed below), customers reduced spending, switching to competitors as corroborated by multiple FEs and journalists. *See, e.g.*, ¶¶123-25 (FEs connecting Kokai's problems with reduced spending); ¶131 (*AdTech* article reporting same); ¶133 (*Marketing Dive* article reporting February 2025 revenue miss due to "technology that has a lot of kinks to iron out"); ¶¶79, 126 (*AdWeek* article identifying Kokai's failure to offer programmatic guarantee deals as reason customers went to competitor). Thus, despite Defendants' claims to investors that Kokai was driving growth, FEs and industry reports revealed that it failed to draw new or convert customers due to these defects. *See* ¶¶84, 123-25.[3]

**Third**, to hide slow adoption, TTD manipulated Kokai adoption metrics. *See, e.g.*, *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 769 (9th Cir. 2023) (statements misleading because sales representatives were pressured to identify deals as "committed" when buyers had no interest). TTD treated customers as having "adopted" Kokai so long as they merely ***had access*** to the new platform,

---

[2] Defendants' reliance on *In re Siebel Sys., Inc. Sec. Litig.* is misplaced as, there, the court found plaintiffs offered "no allegation…that defendants knew by February" that their year-end projections were inaccurate. 2005 WL 3555718, at *5 (N.D. Cal. Dec. 28, 2005). Here, the Complaint is replete with allegations going to Defendants' knowledge of Kokai's slow adoption. *See infra* Section II.

[3] That some of the competitor platforms TTD's customers went to offered inventory that was different than Kokai (Mot. 12) does nothing to refute that customers went elsewhere as a result of their frustrations with Kokai.

regardless of usage. ¶48. Additionally, to boost Kokai-related metrics, TTD had employees push line items into Kokai—meaning TTD attributed to Kokai spending that customers weren't actually choosing to associate with Kokai. *Id.* Defendants even plainly ***forced*** customers, over objections, to convert to Kokai. ¶49.[4]

Defendants' arguments in response to these detailed allegations can be quickly rejected.[5] To start, Defendants claim pressure campaigns to pad metrics are "all-but-ordinary." Mot. 14. But, as noted above, the Ninth Circuit disagrees. *See Glazer*, 63 F.4th at 772 ("pressure campaign" to miscast illusory deals as "committed" was evidence of falsity of rosy sales reporting).

Next, Defendants ignore the Complaint's ***actual*** allegations. They wrongly assert that FE12 "provid[ed] no examples" of diverted spending. *See* ¶124 (FE12 noting "TTD customers split their budgets across multiple platforms … ***like StackAdapt and Basis***"). Defendants also claim that FE6's allegations of manipulated adoption figures are "uncorroborated" (Mot. 14), but ***two*** other former employees confirmed the same. *See* ¶48. And while Defendants claim the allegations that Kokai adoption lagged due to a marketing personnel vacuum and that slow adoption imposed extra costs on TTD are "unpersuasive and non-specific," Mot. 14 n.6, those detailed allegations are, respectively, corroborated by ***three*** well-placed TTD employees (¶¶50-51) and ***admitted to by Defendant Green***, who stated that "maintain[ing] two systems . . . slows [TTD] down." *See* ¶10.

Finally, Defendants truncate challenged statements and claim those snippets are technically "accurate"—ignoring the totality of the statements and black-letter law establishing that they can be misleading by omission. *See Alghazwi*, 2025 WL

---

[4] Defendants claim FE6 does not allege any Individual Defendant was involved in this effort (Mot. 23 n.8), but other FEs did. *See* ¶59(a).

[5] Extrinsic exhibits proffered by Defendants may not be considered to resolve factual disputes. *See Kuhn v. Three Bell Cap.*, 698 F. Supp. 3d 1119, 1122 (N.D. Cal. 2023).

2751076, at *17 (relevant inquiry is whether statements "were misleading 'in light of the circumstances under which they were made'") (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)); *see also Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189 n.2, 205 (E.D. Pa. 2021) (chastising defendants for splicing misstatements in manner that "had the potential to mislead").

For example, in discussing paragraph 220 (Mot. 13), Defendants ignore their assurances to investors in that paragraph that "[t]he core of Kokai has been delivered, and adoption is now ahead of schedule," "We expect all clients to be using it by the end of year," "Kokai is delivering on [key performance indicators], including 24% lower cost per conversion and 20% lower cost per acquisition," "[t]hese improvements are helping unlock performance budgets from new and existing clients," "campaigns on Kokai use roughly 30% more data elements per impression," and "[a]ll of these efficiencies mean more dollars can be reinvested and put to work." ¶220.[6]

Similarly, Defendants argue (Mot. 14) that FE7's report was somehow consistent with their statements to investors about Kokai's adoption. But FE7 was specifically brought in to figure out "why [customers] were ***not*** adopting Kokai" at the pace Defendants were claiming. ¶45. Moreover, FE7's report ***directly contradicted*** TTD's statements assuring of complete adoption of Kokai that year; that "the core of Kokai has been delivered" and that the level of adoption on Kokai was "exceptional" as a result of "upgrading [the] platform." ¶¶174, 220, 222.

---

[6] In contrast to *Patel v. Parnes*, the Complaint here explains why each statement was false or misleading. *See* Mot. 5 (citing *Patel v. Parnes*, 253 F.R.D. 531, 551-54 & 553 n.197 (C.D. Cal. 2008)); 2:07-cv-5364, ECF No. 74 (Complaint) (in just a single paragraph, explaining why dozens of statements over many months were false).

### B. Defendants' False or Misleading Statements Concealing Kokai's Defects

Defendants also repeatedly misrepresented Kokai's capabilities, concealing serious performance defects and functionality limitations that caused customers to resist adoption of and spending through Kokai. Defendants do not challenge the false or misleading nature of multiple challenged statements that tout Kokai's capabilities and features while concealing Kokai's defects, tacitly conceding that this element is satisfied. *See, e.g.*, ¶¶187, 199(d), 203(a); *Smith v. Berryhill*, 742 F. App'x 253, 255 (9th Cir. 2018) (presenting argument in "conclusory manner" renders it waived). For those statements where Defendants do expressly contest whether it was false or misleading, their arguments fail.

***Kokai's "Relevance" Feature.*** Defendants repeatedly represented Kokai's Relevance feature could "score the relevance of every ad impression, across all channels," which would "help optimize every element of the ad purchase process." ¶¶63-64; *see also* ¶¶180, 187, 197, 199(c)-(d). Defendants highlighted how Relevance ensured customers could buy ad space "based on value," as the "secret to helping [customers] simplify" the ad-buying process, ¶199(c)-(d), and stressed that Relevance enabled users to "get the best out of Kokai," providing "an audience-first approach" to campaigns, ¶¶180, 197.

