# Exhibit A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORINNE GONSALVES, et al., Plaintiffs, v. BLOCK, INC., et al., Defendants. | Case No. 25-cv-00642-NW **ORDER DENYING MOTION TO DISMISS** Re: ECF No. 108 |

This is a putative class action for securities fraud against Block, Inc., and two individual directors and officers, Jack Dorsey and Amrita Ahuja (collectively, Defendants). Block is the parent company of Cash App, a mobile-based financial platform. Lead Plaintiff NYC Funds filed a First Amended Consolidated Class Action Complaint ("FAC") alleging that Defendants made materially false and misleading statements regarding Cash App's compliance programming, which led to a series of enforcement actions and an 84% drop in Block's stock price.[1] Plaintiff alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5. FAC, ECF No. 106.

On July 30, 2025, Defendants filed a motion to dismiss. Mot., ECF No. 108.[2] Plaintiff

---

[1] Lead Plaintiff NYC Funds is made up of putative class members Teachers' Retirement System of the City of New York, New York City Employees' Retirement System, New York City Fire Pension Fund, New York City Board of Education Retirement System, Police Superior Officers' Variable Supplements Fund, Police Officers' Variable Supplements Fund, Firefighters' Variable Supplements Fund, Fire Officers' Variable Supplements Fund, New York City Fire Department Life Insurance Fund, and Teachers' Retirement System Variable A (collectively, the "NYC Funds"). Individual Plaintiff Corinne Gonsalves voluntarily dismissed her claims without prejudice to her ability to participate in the action as a putative class member. ECF No. 107.

[2] Having considered the parties' briefs and the relevant legal authority, the Court concluded oral argument was not required, *see* N.D. Cal. Civ. L.R. 7-1(b).

opposed, ECF No. 109, and Defendants filed a reply, ECF No. 114. For the reasons stated below, the Court DENIES Defendants' motion to dismiss.

## I.     BACKGROUND[3]

Lead Plaintiff NYC Funds is a group of retirement pension funds in New York that purchased Block's Class A common stock between February 26, 2020, to May 1, 2025, inclusive (the "Class Period"). Plaintiff brings securities fraud claims on behalf of all entities and individuals who purchased the Class A common stock during the Class Period.

Block is a financial technology company with its principal executive offices in Oakland, California. Block owns a "suite of financial products," and its two main business units are Square and Cash App, the latter of which is at issue in this action. FAC ¶ 17. Launched in 2013, Cash App is "a mobile-based financial platform" intended for "individual consumers." *Id*. ¶ 20. Cash App facilitates mobile "payments, banking, investing, cryptocurrency, tax filing, and small-dollar lending." *Id*.

Jack Dorsey co-founded Block and is currently Block's Chief Executive Officer ("CEO") and Chairman of its Board of Directors, positions he has served in throughout the Class Period. Currently, Amrita Ahuja is Block's Foundational Lead, "overseeing the finance, legal, and people functions." *Id*. ¶ 14. Ahuja formerly served as Block's Chief Financial Officer ("CFO"), a role she held throughout the Class Period. She additionally served as Block's Chief Operating Officer ("COO") starting in February 2023 through the Class Period. In their roles as an officer and/or director of Block, Dorsey and Ahuja were "directly involved in the management and day-to-day operations of [Block] at the highest levels and [were] privy to confidential proprietary information concerning the Company and its business, operations, services, and present and future business prospects." *Id*. ¶ 15. This includes Cash App's operations. Dorsey and Ahuja "were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period." *Id*. ¶ 16.

---

[3] The factual background is drawn from Plaintiff's FAC. *See* ECF No. 106.

