CAZ HASHEMI, State Bar No. 210239
chashemi@wsgr.com
BENJAMIN M. CROSSON, State Bar No. 247560
bcrosson@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300

JESSICA L. SNORGRASS, State Bar No. 259962
jsnorgrass@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1900 Avenue of the Stars, 28th Floor
Los Angeles, CA 90067
Telephone: (424) 446-6900

*Attorneys for Defendants*
*The Trade Desk, Inc., Jeffrey T. Green,*
*Laura Schenkein, and Samantha Jacobson*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| *In re The Trade Desk, Inc. Securities Litigation* | Case No.: 2:25-cv-01396-CAS-DFM |
|  | CLASS ACTION |
|  | **DEFENDANTS' RESPONSE TO LEAD PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
|  | Date: March 16, 2026 |
|  | Time: 10:00 a.m. |
|  | Courtroom: 8D, 8th Floor |
|  | Before: Hon. Christina A. Snyder |

DEFS' RESPONSE TO PLTF'S NOTICE OF
SUPPLEMENTAL AUTHORITY
CASE NO.: 2:25-CV-01396-CAS-DFM

Defendants hereby respond to Plaintiff's Notice of Supplemental Authority in Support of Opposition to Defendants' Motion to Dismiss (Dkt. 85, the "Notice"), which attached the motion to dismiss order issued in *Gonsalves v. Block, Inc.*, No. 5:25-cv-00642 (N.D. Cal. Jan. 6, 2026) ("*Block*"), Dkt. 123.[1] *Block* is readily distinguishable, does not support denial of Defendants' Motion to Dismiss First Amended Consolidated Class Action Complaint (Dkt. 80, "MTD") and, rather, confirms that dismissal is appropriate.

1.     In *Block*, a mobile-based financial platform allegedly falsely and misleadingly touted its substantial growth in its user base and strong compliance infrastructure. *Block* at 8, 10.  Plaintiff alleged the company's user base was materially smaller than publicly represented because its publicly reported numbers were inflated by "duplicate, fraudulent, and illicit accounts," which was enabled by the company's lack of adequate compliance. *Id*. at 3.  Among other things, the company had allegedly discovered that a Russian criminal network opened 8,359 accounts using falsified information, "adding thousands of bogus, prohibited users" to its publicly reported user base, had amassed a backlog of 169,000 unreviewed transaction monitoring alerts, and often permitted the same user whose account was closed due to problematic activity to open new accounts. *Id*. at 3-4.  A third-party report based on interviews with former employees estimated that between 40% and 75% of the company's accounts were "fake, involved in fraud, or tied to a single user opening multiple accounts." *Id*. at 4.  The compliance issues ultimately led to state and federal investigations and "major U.S. sanctions" for compliance deficiencies that the company failed to promptly remedy, "even after they were identified." *Id*.

2.     Plaintiff claims that *Block* is similar to the instant action because the company allegedly "improperly counted users who had multiple accounts as

[1] Defendants' citations herein are to the slip opinion attached as Exhibit A to Plaintiff's filing.

multiple users."  Notice at 1.  As an initial matter, Plaintiff's First Amended Complaint (Dkt. 74, "FAC" or "¶") contains no allegations similar to those in *Block* supporting that any publicly reported numbers were *actually* inflated.  For example, in *Block*, the company was publicly reporting "24 million monthly active customers" despite allegedly knowing that millions of those accounts were fraudulent and duplicative.  *Block* at 10.  In contrast to the detailed allegations in *Block*, Plaintiff's only purported support for alleging that Defendants "improperly counted" Kokai clients rests on allegations from a single former employee (FE6) that The Trade Desk ("TTD") purportedly counted a client as having "adopted" Kokai if the client's "business was available on both" Kokai and another TTD platform.  ¶48.[2]  This is fundamentally different from *Block* where a substantial number of reported users *of the same platform* were allegedly fraudulent and/or knowingly counted multiple times.  And here, even if true, there are no facts suggesting why this was not properly considered in TTD's adoption metrics (nor does FE6 claim insight into TTD's *publicly reported* adoption figures).

3.     In addition to FE6's allegation being uncorroborated, vague, and non-particularized—nor reflective of any misstatement—it is *contradicted* by another former employee (FE7) who allegedly *confirmed* that TTD accurately publicly reported the state of client adoption (*i.e.*, FE7's purported research confirmed that Kokai adoption was "60%" when TTD allegedly publicly represented that it was approximately "50%").  MTD 14, 23 (citing ¶45); Reply, *e.g.*, 1, 7, 9, 15.  Further, Plaintiff admits that TTD also publicly reported the level of *client gross spend* through Kokai—***irrespective of overall client adoption percentage***—(the "bulk" in May 2025, "75%" in August 2025 (¶¶47, 220)), and it does not allege that those publicly reported numbers were false, further undermining any suggestion of impropriety.  MTD 13, 19; Reply 8.

---

[2] *See also* MTD 14; Defendants' Reply in Support of Motion to Dismiss First Amended Consolidated Class Action Complaint (Dkt. 86, "Reply") 8.