But Relevance did not work. Rather than "targeting their audiences," Relevance wrongly determined the value of ads and place ads with undesirable audiences. ¶¶73-76 (akin to placing adult diaper ads with young men). While Defendants claimed Kokai gave clients "more precise, more cost-efficient results," providing a "much better return" on spend, ¶203(b), Kokai actually produced ***random, uncontrollable*** results. ¶99.

Defendants wrongly argue that the problems with Relevance do not matter because they did not "guarantee" that Relevance worked perfectly. Mot. 10. But Defendants need not guarantee that for their statements touting it to be false and

misleading, due to the concealment of Relevance's fundamental problems. *See* ¶¶181, 188, 198, 200; *see also Alghazwi*, 2025 WL 2751076, at *17 (statements are false when they highlight only the positives about a product and omit issues and complaints).[7]

Defendants also wrongly urge the Court to disregard FE1's allegations about Relevance as unfounded "hearsay." But FE1 was ***directly responsible for testing Relevance***, and the Complaint describes the time, place, and attendees of meetings where Relevance issues were discussed. *See* ¶¶31 n.3; ¶¶74-76. And, regardless, there is no hearsay bar for former employee information. Defendants' cited cases involve former employee allegations that were vague and conclusory—the Complaint's allegations here are neither. *See* Mot. 10.

***Kokai's "Programmatic Deals."*** Defendants specifically assured investors that Kokai was "enhanc[ing] programmatic advertising buying." ¶69. In truth, Kokai could not even run programmatic guarantee deals, one of the most popular types of ad campaigns. ¶¶77-79. Three FEs separately confirmed Kokai did not support programmatic guarantee deals and that, accordingly, customers disliked Kokai. ¶78. Industry commentators similarly noted this defect, finding it "just insane," given the importance of such deals to customers. ¶79.

---

[7] Defendants repeat this error throughout their briefing, contending that Plaintiff has not established a given statement was technically false. *See, e.g.*, Mot. 11 (TTD never "made promises" about programmatic guarantee deals), 15 (was not impossible for Kokai to get to full adoption by end of 2024), 16 (progress in Kokai may have actually "contribut[ed] to Q1'24 results"), *id.* (Jacobson never promised "*all* first-party data that *every* client wanted to use had occurred"). This myopic approach improperly supplants the actual legal standard—"whether the statements were misleading 'in light of the circumstances under which they were made.'" *Alghazwi*, 2025 WL 2751076, at *17 (quoting *Matrixx Initiatives, Inc.*, 563 U.S. at 44). Plaintiff's allegations that Defendants' statements led investors and analysts alike to understand Kokai as a success easily surmounts that bar.

8

Defendants argue these statements were immaterial because a news report purportedly "concedes" that such deals accounted for "a small share of spend." Mot. 11. But the purported concession in the news report was attributed to *TTD*, not the reporter. ECF No. 80-19 at 5. Regardless, the magnitude of programmatic guarantee spending is irrelevant; as detailed in the Complaint, the lack of programmatic guarantee deals impeded adoption and spending on Kokai as a whole. ¶78.

***"Seeding" of First-Party Data.*** Defendants also falsely highlighted to investors Kokai's purported ability to integrate "first party" data, which supposedly allowed customers to inject sectoral data into ad-buying decisions (known as "seeding"). Defendants told investors that Kokai allowed customers to "bring incredible first-party data assets to bear" to ad-buying decisions (¶65), and enabled customers "to get the best out of Kokai" (¶197). In truth, Kokai could *not* integrate first-party data of key customer sectors. Multiple FEs explained that despite healthcare being a top three sector at TTD in numerous previous years, Kokai could *not* integrate healthcare sector data. ¶¶88-91.[8] Similarly, despite 2024 being an election year that Green touted as boosting spending, Kokai did *not* work for political sector customers and, as a result, customers went elsewhere or refused to adopt Kokai. ¶93.[9]

Additionally, although Defendants claimed seeding allowed Kokai's customers to "deploy data about their most loyal customers" and "harvest the next generation of loyal customers," ¶66, they hid that customers found Kokai seeding

---

[8] Contrary to Defendants' assertion, a "dummy seed" is an empty placeholder, *not* a replacement for actual seeding. ¶89. And healthcare data being highly regulated does not immunize Defendants' false and misleading statements touting Kokai's abilities to integrate it. *See, e.g.*, ¶¶189, 191, 194, 197, 202-03.

[9] That 2024 was supposedly the highest political spending year for TTD (Mot. 12) reflects, at best, the large industry-wide uptick in spending in that election year. It does *not* negate that political customers spent less with TTD than they would have if Kokai were functional. ¶93.

dysfunctional and it bred "***skepticism***"—not enthusiasm—for Kokai. *See* ¶94 (FEs recalling seeding was "confusing," "opaque," "ambiguous"); ¶¶96-97 (FE7's research identified seeding dysfunctionality as contributing to customer frustration).

In response, Defendants assert that their statements to investors about "first-party integration" are nonactionable because they were not tied to decreased customer spending. But, first, the Complaint ***does*** connect the two: healthcare customers represented 11-12% of TTD's revenue, rendering it a top three most lucrative industry for TTD, and easily large enough to alone cause TTD's 2024 revenue miss. *See* ¶91. Second, regardless, data integration was critical to Kokai's marketing and value proposition by Defendants' own admissions. *See, e.g.*, ¶¶189, 191, 194, 197, 202-03. Of course, then, the data integration failures were material.

***"Pacing."*** Defendants also falsely stated that Kokai could fix what was "holding back [customers'] campaign[s]" by optimizing pacing (the rate of spending ad campaign budget).[10] But Kokai suffered significant pacing problems that hampered adoption and delayed Kokai's rollout. ¶104. Defendants respond with a list of other details Plaintiff could have alleged (Mot. 12-13) but none are required, since the Complaint states clearly why the FEs were "positioned to know" the facts alleged. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009)*; see, e.g.*, ¶104 (manager told FE1 they were in meetings with Green where pacing problems were discussed as cause of delay).

***Enhanced User Interface.*** Defendants also falsely assured investors that Kokai had a state-of-the-art user interface proven to improve ad campaigns by providing customers with a "curated and simplified list of options." *See, e.g.*, ¶199. In reality, Kokai's interface, ***designed by Green's 14-year-old son***, was unfinished and incomplete, as FEs attested. *See* ¶112 (interface was "unfinished," "buggy", and

---

[10] ¶103 (citing TTD-published article titled "Improve pacing and Decision Power from the Programmatic Table").

"discouraged clients" from using Kokai). Accordingly, Kokai "significantly disrupted" customer workflow and impeded adoption. *See* ¶¶107-14.