United States District Court
Northern District of California

### a. User Metrics

Plaintiff alleges that "Cash App's business model relies on two primary levers for revenue growth: (1) acquiring new users, and (2) monetizing existing users by expanding their engagement across multiple products and encouraging higher fund inflows." FAC ¶ 26. "For Block, the growth of [Cash App's] user base is essential to its valuation as a company." *Id*. ¶ 4. From 2019 to 2023, Block reported substantial growth in Cash App's user base: "[i]n December 2019, Block reported 24 million monthly active users; by December 2020, it was 36 million users; and by December 2023, the Company touted 56 million users." *Id*. ¶ 2. Block publicly attributed the growth in users to "viral adoption among customers and an intuitive, social network-like user experience," while also touting Cash App's "strong compliance infrastructure." *Id*. Cash App's user growth metric was important to investors for valuing Block's "scalability and profitability." *Id*. ¶ 4.

To acquire new users, Block designed Cash App to have "frictionless onboarding," where the "signup process was intentionally designed to require minimal information—just a ZIP Code and an email address or phone number." *Id*. ¶¶ 3, 21. Plaintiff contends that "Cash App's 'frictionless' user experience—paired with its failure to implement" compliance programming "transformed the platform into a magnet for bad actors." *Id*. ¶ 29. The "bad actors" created multiple Cash App accounts per user, conflating the number of users and the number of accounts.

Plaintiff states that "Cash App's user base was materially smaller than publicly represented, because the reported numbers were inflated by duplicate, fraudulent, and illicit accounts enabled by Cash App's lack of adequate compliance." *Id*. ¶ 4. Additionally, in February 2022, Block changed how it described user counts from "transacting active cash app customers" to "transacting actives." *Id*. ¶ 94. This new descriptor obscured the number of duplicate accounts per user.

### b. Compliance

During the same period that Block was investing in "frictionless onboarding," Block was also dealing with a series of compliance concerns. For example, "in 2022 Block discovered that approximately 30 members of a Russian criminal network opened *8,359* Cash App accounts using

falsified information, adding thousands of bogus, prohibited users to Cash App's publicly reported user base totals." *Id*. ¶ 32 (emphasis in original). Plaintiff submits that, "Block deliberately underinvested in its compliance infrastructure" to facilitate its "frictionless onboarding" processes. *Id*. ¶ 31. Plaintiff points to a recurring compliance problem: "[e]ven when Block closed an account due to problematic activity, it often permitted the same user to open new accounts," which in turn led to allegedly inflated user account numbers. *Id*. ¶ 32. Additionally, Block had a substantial challenge with reviewing transaction monitoring alerts, and by 2020 Block had amassed a backlog of 169,000 unreviewed alerts. These compliance concerns led to "major U.S. sanctions [for] compliance deficiencies that Block failed to remedy in a prompt or thorough manner, even after they were identified." *Id*.

### c. Public Reporting and Stock Drop

On March 23, 2023, after interviewing former Block employees, Hindenburg Research published a report titled "*Block: How Inflated User Metrics and 'Frictionless' Fraud Facilitation Enabled Insiders to Cash Out Over $1 Billion*" ("Hindenburg Report"). FAC ¶ 171. The report estimated that "between 40% and 75% of the Cash App accounts" Hindenburg reviewed "were fake, involved in fraud, or tied to a single user opening multiple accounts." *Id*. ¶ 34. The day after the Hindenburg Report was published, "the price of Block Class A common stock fell from $72.65 per share at market close on March 22, 2023, to $61.88 per share at market close on March 23, 2023—a decline of nearly 15% on unusually heavy trading volume of over 140 million shares traded—and continued to fall the next trading day." *Id*. ¶ 173.

In the months following the Hindenburg Report, state and federal enforcement agencies initiated investigations and eventually assessed costly penalties against Block. During this period, "Block's stock price collapsed from its Class Period high of $289 per share to just $46 per share— an 84% decline that inflicted massive losses on investors." *Id*. ¶ 6. Plaintiff asserts that Block's stock price collapsed when it was revealed that user growth metrics were inflated, and when Block had to address persistent compliance concerns — concerns that also contributed to inflated user counts.