DEFS' RESPONSE TO PLTF'S NOTICE OF SUPPLEMENTAL AUTHORITY
CASE NO.: 2:25-CV-01396-CAS-DFM

-2-

4.     Nor is the fact that the court in *Block* found statements to not be puffery instructive or dispositive (Notice at 1), including because the contested statements made specific, concrete representations about the company's compliance and number of monthly users—not merely vague corporate optimism and subjective assessments identified here. *Compare Block* at 8, 10 (*e.g.*, "We have implemented an anti-money laundering ('AML') program designed to prevent our payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity"; company "had approximately 24 million monthly active customers in December 2019, achieving 60% year-over-year growth"), *with, e.g.*, ¶204 ("met the moment with Kokai"; ¶184(b) "we are encouraged about the momentum of our business"). *See* MTD 6-7; Reply 9-10.

5.     The scienter analysis in *Block* is likewise inapposite. With the backdrop of, *inter alia*, major U.S. sanctions for compliance deficiencies, the court held that plaintiff adequately alleged it would be "absurd to suggest" that management was without knowledge of the misleading nature of the company's compliance and user metrics statements. *Block* at 4, 13. Among other things, the individual defendants "repeatedly received specific findings—via Board-level reports, internal compliance meetings, and employee feedback—highlighting persistent deficiencies in Block's compliance and sanctions programs." *Id*. at 13. The individual defendants also "regularly engaged with and oversaw reporting and compliance obligations," and "despite their knowledge of the compliance concerns allegedly inflating user metrics," they "continued to publicly promote inflated user metrics" and "prioritized business growth over compliance." *Id*. Nothing analogous is found here, where Plaintiff has not adequately alleged that severe defects and non-adoption even *existed* (let alone that such allegations—if adequately pled—would render it "absurd" that the Individual Defendants would not be aware that their statements were (allegedly) false or misleading). Reply 17. Nor do the specific allegations in *Block* (*e.g.*, 169,000 unreviewed transaction

DEFS' RESPONSE TO PLTF'S NOTICE OF
SUPPLEMENTAL AUTHORITY
CASE NO.: 2:25-CV-01396-CAS-DFM

-3-

monitoring alerts, prohibited criminal network accounts, major compliance sanctions, etc.) parallel Plaintiff's unsupported and conclusory allegations—particularly where Plaintiff's own former employee confirmed the *accuracy* of TTD's challenged public statements.

6.    Plaintiff's suggestion that the court in *Block* credited former employee accounts with detail similar to that pled here is likewise erroneous.  Notice at 2 n.1. In its scienter analysis, the court cited[3]—unlike here—allegations containing specific, detailed accounts by former employees supporting defendants' actual awareness of compliance problems ***specifically undermining the accuracy of their public statements***, including, *inter alia*, that: compliance materials and specific, named reports addressing entity-specific and global compliance risks were presented to an individual defendant; the individual defendant commissioned an independent third-party compliance review that concluded the company lacked an adequate compliance program; executives rarely took substantive compliance action unless spurred by a "major external event" like Russia's invasion of Ukraine; certain high-profile accounts were exempted from compliance monitoring; and a former employee was directed to disable monitoring alerts on certain high-risk accounts.  *Block* FAC ¶¶135-136.  And while no former employee here allegedly interacted with any Individual Defendant (MTD 2), a former employee in *Block* had "multiple direct interactions" with the individual defendant. *Block* FAC ¶137.[4]

---

[3] *Block* at 13 (citing *inter alia*, paragraphs 134-137 of *Gonsalves v. Block, Inc.*, No. 5:25-cv-00642 (N.D. Cal. June 18, 2025) ("*Block* FAC"), Dkt. 106).

[4] Similarly, the "company-wide" meeting allegations in *Block* bear no resemblance to Plaintiff's allegations.  The plaintiffs in *Block* alleged that anonymous employee questions in those meetings specifically and repeatedly highlighted deficiencies in compliance practices and criticized the chief compliance officer's leadership, which the individual defendants evaded answering. *Id.* ¶137.  In one all-hands meeting, *every single question* was about compliance and concerns with it, including "the absence of a functioning compliance program, the lack of internal controls, and failures in leadership

7.      Finally, the readily distinguishable allegations in *Block* render its holding that loss causation was adequately pled inapposite.  The court noted that it found plaintiff had properly alleged that defendants made misleading statements that inflated the company's stock prices by allowing bad actors to create multiple accounts, which inflated user account metrics, and this became known to the market following the release of a third-party report detailing that 40% to 75% of the company's accounts were fake, involved in fraud or tied to a single user opening multiple accounts—followed by a 15% stock decline on unusually heavy trading volume (thereafter followed by investigations and sanctions).  *Block* at 3-4, 8-10.  No similar allegations are present here to plausibly suggest that TTD's stock price declines were caused by disclosure of material misstatements.  And contrary to Plaintiff's assertion in the Notice, the *Block* decision does not mention a revenue miss, let alone support that a miss, without more, suffices to adequately allege loss causation (Notice at 2), which would be contrary to Ninth Circuit law.  MTD 28-29.

Dated: February 17, 2026

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: /s/ *Caz Hashemi*
CAZ HASHEMI
E-mail: chashemi@wsgr.com

*Attorney for Defendants*
*The Trade Desk, Inc.,*
*Jeffrey T. Green, Laura Schenkein,*
*and Samantha Jacobson*

---

accountability," and the individual defendants' "dismissive" answers "triggered a mass resignation of compliance professionals."  *Id*. ¶137(b).