In response, Defendants argue the Complaint "cherry-pick[s]" customer complaints. Mot. 12. Not so. Instead, it details pervasive customer frustration with Kokai that impacted adoption and spend—including through accounts of twelve FEs, customers, and contemporaneous independent reporting citing numerous other customers.[11] And, while TTD's former marketing director did not explicitly connect interface frustrations with reduced spending, FEs did. ¶¶112-14.[12]

***S&P 500 Plus List.*** Defendants claimed that Kokai's "S&P 500 Plus" list provided the "best access of inventory" on the open internet (¶65), but that list performed no better than ordinary inventory (¶80). Defendants disapprove of Plaintiff's reliance on an unnamed client, but plaintiffs may rely on anonymous sources. *In re See Beyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1159 (C.D. Cal. 2003). Additionally, Defendants argue the Complaint does not dispute the 500 Plus feature may have meaningfully improved performance, but it does ***exactly*** that. *See, e.g.*, ¶82 (FE2, FE6, and director at marketing company corroborating that fact).

***Performance metrics.*** Defendants falsely and misleadingly emphasized Kokai's supposed improvements in two key performance metrics—"incremental reach" (*i.e.*, the number of new consumers seeing an ad) and "cost per acquisition" (*i.e.*, the cost to generate a particular consumer action). They stressed that, with Kokai, incremental reach was "up more than 70%" (¶66) and cost-per-acquisition "improved by about 27%." (¶102). But, as FE1 recounted, incremental reach is a

---

[11] Given this degree of corroboration, Defendants' challenge to "internet commentary" is of no moment. Mot. 12.

[12] Further, it is reasonable to infer that customers who "hated [Kokai] with a passion" reduced spending on it. *Compare* Mot. 12 *with* ¶109; *see also Loc. 272 Labor Mgmt. Pension Fund v. Walt Disney*, 2025 WL 2428897, at *1 (C.D. Cal. Aug. 21, 2025) (factual disputes resolved in plaintiffs' favor at pleading stage).

campaign-specific measure and, thus, for Green to broadcast it in aggregated form was "meaningless and inaccurate." ¶101. Similarly, as FE5 explained, Defendants misleadingly represented the "cost-per-acquisition" figure, as TTD never conducted the A/B test necessary to provide such a metric. ¶102.[13]

Likewise, Defendants falsely emphasized that "case study after case study" supported Kokai's success, but TTD **struggled** to find success stories. ¶82. Three FEs explained that Kokai demonstrated **no** improvement over Solimar, with one FE from client services recalling they "couldn't find **any**" success stories. *Id.*[14]

Defendants respond that the incremental reach allegations are "unconvincing," but ignore the particularized allegations supporting them— including FE1's explanation that the metric **could not** be accurately aggregated because "different combinations of settings and different levels of aggressive pricing" would produce dramatically different results on a "campaign-by-campaign" basis. ¶101.

Defendants' assertion that the Complaint needs "more senior level discussions" fares no better. Mot. 17. A senior officer is not inherently more credible than FE1, whose entire job it was to improve Relevance. *See Zucco*, 552 F.3d at 1000 (FE simply must "be in a position to know" facts alleged); *see also Cullen v. Ryvyl Inc.*, 2024 WL 4536471, at *9 n.6 (S.D. Cal. Oct. 21, 2024) (rejecting

---

[13] Again, Defendants isolate the "cost per acquisition" phrase from much larger alleged misstatements which are alleged to be false and misleading for reasons beyond *just* that metric. *See* ¶¶203(b), 220, 222.

[14] Defendants' reference to Unilever's "success story" (Mot. 22) does not suggest otherwise as, there, TTD touted Unilever's success generically, rather than in the key performance indicators Plaintiff alleges Defendants embellished. And, in light of Plaintiff's allegations that Defendants manipulated the statistics they touted, Defendants are not entitled to an assumption that that success story was accurately told.

argument that "low-level" FEs lack credibility); *United Ass'n Nat'l Pension Fund v. Carvana Co.*, 759 F. Supp. 3d 926, 976 (D. Ariz. 2024) (similar).

### C.    The PSLRA's Safe Harbor Does Not Protect Defendants' Misstatements

Defendants wrongly contend that some misstatements were forward-looking and deserve safe harbor immunity. *See* Mot. 7-8 (citing ¶¶174, 177, 183(b), 209(a), 215, 220).

***First***, Defendants' misstatements were not purely forward-looking: they concerned "what has already happened and what is currently known." *Stitch Fix*, 790 F. Supp. 3d at 778; *see also In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1146-47 (9th Cir. 2017) (sustaining mixed statements of present and future fact). For example, in the statement at paragraph 220, Defendants also stated that "Kokai ***has been delivered***," "adoption ***is now*** ahead of schedule," "[a]round two-thirds of our clients ***are now*** using it and the bulk of the spend in our platform ***is now*** running through Kokai," and Kokai "***is delivering*** [improved performance]."[15] *See also* ¶215 ("[T]he majority [of our clients] ***already*** have [moved to Kokai].").

***Second***, the safe harbor only applies to misstatements—***not*** omissions. *In re Celera Corp. Sec. Litig.*, 2013 WL 4726097, at *2 (N.D. Cal. Sept. 3, 2013). In November 2023, when Defendants told investors that "we'll expect that over the course of 2024, we get to full adoption," (¶174), they omitted that adoption was under 50%; TTD launched a pressure campaign and manipulated adoption numbers; TTD gutted its marketing team; and customer dissatisfaction shifted spend to

---

[15] Defendants' argument that investors knew Kokai was in "beta" (Mot. 16) and was "early in its roll out" (*id.* 14, 17) and so were not defrauded by its defects mischaracterizes the facts: investors were repeatedly told that Kokai ***had been*** successfully developed and ***was being*** "enthusiastically adopted," even if additional features were still being added.

1    competitors. ¶¶41, 48-51, 121-26. *See also* ¶183(b) (omitting defects and inability

2    to integrate first-party data); ¶209(a) (omitting performance defects).[16]

3         ***Finally***, regardless, Defendants failed to provide the meaningful cautionary

4    language necessary to invoke the safe harbor. *See Stitch Fix*, 790 F. Supp. 3d at 778.

5    To invoke the safe harbor, Defendants' cautionary language "must accurately

6    convey appropriate, meaningful information about [both] the forward-looking

7    statement [and] the non-forward-looking statement." *Quality Sys.*, 865 F.3d at 1148.

8         Defendants' boilerplate warnings, including that "new or existing

9    competitors" might have "more attractive offerings" which could hurt adoption (*see*

10   ECF No. 80-3 at 16) did not meaningfully warn about ***existing*** problems with Kokai

11   itself. *See, e.g., Glazer*, 63 F.4th at 780 ("boilerplate…generic risks" did not warn

12   of specific risks); *Zaghian v. Farrell*, 675 F. App'x 718, 720 (9th Cir. 2017) (same).