On June 18, 2025, NYC Funds filed an amended consolidated class action complaint on

behalf all persons and entities who purchased or acquired Block's Class A publicly traded common stock during the Class Period and who were damaged.[4]  FAC, ECF No. 106.  Plaintiff brings two claims: (1) Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) against Block, Dorsey, and Ahuja; and (2) Violation of Section 20(a) of the Exchange Act against Dorsey and Ahuja.  Plaintiff challenges statements and omissions related to Block's user metrics and compliance programming.

## II.    REQUEST FOR JUDICIAL NOTICE

In connection with their motion to dismiss, Defendants ask the Court to take judicial notice of or incorporate by reference 16 separate exhibits.  Request for Judicial Notice, ECF No. 108-19 ("RJN"); Declaration of Brian M. Lutz, Exs. A-P, ECF No. 108-2.

First, Defendants ask the Court to incorporate by reference documents cited and quoted in the FAC, including Block's SEC filings, shareholder letters, earnings call transcripts, and published responses to recent investor questions (Exhibits A-D, F, H-L, and N-P).  Plaintiff does not contest Defendants' request for incorporation by reference.  Opp'n to RJN, 1, ECF No. 110.

Second, Defendants ask the Court to take judicial notice of additional Block SEC filings that were not referenced in the complaint (Exhibits E, G, and M).  Plaintiff opposes Defendants' request for judicial notice of Exhibits E, G, and M "to the extent Defendants seek to introduce" these documents "to assume the truth of the matters asserted therein."  *Id.*

Plaintiff correctly notes that when assessing the sufficiency of the complaint under Federal Rule of Civil Procedure 12(b)(6), the Court generally cannot consider material outside of the pleadings.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018); *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).  Once a document is incorporated by reference or judicially noticed, the Court "may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)," but the Court may not "assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded

---

[4] On April 30, 2025, the Court granted NYC Funds' motion to be lead plaintiff and appointed Lieff Cabraser and Cohen Milstein as co-lead counsel.  ECF No. 102.

United States District Court
Northern District of California

complaint." *Khoja*, 899 F.3d at 1003.  Accordingly, the Court GRANTS Defendants' motion and incorporates by reference Exhibits A-D, F, H-L, and N-P, and takes judicial notice of Exhibits E, G, and M, subject to *Khoja*'s restrictions.

## III.   LEGAL STANDARD

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the [plaintiff]." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).  However, the tenet that a court must accept a complaint's allegations as true "is inapplicable to . . . [t]hreadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).

"Securities fraud class actions must [also] meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA)." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014).  Under Rule 9(b) and the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to the alleged false statements or omissions, and a party must "state with particularity the circumstances constituting fraud or mistake."  15 U.S.C. § 78u-4(b)(2)(A); Fed. R. Civ. P. 9(b).  If the complaint does not satisfy the PSLRA's pleading requirements, the Court must grant a motion to dismiss the complaint.  15 U.S.C. § 78u-4(b)(3)(A).

## IV.   DISCUSSION

Plaintiff brings two claims: (1) violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) and (2) violation of Section 20(a) of the Exchange Act.  Defendants move to dismiss both claims.

### A.      Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b)

Section 10(b) of the Exchange Act prohibits any act or omission resulting in fraud or deceit in connection with the purchase or sale of any security.  15 U.S.C. § 78j(b) (declaring it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or

United States District Court
Northern District of California

deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary."). 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements Section 10(b) by making it unlawful to "make any untrue statement of a material fact" or to "omit to state a material fact necessary" to make a statement not misleading, "in the light of the circumstances under which they were made." 17 C.F.R. § 240.10b-5.

"To plead a claim under [S]ection 10(b) and Rule 10b-5, the Plaintiff[ ] must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613 (9th Cir. 2017) (quoting *Oregon Pub. Emps. Ret. Fund*, 774 F.3d at 603). Federal Rule of Civil Procedure 9(b) requires a plaintiff who alleges fraud or mistake, including for securities fraud claims, to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 990 (9th Cir. 2009).

Defendants contend that Plaintiff fails to adequately plead falsity, scienter, and loss causation as required under the Exchange Act. For the reasons stated below, the Court finds that the Plaintiff has alleged sufficient facts to support each element and accordingly denies Defendants' motion to dismiss Plaintiff's first claim.