13   The disclosures' "meaningfulness" is further undermined by the fact that they were

14   made ***after*** Defendants knew of Kokai's deficiencies. *See In re Facebook, Inc. Sec.*

15   *Litig.*, 87 F.4th 934, 951 (9th Cir. 2023) ("[B]road pronouncements without

16   meaningful acknowledgement of the known risks…do[] not suffice[.]"). And, as

17   demonstrated herein, Plaintiff adequately pleads Defendants' actual knowledge of

18   Kokai's lagging adoption and technical defects (*see infra* Section II)—accordingly,

19   the second prong of the safe harbor provides no shelter, either.

20

21

22

23

---

24   [16] Defendants' authorities are not to the contrary. *See, e.g., Wochos v. Tesla, Inc.*,
25   985 F.3d 1180, 1190 (9th Cir. 2021) (safe harbor does not "protect [issuers] when
     they make a materially false or misleading statement about current or past facts, and
26   combine that statement with a forward-looking statement"); *Jaszczyszyn v.*
     *SunPower Corp.*, 2024 WL 3463348, at *10 (N.D. Cal. July 17, 2024) (dismissing
27   statements because plaintiff "fail[ed] to show Defendants' then-present knowledge
28   of falsity").

### D.    Defendants' Statements Are Not Immaterial Puffery

Defendants also try to recast certain of their misstatements as mere "puffery". *See* Mot. 6-7 (challenging statements at ¶¶177, 183(b), 184(b), 185, 202, 204, 208, 209(b), 209(d), 210, 217, 221). That effort fails.

To start, Defendants ignore the applicable standard. Dismissing a statement on puffery grounds requires "conclud[ing] that the statement is 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance.'" *In re Honest Co. Sec. Litig.,* 615 F. Supp. 3d 1149, 1154 (C.D. Cal. 2022). That standard cannot be met here. *See also Carvana*, 759 F. Supp. 3d at 988 (noting materiality inquiry best left for summary judgment).

Defendants did not merely convey "optimism" about Kokai. Mot. 6. They went much farther, telling investors Kokai had specific capabilities (that it did not have) and was adopted by a high percentage of its customers (when it was not). *Zaghian*, 675 F. App'x at 721 (statements addressing specific product and its profitability not puffery). For instance, Defendants stated that they were "confiden[t] [Kokai] represents a major advance in advertiser performance and [is] going to be enthusiastically adopted" (¶177)—that is not immaterial puffery. *See Alghazwi*, 2025 WL 2751076 (sustaining statements touting "highly successful launch of Syndeo," and Syndeo as "a revolutionary system that offers significant improvements," wherein executives were "thrilled by the strong early feedback we are receiving from the field"). These repeated statements about Kokai were not "obviously unimportant" to investors; quite the contrary, Defendants told investors Kokai was TTD's "most important" product.

Similarly, Defendants touted about Kokai driving growth at TTD. *See* ¶183 (growth "speaks to [Kokai's] innovation" and Green had "never been more optimistic about…our ability to gain [market share]"); ¶184 ("executing on large long-term growth drivers"); ¶202 ("With…Kokai…we will continue to deliver exceptional value…and grow our leadership"). Such statements are regularly

sustained in this Circuit, given their significance to investors. *See, e.g.*, *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *10 (N.D. Cal. Apr. 28, 2020) (sustaining statement about "a lot of tailwinds in the business"); *Stitch Fix*, 790 F. Supp. 3d at 772 (sustaining statement that company "can see in the data that [the new platform is] working").

Additionally, courts sustain comparative statements like Defendants' representing Kokai as superior to Solimar. *Compare, e.g.*, ¶185 ("[W]e are better positioned than ever."); ¶210 ("[B]est product that we've ever shipped."); ¶217 ("Kokai is more effective in almost every way.") *with In re New Century*, 588 F. Supp. 2d 1206, 1215 (C.D. Cal. 2008) (sustaining statements that credit quality was "better" than in the past).

Finally, even general statements of optimism may be actionable when they "address specific aspects of a company's operation that the speaker knows to be performing poorly." *Quality Sys.*, 865 F.3d at 1143. Here, Defendants' statements that they were "incredibly encouraged by the early results from Kokai," TTD "met the moment with Kokai" and was "firing on all cylinders" (¶¶204, 209), "adoption…has been phenomenal" and Kokai "is the best [product] that we've ever shipped" (¶210), are actionable because Defendants "allegedly knew that the contrary was true." *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (sustaining statements that the inventory situation was "in good shape" or "under control" "while they allegedly knew that the contrary was true").

Additional facts further undermine Defendants' "puffery" contentions.

***First***, Defendants made nearly all the challenged statements during investor conferences and in response to analyst questions. *See Glazer*, 63 F.4th at 770-771 (rejecting puffery argument because "many of the challenged statements were made during earnings conference calls" and in response to analyst questions); *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) (same).

***Second***, Defendants and analysts repeatedly described Kokai as hugely important for TTD's success. *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2017 WL 66281, at *17 (N.D. Cal. Jan. 4, 2017) ("environmentally friendly" statement not puffery when defendants and analysts regarded environmental friendliness as a core aspect of VW); *see also Atlas*, 556 F. Supp. 2d at 1155 ("frequency" of statement undercut puffery argument); *Quality Sys.*, 865 F.3d at 1143-44 (similar). Indeed, Defendants repeatedly told investors Kokai was the "largest…most important platform overhaul ever" and analysts relied on those representations. *See* ¶264; *see also* ¶¶38, 40-41 (analysts reporting on adoption rates and management's sentiment towards adoption); ¶¶174, 184, 212(a)-(f), 215, 220 (Defendants publicizing Kokai adoption); ¶¶262-65 (Defendants emphasizing importance of Kokai as growth driver) ¶35 (analysts reporting on Kokai's potential as growth driver); ¶¶180, 183-84, 187, 189, 191, 194, 197, 199, 203-04, 217, 222 (Defendants repeatedly touting capabilities); ¶¶69-70 (analysts reporting on interface and improved performance).

***Third***, as discussed *infra* at Section II, Defendants knew "material adverse facts that cut against the positive representations that [they] made in the challenged statements." *See, e.g.*, *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *16 (N.D. Cal. Aug. 17, 2022) ("Optimistic statements are ***not*** inactionable puffery…where…defendants were aware of undisclosed facts that rendered the optimistic statements false or misleading.").

Defendants' cited authorities do not lead to a different outcome. In *Brodsky v. Yahoo! Inc.*, reassurances that the switch to a new product was "technically smooth" were found ***not*** to be immaterial puffery. *See* 592 F. Supp. 2d 1192, 1200 (N.D. Cal.