### 1. Falsity

Under the PSLRA, a statement is false if it "directly contradict[s] what the defendant knew at that time." *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022). "Even if a statement is not false, it may be misleading if it omits material information." *Khoja*, 899 F.3d at 1008–09. Put another way, "a statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.,* 845 F.3d 1268, 1275 (9th Cir. 2017). To meet the PSLRA and 9(b) pleading standard, "plaintiffs must allege a misrepresentation or a misleading omission with particularity and explain why it is misleading." *Id*. at 1274.

7

United States District Court
Northern District of California

Plaintiff challenges two categories of statements made by Block: (a) statements regarding Block's compliance programming; and (b) statements regarding user metrics.

### a. Statements Regarding Block's Compliance Programming

Plaintiff argues that Defendants made a series of material misrepresentations or omissions regarding Block's and Cash App's compliance programs, specifically the level of investment in and robustness of the compliance program. *See, e.g.*, FAC ¶¶ 71, 81, 83, 91, 92, 110, 117, 126, 127.[5]  For example, Plaintiff points to the following statements from Defendants about compliance:

- "*We have implemented an [anti-money laundering ("AML")] program designed to prevent our payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity. . . . Our AML compliance program includes policies, procedures, reporting protocols, and internal controls*, including the designation of an AML compliance officer, *and is designed to address these legal and regulatory requirements and to assist in managing risk associated with money laundering and terrorist financing*."  *Id*. ¶ 71 (statement in Block's 2019 10-K filing).

- "[Block is] aware that there has been a recent rise in scammers trying to take advantage of customers using financial products, including Cash App. *We've taken a number of proactive steps and made it our top priority*."  *Id*. ¶ 81 (statement from Block spokesperson in response to October 11, 2020 New York Times article).

- "In order to do that, *we must maintain a culture of compliance and responsible risk management, including through investment in programs, processes, controls and teams with deep compliance expertise, prioritizing compliance ultimately helps us drive trust to their customers with regulators and external partners, and that enables us to then develop innovative products responsibly. We have significantly grown our investment in compliance over the last few years.* At a company level, we expect to invest approximately $160 million in compliance in 2023, which represents an increase in our investment dollars of more than 5x since 2020, outpacing OpEx growth by approximately 2x during that same period. *Specifically within Cash App, the pace of growth on compliance investment has been even faster than that*."  *Id*. ¶ 127 (statement from Ahuja during Block's May 4, 2023 earnings call).

Plaintiff posits that the statements are misleading or false because Block's "compliance infrastructure was chronically under-resourced, fundamentally flawed, and reliant on substandard

---

[5] Plaintiff specifically focuses on the bold and italicized phrases in the statements.

systems and processes for customer due diligence, identity verification, and transaction monitoring." *Id*. ¶ 25. These alleged failures led to violations of "sanctions laws and enabled widespread fraud, illegal activity, and the creation of duplicate accounts." *Id*. ¶ 69. Plaintiff further alleges that "Block's senior leadership knowingly deprioritized compliance in favor of growth, as evidenced by a large backlog of unresolved alerts and a persistent failure to shut down accounts involved in illicit conduct." *Id*.

Defendants argue that Plaintiff fails to show that the statements made about Block's compliance efforts were untrue; for example, Plaintiff did not allege that "Block did *not* design anti-money laundering programs, that Block did *not* take efforts to combat wrongdoing on Cash App, or that Block did *not* invest in compliance." Mot. at 9. Further, Defendants maintain that the statements regarding compliance efforts were not misleading by omission because the facts referenced in the statements were previously disclosed or not pled with particularity in the FAC. The Court disagrees.