2008). And Defendants' cases where statements were unlikely to induce consumer reliance are inapposite where, here, analysts relied on the assurances in question.[17]

### E.    Defendants' Statements Are Not Inactionable Opinions

Defendants also assert that five of their misstatements (¶¶177, 183(a), 183(b), 204, 210) are "inactionable opinions." Mot. 15-18. This argument fails, too.

As an initial matter, Defendants again ignore large portions of the alleged misstatements in ¶¶177, 183(b), and 204. When considered fully—as they must—each misstatement "expresses certainty about a thing" which, under *Omnicare*, is the very definition of a fact, not opinion. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015) ("A statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not.").

But even if these statements were opinions, they are actionable because they did not "fairly align[] with the information in [Defendants'] possession at the time" and thus are "misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 186–87, 194.

For example, Defendants' statements that Kokai was being "enthusiastically adopted" (¶177), that its "revenue growth acceleration in the first quarter speaks to

---

[17] Defendants' other cited cases are readily distinguished. Mot. 6. While the *Park v. GoPro, Inc.* court dismissed a statement regarding "strong sales" of a certain product, the complaint there did not allege any analyst reliance—or even reference—to that statement. *See* 2019 WL 1231175, at *9 (N.D. Cal. Mar. 15, 2019); Am. Compl., 18-cv-00193, ECF No. 70 (June 18, 2018). The same is true of the statements the Ninth Circuit *sua sponte* deemed to be puffery in the two-page *In re Nimble Storage, Inc. Sec. Litig.* opinion. 756 F. App'x 779, 780 (9th Cir. 2019). Similarly, the court in *Sunpower* dismissed the statements at issue because they were "unlikely to induce customer reliance." 2024 WL 3463348, at *9. And the cited "everything is clicking" language was not actually at issue in *In re Cutera Securities Litigation*, but rather was a quote from a case from thirty years ago, 610 F.3d 1103, 1111 (9th Cir. 2010) (citing *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1095 (N.D. Cal. 1994)).

the innovation and value that we're delivering to our clients with Kokai" (¶183(a)),
and that the Company had "met the moment with Kokai" which was "firing on all
cylinders" (¶204), did not "fairly align" with the facts that Kokai was deeply
unpopular with customers, TTD was manipulating its adoption figures, and Kokai
lacked key functionality. *See supra* Sections I.A-I.D.

Similarly, Defendants' statement that "the innovations in our Kokai platform
will help our clients take advantage of this revaluation and fully leverage data-driven
buying to fuel their own business growth" (¶183(b)), did not align with Defendants'
knowledge that Kokai's performance metrics were untested, overstated, and
untrusted by customers, who encountered frustrating limitations with first-party data
integration and ***avoided*** the new platform.

Finally, Defendants' statements that "[t]he adoption [of Kokai] has been
phenomenal" and that the platform was "the best that we've ever shipped" (¶210),
contradicted customer feedback about Kokai, TTD's enlisting of FE7 to investigate
customers' complaints (¶45), FE7's finding that customers greatly preferred Solimar
to Kokai (¶45), and TTD's improper efforts to boost adoption numbers (¶49).[18]

## II.    THE COMPLAINT RAISES A STRONG INFERENCE OF SCIENTER

Scienter is "a mental state that not only covers 'intent to deceive, manipulate,
or defraud,' but also 'deliberate recklessness.'" *Schueneman*, 840 F.3d at 705.
Plaintiffs need only raise a "strong inference" of scienter that "need not be
irrefutable…or even the 'most plausible.'" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,

---

[18] Defendants' assertion that "Plaintiff has not shown that Green did not 'believe"
his opinion statements overstates the legal standard and ignores the many allegations
of Green's knowledge of the true state of Kokai. *See infra* Section II; *see also In re
Intuitive Surgical Sec. Litig.*, 2017 WL 4355072, at *3 (N.D. Cal. Sept. 29, 2017)
(sustaining opinion statements because it was "plausible that a reasonable investor
would find that the omitted information…rendered the statements of opinion
misleading").

551 U.S. 308, 322-24 (2007). No "smoking-gun" is required. *Id.* "The inquiry is whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 310. The Complaint here includes ample allegations that support a strong inference of scienter.

***First***, the Complaint alleges what the Ninth Circuit has held is "[t]he most direct way" to show scienter: "data, available to the party, which contradict the statement." *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004). In alleging that data was "available to the party," it is enough to allege that defendant had "***access*** to the disputed information [to] raise a strong inference of scienter." *Quality Sys.*, 865 F.3d at 1145.

Here, data and reports contradicting Defendants' false statements was "available" to them: Defendants received weekly updates on Kokai's slow adoption and product failures from Tableau and other written reports. ¶¶52-57. Defendants also actively monitored social media where customers discussed Kokai, including critiquing Kokai's shortcomings. ¶¶120, 257. Defendants even enlisted FE7, Manager of Brand Strategy, to assess ***why*** TTD customers were not adopting Kokai—with a final report presented internally to senior management detailing that many customers were still using Solimar over Kokai and expressly describing why customers did not like Kokai. ¶¶45, 96.

Courts in this Circuit routinely find that such allegations of access to reports contradicting public statements raise a strong inference of scienter. *See, e.g.*, *Stitch Fix*, 790 F. Supp. 3d at 779 (strong inference of scienter established where defendants knew customers numbers from slide decks presented to defendants at meetings; *Weston v. DocuSign*, 669 F. Supp. 3d 849, 884 (N.D. Cal. 2023) (strong inference of scienter established where confidential witnesses stated that defendants had access to databases containing relevant metrics and information).

*Second*, Defendants attended internal meetings where Kokai's lagging adoption and defects were discussed. *See* ¶¶58-61, 247-49; *see also Cutler v. Kirchner*, 696 F. App'x 809, 815 (9th Cir. 2017) (allegation of a confidential witness that defendants attended meetings where relevant information was shared supported scienter); *Alghazwi,* 2025 WL 2751076 at *15 (crediting FE reports from meetings attended by former employees and defendants). Courts credit such allegations where, as here, the FEs are identified with "sufficient particularity" to support "the probability that a person in the position occupied by the source would possess the information alleged." *Oracle Corp.*, 380 F.3d at 1233. The Complaint specifies each FE's job title, responsibilities, reporting line, and period of employment—all of which credibly and with particularity support that the FEs were in a position to possess the information alleged. ¶¶31-32, 44-45, 51; *Alghazwi,* 2025 WL 2751076 at *15 ("While the SAC does not identify the [FE] witnesses by name, it identified their job titles, duties, reporting structure, and dates of employment, such that the Court can make inferences about the type of information that they would reasonably have been exposed to"). Plus, the FEs' accounts are corroborated by third-party reporting citing numerous clients complaining about the defects. ¶¶58-61, 136-41.[19]

*Third*, Defendant Green regularly spoke to analysts about Kokai's adoption and capabilities. *See, e.g.*, ¶¶210, 212, 222. Either he knew his responses to these analyst questions were false or was reckless in not learning the truth before speaking on the subject. *In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at *11 (S.D. Cal. Mar. 18, 2019) (strong scienter inference when defendants issued specific statements in response to analyst and investor questions); *In re Finisar Corp. Sec. Litig.*, 2017 WL 1549485, at *7 (N.D. Cal. May 1, 2017) (strong scienter inference where

---

[19] Defendants wrongly charge FE8 with failing to include details about discussions with TTD leadership about lagging adoption. *See* ¶59(c) (noting timing, attendees, and topics of such discussions).