Plaintiff has pled sufficient facts, taken as a whole, to support an inference that Block's compliance program was not capable of meeting regulatory requirements, and Block did not take timely steps to strengthen compliance tools; collectively, these pleaded facts support Plaintiff's allegations that Block's assurances about the design and implementation of its compliance programming were misleading. First, Block's public assurances that Block had "taken a number of proactive steps and made it our top priority" to address "recent rise in scammers" on Cash App, does not align with Block's lack of investment into compliance programming, namely an understaffed compliance team with a growing number of unaddressed scam alerts, or Block's "frictionless" and "lax onboarding protocols." FAC ¶¶ 81, 111. Second, Block made assurances that, for "identity-theft or account take-over scams," Block will "***review the account in question****. If deemed fraudulent, **we will take the necessary action starting with account closure and disablement of all applicable products***." *Id*. ¶ 110. These statements do not align with Block's "large backlog of unresolved alerts." *Id*. ¶ 111. Block continued to make similar assurances regarding compliance being a top priority through 2024 – "***the pace of growth on compliance investment has been even faster***" – while internally, Defendants were advocating for user on-

9

boarding systems that necessarily were at odds with compliance efforts. *Id*. ¶ 127. Drawing all reasonable inferences from the above facts in favor of Plaintiff, as the Court must, Plaintiff has adequately pled misrepresentation or a misleading omission.

<div align="center">

**b.      Statements Regarding User Metrics**
</div>

Plaintiff additionally states that Defendants made a series of material misrepresentations or omissions regarding Cash App's user metrics, including the number of user accounts and user growth. *See, e.g.*, ¶¶ 73, 75, 76, 77, 78, 79, 85, 86, 87, 88, 89, 94, 96, 100, 103, 104, 105, 106, 112, 114, 119, 120, 121, 122, 123, 124, 129, 130, 143. For example, Plaintiff challenges the following statements from Defendants about user metrics:

- In a 2020 letter to shareholders, "Defendants discussed the growth and strength of Cash App through the metric of '*active Cash App customers*,' which the Company defined as a '*customer [with] at least one cash inflow or outflow during the specified period*.' Defendants represented that '*Cash App had approximately 24 million monthly active customers in December 2019, achieving 60% year-over-year growth*.'" *Id*. ¶ 73 (statement in a February 26, 2020 letter to shareholders).

- "Our Cash App Customers: As of December 2020, Cash App had more than *36 million monthly transacting active customers* across the United States and Europe who had at least one financial transaction using any Cash App product or service during the specified period." *Id*. ¶ 86 (statement in Block's 2020 10-K filing).

- "So, we do believe Cash App has reached a mainstream scale, and that's with over 30 million monthly active customers in June. *And these are monthly active customers, not overall accounts*." *Id*. ¶ 143 (statement from Dorsey in an August 2020 earnings call).

Plaintiff argues that the statements are misleading or false because they "materially misled investors by creating the false impression that Cash App's reported user metrics were accurate and reliable because they were supported by sound compliance practices," when in reality the user metrics were inflated due to "misuse by bad actors," who could create multiple accounts. *Id*. ¶ 69. Defendants insist that the statements Plaintiff points to are not false or misleading because the metrics were not inflated.

Plaintiff has pled sufficient facts, viewed collectively, to support an inference that Block reported user metrics that included substantial numbers of fraudulent accounts, and relately that

<div align="center">10</div>

Block's statements regarding the number and growth of users was misleading. Block regularly made statements about the number of "transacting active customers" or "transacting actives," and regardless of the terminology used, Block did not disclose the substantial number of fraudulent Cash App users, which significantly inflated Block's metrics. *Id*. ¶ 94. Additionally, Plaintiff alleges that Block's switch in terminology – from "transacting active customers" to "transacting actives" – is itself misleading because of the prevalence of multiple "actives" per "customer." Block claims that despite the switch in terminology, it never altered how it calculated the metric. While Defendants may be able to rebut these allegations through discovery, at this stage, the Court must view all pleadings in the light most favorable to Plaintiff. The Court finds that Plaintiff has sufficiently pled facts to support the allegation that Defendants misled investors by counting fraudulent accounts in user metrics and by switch the methodology of counting users without adequate explanation.