"analysts had been speculating about" a topic "for months, providing further incentive for Defendants to seek out or pay attention to" that topic).

*Fourth*, Defendant Green acknowledged that he followed client reactions to Kokai and knew it was behind schedule, even claiming that the delay in Kokai's adoption was ***"deliberate."*** ¶134. *See also Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 602 (N.D. Cal. 2019) (when defendant professed their "intimate knowledge" of a subject, it "was at least deliberately reckless not to investigate the accuracy of their statements").

*Fifth*, while motive is not required, *Tellabs*, 551 U.S. at 310, the Complaint pleads one. "[D]efendants' sale of stocks helps contribute to an inference of scienter." *In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *14 (N.D. Cal. Jan. 6, 2022). Here, Defendants sold a staggering $465 million in TTD stock during the Class Period. ¶¶148-50, 243-45. Additionally, the timing of the sales is highly suspicious, with multiple sales on or shortly after issuance of false and misleading statements, and Defendant Green disposing of over $48 million in stock just ***one day*** before TTD's then-largest single-day market-cap drop in February 2025. ¶¶152-58.

*Sixth*, Kokai's adoption was critical to TTD's success, as reflected by Defendants' tracking of it (¶¶52-57) and the market's focus on it (*supra* Section I.A-I.E.) An inference of scienter is supported where the subject of the fraud is so prominent that "it would be 'absurd' to suggest that management was" unaware. *Okla. Firefighters Pension and Ret. Sys. v. Snap Inc.*, 2024 WL 5182634, at *3 (9th Cir. Dec. 20, 2024); *see also Schenwick v. Twitter, Inc.*, 282 F. Supp. 3d 115, 1145-46 (N.D. Cal. 2017) ("absurd" to suggest that Twitter's executive would not know engagement metrics "integral to Twitter's success"); *Stitch Fix*, 790 F. Supp. 3d at 780 (implausible to conclude defendants were unaware of metrics related to "transformational" new product line).

In this case, it would be absurd to suggest that TTD's management did not know the true Kokai adoption rate or about its defects. Kokai was TTD's primary product. Defendant Green stated at its unveiling that Kokai ***"will be the largest platform launch in our history."*** ¶263. Similarly, Defendant Schenkein explained that Kokai was TTD's "***biggest product release ever***" and one of TTD's ***"largest growth drivers."*** ¶264. Indeed, TTD ***"staked its future"*** on Kokai. *Id*. Moreover, Defendants and market analysts saw Kokai as determinative of TTD's success. ¶¶32-35, 263-64. Kokai's monumental importance bolsters an inference that TTD's executives paid attention to its development, adoption, and reception from clients.

***Seventh***, TTD announced Defendant Schenkein's abrupt departure ***on the same day*** that TTD disclosed that Kokai was not fully adopted, resulting in a slow-down in revenue and causing TTD's stock price to drop by 40%. ¶¶142, 267-69. Defendant Schenkein is neither near retirement age nor did she leave for another position. ¶142; *see In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *6 (N.D. Cal. June 1, 2020) ("close temporal proximity" of a disclosure and a resignation weighs "against an innocent inference that defendants resigned for 'unrelated personal or business reasons'"); *In re Fibrogen, Inc.*, 2022 WL 2793032, at *25 (N.D. Cal. July 15, 2022) ("[A]brupt resignation tends to support scienter.").[20]

***Finally***, Defendants knowingly hid the truth about Kokai's true adoption numbers. *See Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1124 (C.D. Cal. 2012) ("[E]vidence of concealment is strongly indicative of scienter."). Defendants manipulated adoption numbers by counting clients who were still using

---

[20] Unlike in *Zucco* and *Align*, Schenkein's sudden departure occurred on the ***same day*** as TTD's disclosure of low growth, leading to a 40% stock drop. *See Zucco*, 552 F.3d at 1002 (none of the resignations occurred the day of corrective disclosure); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 622 (9th Cir. 2017) (resignation was not contemporaneous to disclosure that caused stock price drop).

Solimar as having adopted Kokai, pressuring customers to convert, and forcing customers onto Kokai over their objections. ¶¶48-49.

### A.    Defendants' Scienter Arguments Fail

Defendants urge the Court to ignore the Complaint's well-pled allegations of scienter and adopt their own counter-factual narrative. Defendants' request is improper and fails.

***First***, Defendants assert *ipse dixit* that they accurately reported adoption numbers, and claim the FEs did not say otherwise. Mot. 20-24, 28. But Defendants ignore the Complaint's ***actual*** allegations and the ***actual*** accounts of the FEs. As detailed in the Complaint, Defendants knew—but kept from investors—that adoption of Kokai was not as represented. Among other things, Defendant Green and other senior executives received weekly spreadsheets detailing Kokai's lagging adoption. ¶54. Kokai's slow adoption was also discussed during regular meetings, and available on Tableau reports, which provided Kokai's real time adoption, transition, and reversion rates, sales and product usage rates, and feature-level engagement. ¶55. And multiple former employees detailed how Defendants openly acknowledged at meetings that TTD adoption was behind schedule. ¶59. The accounts of the many FEs are consistent with each other and later investigative reports, further supporting their reliability. *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129 at *26 (N.D. Cal. Mar. 21, 2018).[21]

---

[21] Defendants' cited authorities are inapposite. Unlike both *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999), as amended (Aug. 4, 1999), and *McGovney v. Aerohive Networks, Inc.*, 2019 WL 8137143 (N.D. Cal. Aug. 7, 2019), Plaintiff alleges specific information contained in the Tableau reports, and that Defendants received the Tableau reports and reviewed them in meetings. *See also S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (noting *Silicon Graphics* as "too demanding and focused too narrowly in dismissing vague, ambiguous, or general allegations outright" in light of *Tellabs*).