### c. Materiality

The materiality of the misrepresentations or misleading omissions are also sufficiently pled. Materiality is established when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 131 (2011). Plaintiff stressed that the market's reaction (15% stock drop on the first day of reporting) and frequency of questions posed to Block regarding compliance after the Hindenburg Report was published show that investors were interested in Block's compliance program and user account metrics. Other courts in this District have found assurances regarding the effectiveness of internal controls, as well as statements about inflated user accounts, to be material. *See, e.g.*, *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1024 (N.D. Cal. 2020) (holding that defendants' statements "left investors with the false or misleading impression" that the company "was curing its prior internal controls weaknesses and no new concerns needed to be disclosed"); *In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1096 (N.D. Cal. 2017) (holding that "[t]he fact that a critical performance metric was based on a significant number of fraudulent accounts" was material because it "would certainly 'give a reasonable investor the

United States District Court
Northern District of California

impression of a state of affairs that differs in a material way from the one that actually exists.'"). The Court finds that Plaintiff has sufficiently pled materiality.[6]

### 2. Scienter

Plaintiff must allege, "with particularity," facts that give "rise to a strong inference that the defendant acted with the required state of mind.'" *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011) (quoting 15 U.S.C. § 78u–4(b)(2)(A)). "A complaint can plead scienter by raising a strong inference that the defendant possessed actual knowledge or acted with deliberate recklessness." *Id.* The Court first determines whether any allegations, standing alone, "are sufficient to create a strong inference of scienter." *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 992 (9th Cir. 2009), *as amended* (Feb. 10, 2009). If no individual allegations are sufficient, the Court "conduct[s] a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.* In reviewing the sufficiency of the complaint, the Court must "take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323 (2007). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

Here, Plaintiff claims that Defendants acted with scienter because they "promoted misleading Cash App user metrics despite having direct access to internal data and information revealing materially lower verified user and unique SSN counts and pervasive fraud and illicit

---

[6] The Court finds Defendants' alternative argument that the challenged statements are mere corporate puffery unavailing. "Puffery" is not actionable under the PSLRA because the law deems such statements so amorphous as to be immaterial. *See In re Omni Vision Techs., Inc. Sec. Litig.*, 937 F.Supp. 2d 1090, 1102 (N.D. Cal. 2013). Determining whether a given statement is material "entail[s] fact-intensive assessments that are more properly left to the jury," and therefore, "[i]n deeming a statement puffery at the motion to dismiss stage, courts must exercise great caution." *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014) (citing *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012)). Accordingly, to dismiss claims on the ground that the statements are "puffery," the Court must conclude that the statement is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Id.* (citing *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) (citation omitted). The Court does not reach that conclusion here.

12

activity on the platform including criminals' and others' use of multiple accounts." FAC ¶ 132. Plaintiff contends that Dorsey and Ahuja were in leadership positions and had "access to contemporaneous contradictory information," and "knew the public statements at issue were materially false or acted with severe recklessness in ignoring the substantial risk of misleading investors." *Id*. Plaintiff argues that the scienter is also attributable to Block because of the conduct of senior executives, including Dorsey and Ahuja.

Defendants deny that Dorsey and Ahuja's leadership roles support inferences of fraud. Mot. at 20. The Court disagrees. While correct that as "a general matter, 'corporate management's general awareness of the day-to-day workings of the company's business'" does not on its own establish scienter, "management's role in a company may be relevant and help to satisfy the PSLRA scienter requirement." *S. Ferry LP, No. 2*, 542 F.3d at 784-85. "[S]uch allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information." *Id.* at 785-86. Additionally, "such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd to suggest that management was without knowledge of the matter." *Id.* (citations omitted).