***Second***, Defendants erroneously assert (Mot. 20-24) that the Court should disregard accounts of the FEs, claiming they lacked direct contact with Defendants or adequate knowledge of Defendants' state of mind. Once again, Defendants ignore the Complaint's ***actual*** allegations, including that numerous FEs attended meetings with Defendants where Kokai's slow adoption and customer complaints were discussed. ¶¶58-61.[22] For example, FE2 attended all-hands meetings led by Defendant Green and attended by Defendants Schenkein and Jacobson, during which Defendants reviewed the Kokai Tableau dashboard.[23] ¶¶53, 55, 59, 98, 247-49. Moreover, nothing requires Plaintiff to plead direct communication with Defendants; even "hearsay" is sufficient for the "scienter calculus." *See Roberts*, 2020 WL 2042244, at *10-11 (FE allegations supported scienter despite lack of "direct contact" with defendants); *LifeLock*, 780 F. App'x at 484-85 n.5 (similar); *Extreme Networks*, 2018 WL 1411129, at *28 (crediting witnesses who had no communications with defendant other than meetings).[24]

Defendants also erroneously assert that the FEs cannot possibly know about the impact of Kokai's suppressed adoption on TTD's revenue because they were not in TTD's finance department. Mot. 20. But this argument has been rejected by the Ninth Circuit. *See Berson*, 527 F.3d at 987 (crediting FE accounts about effect on

---

[22] Defendants' cited authorities are inapposite. *See, e.g.*, *McGovney*, 2019 WL 8137143 (no FEs were employed at company when statements were made; no allegation that FEs attended meetings with defendants); *Dolly v. GitLab Inc.*, 2025 WL 2372965, at *14 (N.D. Cal. Aug. 14, 2025) (complaint offered only the "generic allegation" that "GitLab leadership was regularly kept in the loop").

[23] Defendants mistakenly assert that FE3 did not state what information was in the Tableau reports. MTD at 22. In truth, FE3 explained that Defendants Green, Schenkein, and Jacobson had access to KPI changes through Tableau which represented Kokai's deficiencies. ¶81.

[24] Unlike Defendants' cited authority, *In re Downey Sec. Litig.*, 2009 WL 2767670 (C.D. Cal. Aug. 21, 2009), here, FE1 directly learned from the individual who attended the meeting where pacing was discussed. ¶104.

revenue even though FEs were not in the finance department). Here, Plaintiff adequately alleges the FEs' positions and the source of their knowledge. *Alghazwi*, 2025 WL 2751076, at *15 (court may "make inferences about the type of information [FEs] would reasonably have been exposed to."). And, given that Kokai was TTD's primary revenue source, one need not be in finance to know that Kokai's slow adoption and customer disdain for it would negatively impact TTD's revenue.

Defendants also try to criticize FE1's description of Kokai's Relevance feature, claiming FE1's account lacks foundation. Mot. 21. But FE1 was TTD's Senior Data Scientist from June 2019 to August 2024 and was responsible for developing and testing Relevance and other metrics for Kokai from January 2024 until mid-2024 to determine whether they worked properly. ¶¶31, 75. And, as detailed in the Complaint, that Relevance was unreliable and unstable was directly communicated to Defendant Green. ¶76; *see LifeLock*, 780 F. App'x at 484 n.5 (crediting FE account based on hearsay where it formed "a plausible and coherent narrative" and FE was in a position to know).

Similarly, Defendants argue that FE4 does not state when and whether TTD's SVP of Technology informed Defendant Green that Kokai's adoption was slower than TTD's public projections. Mot. 22. But FE4 confirmed that the SVP of Technology ***repeatedly*** discussed Kokai's slow adoption with Defendant Green and that the SVP knew that Kokai's adoption was slower than the Company was publicly reporting. ¶111. Defendants' suggestion that FE4 and the SVP of Technology were lying and Green was never told is baseless and cannot be accepted at this stage. *See LifeLock*, 780 F. App'x at 484 n.5 (at pleading stage, crediting FE's assertion that his supervisor and defendant met regularly to discuss reports he prepared).

***Third***, Defendants urge the Court to ignore their $465 million of Class Period stock sales, Mot. 25-26, absurdly claiming the amount sold is "small." But Defendants sold a huge volume of TTD stock during the Class Period. ¶¶148-50. Defendant Green sold 4,081,128 shares of his TTD stock for more than ***$443 million***

and Defendant Schenkein sold 169,840 shares of TTD stock for more than *$18 million*. *Id*. Courts have repeatedly found that stock sales similar in magnitude support scienter, regardless of size in percentage terms. Mot. 25; *see, e.g.*, *Oracle Corp.*, 380 F.3d at 1232 ("astronomical" insider sales support scienter, despite representing just 2.1% of holdings).[25]

Further, stock holdings at the end of the Class Period (Mot. 26) do not rebut scienter. *See In re Questcor Sec. Litig.*, 2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) (retaining holdings at end of Class Period "does not negate the inference of scienter"). And, while a certain small amount of Defendants' Class Period sales were made pursuant to 10b5-1 plans (Mot. 26), those plans were adopted ***during*** the Class Period while Defendants were in possession of the true facts regarding Kokai. ¶¶163-66. A 10b5-1 plan is "no defense" in such circumstances. *See, e.g.*, *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 2022 WL 4491093, at *13 (S.D. Cal. Sept. 27, 2022) ("the trading plans in question were not adopted until after the motive and opportunity to mislead investors allegedly arose"). Indeed, Defendant Green's amendment of a 10b5-1 plan further strengthens the scienter inference because it demonstrates a ratification of the trades during the fraudulent period. *E.g.*, *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1068-69 (C.D. Cal. 2008).

***Fourth***, Defendants incorrectly assert that Plaintiff has not alleged the required "unusual circumstance" for the core operations doctrine to apply. Mot. 27. Allegations, like here, that it would be "absurd" for management to not know about the adoption and capabilities of its "largest and most important platform" and "growth driver" (¶264), are just the type of "unusual circumstances" the Ninth

---

[25] Defendants' cited authorities involve far smaller sales. *In re AnaptysBio, Inc.*, 2021 WL 4267413, at *8 (S.D. Cal. Sept. 20, 2021) ($2.6 to 12 million); *Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 2015 WL 1775221, at *37 (C.D. Cal. Apr. 14, 2015) ($1 million).

Circuit finds sufficient. *Snap Inc.*, 2024 WL 5182634, at *2-3 (finding scienter where fraud threatened more than half of company's revenue); *Berson*, 527 F.3d at 989 (finding scienter where fraud involved "stop work orders that allegedly halted tens of millions of dollars of the company's work"); *see also Robb v. Fitbit Inc.*, 2017 WL 219673, at *6 (N.D. Cal. Jan. 19, 2017) (scienter strengthened by importance of product to "revenue stream").

## III.    THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION

Loss causation is generally "a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). "[P]laintiffs need only show a 'causal connection' between the fraud and the loss by tracing the loss back to 'the very facts about which the defendant lied.'" *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). Moreover, corrective disclosures "need ***not*** be a 'mirror image'" of the [alleged] misrepresentation." *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1046 (N.D. Cal. 2018). The Complaint amply meets these standards.