Plaintiff notes that "acquiring new users" was one of the "primary levers for revenue growth," and that "Block measured the expansion of its user base by publicly reporting to investors the number of active Cash App users." FAC ¶¶ 27-28. Plaintiff alleges that, as senior executives, Dorsey and Ahuja "repeatedly received specific findings—via Board-level reports, internal compliance meetings, and employee feedback—highlighting persistent deficiencies in Block's" compliance and sanctions programs. FAC ¶¶ 134-137. Both Dorsey (co-founder, CEO, and Chairman) and Ahuja (CFO and COO) held key roles that regularly engaged with and oversaw reporting and compliance obligations. And, despite their knowledge of the compliance concerns allegedly inflating user metrics, Dorsey and Ahuja "continued to publicly promote inflated user metrics and endorsed or permitted strategic decisions that prioritized business growth over regulatory compliance." *Id*.

<div style="margin-left:auto">United States District Court<br>Northern District of California</div>

These facts, taken together, raise a "strong inference" that Defendants were aware of facts that made their public assurances misleading. Under the alleged circumstances, "it would be 'absurd' to suggest that management was without knowledge of the matter." *South Ferry,* 542 F.3d at 786.

### 3. Loss Causation

The PSLRA requires the plaintiff to prove "that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). "Loss causation" refers to the "causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). "To prove loss causation, plaintiffs need only show a 'causal connection' between the fraud and the loss . . . by tracing the loss back to 'the very facts about which the defendant lied.'" *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (internal citations omitted). Stated another way "[t]o establish loss causation in a fraud-on-the-market case, the plaintiff must show that after purchasing her shares and before selling, the following occurred: (1) 'the truth became known,' and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020). "So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). The requirement "'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' loss causation." *Id.* (quoting *Twombly,* 550 U.S. at 555).

Plaintiff has properly alleged that Defendants made misleading statements that led to inflated stock prices, specifically, that Block's compliance program permitted bad actors to create multiple accounts, which in turn inflated the user account metrics. Plaintiff has also alleged that the fraud became known to the market following the release of the March 23, 2023 Hindenburg Report. *See* FAC ¶¶ 53, 173. Finally, Plaintiff alleges that "[o]n this news, the price of Block Class A common stock fell from $72.65 per share at market close on March 22, 2023, to $61.88 per share at market close on March 23, 2023—a decline of nearly 15%." *Id*. ¶ 173. Taken together, these facts sufficiently allege loss causation.

14

The Court finds that Plaintiff has adequately pled falsity, scienter, and loss causation as required under the Exchange Act. Therefore, Plaintiff has adequately alleged a claim under Section 10(b) and Rule 10b-5. The Court DENIES Defendant's motion to dismiss Plaintiff's first claim.

### B. Violation of Section 20(a) of the Exchange Act

Plaintiff additionally alleges that Dorsey and Ahuja are liable under Section 20(a) of the Exchange Act. To state a prima facie Section 20(a) claim, a plaintiff must plead: (1) "a primary violation of federal securities laws"; and (2) "that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Whether an individual defendant is a "controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Flood v. Miller*, 35 F. App'x 701, 703 (9th Cir. 2002) (citing *Kaplan v. Rose,* 49 F.3d 1363, 1382 (9th Cir. 1994)). The plaintiff need not show the controlling person's *scienter* or that they 'culpably participated' in the alleged wrongdoing." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.,* 96 F.3d 1151, 1161 (9th Cir. 1996). At the motion to dismiss stage, "[c]ourts have found general allegations concerning an individual's title and responsibilities to be sufficient to establish control." *Kyung Cho v. UCBH Holdings, Inc.,* 890 F.Supp.2d 1190, 1205 (N.D. Cal. 2012) (internal citations omitted).

Here, Plaintiff has alleged that Dorsey and Ahuja were officers and/or directors of Block—the Chairman and CEO, and the CFO and COO, respectively. FAC at 1. Plaintiff has further alleged that Dorsey and Ahuja personally made some of the challenged statements. *See, e.g., id.* ¶¶ 78, 143.

These allegations suffice to state a claim for violation of Section 20(a). Accordingly, the Court DENIES Defendant's motion to dismiss Plaintiff's second claim.

/ / /

/ / /

/ / /

15

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is DENIED.  Defendants shall file an answer to the FAC within 21 days.

**IT IS SO ORDERED.**

Dated: January 6, 2026

Noël Wise
United States District Judge