***February 12, 2025 disclosure.*** On February 12, 2025, Trade Desk announced a revenue miss for the first time in its history, which Defendants attributed to Kokai's slow adoption. ¶¶128, 226. As the Ninth Circuit has held, "[a] plaintiff may…prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *First Solar Inc.*, 881 F.3d at 754; *see also DocuSign, Inc.*, 669 F. Supp. 3d at 887 (same); *In re Doximity, Inc. Sec. Litig.*, 2025 WL 1449598 (N.D. Cal. May 13, 2025) (same); *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 950 (N.D. Cal. 2022) (same). Ignoring these authorities, Defendants seek a different outcome because the purported disclosure did not include an admission of "fraud." Mot. 28. This is

incorrect as a legal matter and, in any event, Defendants specifically attributed the revenue miss to the fact that Kokai's adoption "was slower than we anticipated." *Id*.

***March 11, 2025, disclosure.*** On March 11, 2025, *AdWeek* published an exposé revealing for the first time that Kokai's performance was contrary to what Defendants claimed. ¶¶136-41. Defendants again fault the *AdWeek* report because it did not explicitly state that TTD was engaging in fraud. Mot. 29. But, again, no such claim of fraud is required. *See also In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 934 (N.D. Cal. 2020) (an article without an admission of fraud constituted a corrective disclosure).

***August 7, 2025, disclosure.*** Finally, Defendants disclosed on August 7, 2025, that there were further delays in Kokai's adoption and a concomitant slow-down in revenue, only three-quarters of TTD's client spend was on Kokai and Kokai's key features were still not developed, and Defendant Schenkein was abruptly leaving the Company. ¶¶142-44. *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 985 (N.D. Cal. 2015) (stock price decline following announcement of resignation by CEO sufficient for loss causation).

In response, Defendants claim TTD's stock drop was due to increasing competition and industry risk, not news regarding Kokai. Mot. 29-30. But analysts specifically attributed TTD's stock decline to poor Kokai adoption. ¶143. Regardless, untangling potential causes of TTD's stock decline is a question of damages for a later stage of the case—***not*** a basis to dismiss it. *See Alghazwi*, 2025 WL 2751076, at *18 (plaintiff need not show alleged fraud was the *only* cause of stock drop); *Splunk Inc.*, 592 F. Supp. 3d at 953 (same); *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1046 (N.D. Cal. 2018) (rejecting argument that stock declines were due to confounding factors).[26]

---

[26] Unlike here, in *Brodsky*, plaintiffs expressly *admitted* that one purported disclosure did not reveal, but rather further concealed, the alleged fraud, and

Plaintiff's allegations that Defendants misrepresented or omitted facts that substantially caused economic loss is sufficient at this stage.

Defendants' authorities are likewise inapt. For example, Defendants rely on *Metzler Investment GMBH v. Corinthian Colleges, Inc.*, but plaintiffs there did not allege that the disclosures revealed ***any*** information about the fraud. 540 F.3d 1049 (9th Cir. 2008). Unlike in *Curry v. Yelp Inc.*, Plaintiff alleges that a news report (and customer complaints therein) revealed missing features and critical defects in Kokai. *See* Mot. 29 (citing 875 F.3d 1219, 1225 (9th Cir. 2017)). Finally, in contrast to *Ng v. Berkeley Lights, Inc.*, 2024 WL 695699 (N.D. Cal. Feb. 20, 2024), Schenkein's departure was announced at the same time TTD revealed Kokai's delay and defects which caused a significant drop in stock price. ¶¶142-43; *see also Nathanson*, 87 F. Supp. 3d at 985 (finding that the executive departure supports loss causation).

## IV.   THE COMPLAINT ADEQUATELY STATES CLAIMS UNDER SECTIONS 20(a) AND 20(A)

Defendants offer no serious challenge (nor could they) to the allegations that Defendants Green, Schenkein, and Jacobson were controlling persons at TTD and, thus, are liable under Section 20(a). ¶¶26, 294-300. Nor do Defendants seriously contest the Complaint's well-pled allegations under Section 20A: Defendants sold over $465 million worth of stock, pursuant to plans adopted after their fraud was under way, while possessing material, nonpublic information regarding Kokai's adoption and defects. ¶¶145-69. *See, e.g.*, *McKesson Corp.*, 411 F. Supp. 3d at 605 (sustaining a Section 20A claim where the defendant made sales during the class period while in possession of material, nonpublic information).[27]

---

plaintiffs did not even attempt to link the information in the other disclosure to the statements at issue. 592 F. Supp. 2d at 1207.

[27] *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 623 (9th Cir. 2017) is inapposite because there, unlike here, plaintiffs did not adequately allege that defendants possessed material non-public information.

## <u>CONCLUSION</u>

For these reasons, Defendants' Motion To Dismiss should be denied.[28]

---

[28] If the Court grants Defendants' motion, Plaintiff requests leave to amend. *See In re Daou Sys. Inc.*, 411 F.3d 1006, 1013 (9th Cir. 2005).

Dated: December 12, 2025

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

*/s/ Jonathan D. Uslaner*
Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel.: (310) 819-3481

-and-

Hannah Ross (admitted *pro hac vice*)
(hannah@blbglaw.com)
John Rizio-Hamilton (admitted *pro hac vice*)
(johnr@blbglaw.com)
Prachi Patel (admitted *pro hac vice*)
(prachi.patel@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel.: (212) 554-1400

*Counsel for Lead Plaintiff*
*Public Employees' Retirement System of*
*Mississippi, and Lead Counsel for the Class*

**COHEN MILSTEIN SELLERS**
**& TOLL PLLC**

Laura H. Posner (admitted *pro hac vice*)
(lposner@cohenmilstein.com)
Brendan R. Schneiderman
(bschneiderman@cohenmilstein.com)
88 Pine St., 14th Floor
New York, NY 10005
Tel.: (212) 838-7797

-and-

Steven J. Toll (admitted *pro hac vice*)
(stoll@cohenmilstein.com)
Molly J. Bowen (admitted *pro hac vice*)
(mbowen@cohenmilstein.com)
1100 New York Avenue, N.W., Suite 800
Washington, D.C. 20005
Tel.: (202) 408-4600

*Counsel for Lead Plaintiff Arkansas Public*
*Employees' Retirement System, and Lead*
*Counsel for the Class*

John L. Davidson (admitted *pro hac vice*)
(jdavidson@dbslawfirm.net)
DAVIDSON, PLLC
1062 Highland Colony Parkway
200 Concourse, Suite 275
Ridgeland, Mississippi 39157
Tel.: (601) 932-0028

*Additional Counsel for Lead Plaintiff Public
Employees' Retirement System of Mississippi*